## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| UNITED UNION OF ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO.8, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | CIVIL ACTION NO.<br><br>CLASS ACTION |
| Plaintiff, | ) ) ) | **COMPLAINT FOR VIOLATION OF** |
| | ) | **THE FEDERAL SECURITIES LAWS** |
| vs. | ) ) | |
| OCWEN FINANCIAL CORPORATION, RONALD M. FARIS, JOHN V. BRITTI and WILLIAM C. ERBEY. | ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) ) | |

Plaintiff United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 ("Plaintiff") brings this securities class action pursuant to §§ 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of all investors who purchased or otherwise acquired the common stock of Ocwen Financial Corporation ("Ocwen" or the "Company"), between May 2, 2013 and August 11, 2014, inclusive (the "Class Period"). The allegations herein are based upon Plaintiff's knowledge with respect to Plaintiff, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents and press releases, Ocwen's public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding Ocwen, securities analysts' reports and advisories about the Company, transcripts of Ocwen investor conference calls, and information posted on Ocwen's website.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This action arises out of Defendants' fraudulent scheme to artificially inflate Ocwen's stock price.   As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.     Ocwen is a financial services holding company which, through its subsidiaries, is engaged in the servicing and origination of forward and reverse mortgage loans in the United States and internationally.   The Company's Servicing segment provides residential and commercial mortgage loan servicing, special servicing, and asset management services to owners of mortgage loans and foreclosed real estate.   This segment's residential servicing portfolio includes conventional, government insured, and non-agency loans, such as subprime loans. Ocwen's Lending segment is involved in originating and purchasing conventional and government insured residential forward, and reverse mortgage loans primarily through its correspondent lending arrangements, as well as offers direct lending services.   The Company entered into several transactions with related companies in connection with its mortgage servicing process.

3.     Plaintiff alleges that Defendants have fraudulently inflated Ocwen's stock price during the Class Period by disseminating materially false and misleading statements, and failing to disclose material information, concerning the Company's true financial condition and business prospects.

4.     Specifically, Defendants made false and/or misleading statements and/or failed to disclose a myriad of material information regarding the Company's improper business and

operational practices including, among other things, the fact that Ocwen's mortgage servicing practices violated applicable regulations and laws; that the Company's executives allowed related company Altisource Portfolio Solutions, S.A. ("Altisource")—a company of which Defendant William C. Erbey, Ocwen's Chairman of the Board, owns approximately 27% of its shares outstanding—to impose wholly unreasonable rates for services provided to Ocwen; and that Defendant William C. Erbey, along with other directors and officers, were directly involved in approving Ocwen's conflicted transactions with Altisource. In addition, the Company's financial results were artificially inflated during the Class Period, resulting in a restatement of the Company's financial results.

5. Accordingly, Defendants issued materially false and misleading statements and omitted material information from Ocwen's public disclosures, which failed to disclose, among other things, that: (i) Altisource was charging exorbitant fees to Ocwen to enable Defendants to funnel as much as $65 million in questionable fees; (ii) despite public representations to the contrary, Defendant Erbey was personally involved in approving conflicted transactions with Altisource and other related entities which he controlled; (iii) the Company failed to comply with applicable laws and regulations, including lending regulations designed to protect homeowners; (iv) the Company's financial statements during the Class Period were artificially inflated and did not provide a fair presentation of the Company's finances and operations; (v) the Company lacked adequate internal and financial controls; and (vi) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

6. On December 19, 2013, the first of several partial disclosures regarding the Company's illicit practices in connection with its mortgage servicing business was published. A *New York Times* article titled "Big Subprime Mortgage Loan Servicer Agrees to $2.2 billion

3

Settlement" announced a $2.2 billion settlement entered into by Ocwen with the Consumer Financial Protection Bureau in connection with the Company's mortgage servicing business. The article stated that the Bureau *"believe[s] that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process[.]"*

7.    On February 26, 2014, an article by *Bloomberg* titled, "Lawsky Cites Ocwen Conflicts as He Reviews Wells Fargo Deal," continued to expose Ocwen's deficient operational practices. The article disclosed that the New York Department of Financial Services ("NY Department of Financial Services") issued a letter to the Company expressing concerns regarding Ocwen's business transactions with related companies and Defendant Erbey's and other officers' and directors' involvement in approving transactions with said affiliated companies.

8.    On August 4, 2014, the NY Department of Financial Services issued a second letter to Ocwen stating that it was reviewing what it called "a troubling transaction" with Altisource relating to the provision of force-placed insurance which is *"designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work."* The article went on to question the *"the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement"* which *"appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."*

9.    The full truth finally emerged on August 12, 2014, when the Company disclosed yet more problems with its business and operations when it announced that certain transactions with *another* related company in which Defendant Erbey holds a substantial stake—Home Loan Servicing Solutions, Ltd. ("HLSS")—would lead to the Company restating its financial results for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014. As a result

of the restatement, the Company announced that it expects to report material weaknesses in its internal controls. As a result of this disclosure, Ocwen's stock price declined an additional $1.18 per share, or 4.48%, on higher than average trading volume.

10.     Overall, in response to these disclosures, the Company's stock price plummeted an aggregate 55%, from a closing of $56.00 on December 18, 2013 to a closing price of $25.16 on August 12, 2014.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and § 27 of the Exchange Act. Venue is proper pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b). Ocwen is incorporated in Florida, has operations in this District, false statements were made in this District, and acts giving rise to the violations complained of occurred in this District.

13.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.     PARTIES

14.     Plaintiff acquired Ocwen common stock at artificially inflated prices during the Class Period as described in the attached certification and was damaged thereby.

15.     Defendant Ocwen, a financial services holding company, is incorporated in Florida and maintains offices at 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409. Defendant Ocwen is traded on the New York Stock Exchange ("NYSE") under the symbol "OCN."

16.     Defendant Ronald M. Faris ("Faris") is the Chief Executive Officer ("CEO") of the Company and has served in that role since October 2010. He has served as a director of Ocwen since May 2003 and as the President of Ocwen since March 2001. Defendant Faris served as Executive Vice President of Ocwen from May 1998 to March 2001, as Senior Vice President from May 1997 to May 1998 and as Vice President and Chief Accounting Officer of Ocwen from June 1995 to May 1997. From March 1991 to July 1994, he served as Controller for a subsidiary of Ocwen.

17.     Defendant John V. Britti ("Britti") has served as the Chief Investment Officer ("CIO") at Ocwen since June 2, 2014. Britti has been the Executive Vice President at Ocwen since March 2012. He previously served as Chief Financial Officer ("CFO") from March 5, 2012 until June 2014. He has been with Ocwen since January 2011.

18.     Defendant William C. Erbey ("Erbey") has served as the Executive Chairman of the Board of Directors of Ocwen since September 1996, as the Chief Executive Officer of Ocwen from January 1988 to October 2010 and as the President of Ocwen from January 1988 to May 1998. Erbey has also served as Chairman of the Board of Directors for Altisource since July 2009. He is also the founder of HLSS and has served as its Chairman since December 2010. He has also served as Chairman of the Board of Directors of Altisource Residential Corporation since July 2012 and as Chairman of the Board of Directors of Altisource Asset Management Corporation since March 2012.

19.     Defendants Faris, Britti, and Erbey (collectively, the "Individual Defendants") possessed the power and authority to control the contents of Ocwen's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

20.     Ocwen is a financial services holding company which, through its subsidiaries, is engaged in the servicing and origination of forward and reverse mortgage loans. Ocwen is headquartered in Atlanta, Georgia with offices throughout the United States and in the United States Virgin Islands with support operations in India, the Philippines and Uruguay.

21.     The Company states that it works with customers in a variety of ways to make their loans worth more, including purchasing of mortgage servicing rights, sub-servicing, special servicing and stand-by servicing. Ocwen enters into several transactions with related companies in connection with its mortgage servicing process, among those companies is Altisource.

22.     In the Company's Form 10-K filed with the SEC on February 29, 2012, Ocwen provided the following assurances regarding the fairness of rates charged by related company Altisource for services provided to Ocwen:

> For purposes of governing certain of the ongoing relationships between Ocwen and Altisource after the Separation, and to provide for an orderly transition to the status of two independent companies, we entered into certain agreements with Altisource. Under these agreements, Altisource and Ocwen provide to each other services in such areas as human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, law, strategic planning, compliance and other areas where we, and Altisource, may need transition assistance and support following the Separation. Altisource also provides certain technology products and support services to us, including the REALSuite™ of applications that support our Servicing business. In addition, in the third quarter of 2011, Ocwen and Altisource entered into a Data Access and Services Agreement under which Ocwen agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee.
>
> Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.
>
> Our business is currently dependent on many of the services and products provided under these long-term contracts which are effective for up to eight years with renewal rights. *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

23.     Throughout the Class Period, in regular press releases, conference calls and filings with the SEC, Ocwen and the Individual Defendants repeatedly made false and misleading statements and omissions concerning the Company's mortgage servicing process, including the Company's compliance with laws and regulations, the fairness of rates charged by Altisource for services provided to Ocwen, along with false statements and omissions regarding

8

Defendant Erbey's involvement in approving conflicted transactions with Altisource. In addition, the Company also issued false and misleading financial statements. These false and misleading statements created a false impression concerning Ocwen's financial and operational status and future growth prospects.

24. The Class Period begins on May 2, 2013, when Ocwen issued a press release announcing financial results for the first quarter of 2013. The press release stated in pertinent part as follows:

> ATLANTA, May 2, 2013 (GLOBE NEWSWIRE) -- Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $45.1 million, or $0.31 per share, for the first quarter of 2013 compared to Net income of $19.3 million, or $0.14 per share, for the first quarter of 2012. Ocwen produced record revenue of $406.7 million, up 147% from the first quarter of 2012. Income from operations grew by 108% to $163.1 million for the first quarter of 2013 as compared to $78.4 million for the first quarter of 2012.
>
> Ocwen's normalized pre-tax earnings were $101.4 million, a 90% increase over normalized pre-tax earnings in the first quarter of 2012 and a 22% increase over the fourth quarter of 2012. The adjustments in the first quarter of 2013 included: $38.2 million of transition expenses; the write-off of $17.0 million of unamortized deferred costs and discount associated with the early termination and replacement of a senior secured term loan facility; and $5.1 million of contribution from sold operations. Ocwen generated Cash flow from operations of $401.9 million. After reducing this amount for the repayment of related match funded debt, the Company generated adjusted cash flow from operations of $265.8 million.
>
> * * *
>
> "The Company's string of record quarterly revenues will continue into the second quarter as we benefit from a full quarter of ResCap revenue and our recent acquisition of Ally Bank's mortgage servicing rights," commented Bill Erbey, Ocwen's Chairman. "Ocwen's core earnings and cash-flow were strong in the first quarter, and we should see these trend higher as a percentage of revenue as we drive down costs and delinquencies on newly acquired business. Ocwen's lower funding costs and improving pre-pay speeds on non-prime loans should also support better performance versus our original expectations."
>
> Mr. Erbey continued, "As a leader in the industry, Ocwen has a long and successful history of adding business in an accretive and disciplined manner. Ocwen remains very well-positioned with the lowest cost to service for non-

performing loans in our industry and superior ability to bring down delinquencies. The Company has a substantial pipeline, which has grown to $375 billion. With one of the strongest balance sheets in the industry, Ocwen is well positioned to produce strong earnings, expand margins and increase cash-flow."

25.     On May 8, 2013, the Company filed its quarterly report for the period ended March 31, 2013 on Form 10-Q with the SEC that was signed by Defendant Britti. In addition to repeating the Company's false and misleading financial results from the May 2, 2013 press release, the Form 10-Q stated the following:

*Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC.* As of March 31, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 26% of the common stock of Altisource, approximately 2% of the common stock of HLSS, approximately 24% of the common stock of Residential and approximately 24% of the common stock of AAMC.

\*\*\*

*We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

26.     The Form 10-Q also contained signed certifications pursuant to SOX by Defendants Faris and Britti that falsely stated that Ocwen's Form 10-Q did not "*contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.*"

27.     On August 1, 2013 the Company issued a press release reporting its false and misleading financial and operating results for the quarter ending June 30, 2013. The press release also failed to disclose that the rates charged by Altisource were not fair market value and

10

failed to disclose the involvement of Defendant Erbey, along with other directors and officers, in approving conflicted transactions. The press release stated in part as follows:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $76.7 million, or $0.53 per share, for the second quarter of 2013 compared to Net income of $44.8 million, or $0.32 per share, for the second quarter of 2012. Ocwen produced record revenue of $530.0 million, up 151% from the second quarter of 2012. Income from operations grew by 24% to $155.2 million for the second quarter of 2013 as compared to $125.5 million for the second quarter of 2012. Ocwen's Net cash provided by operating activity was $475.1 million.
>
> Net income for the six months ended June 30, 2013 is $121.9 million, or $0.84 per share, as compared to $64.2 million, or $0.47 per share, for the same period in 2012. Revenue in the first half of 2013 increased 149% from the first half of 2012 to a total of $934.8 million.
>
> Ocwen's normalized pre-tax earnings for the second quarter of 2013 were $165.9 million, a 130% increase over normalized pre-tax earnings in the second quarter of 2012 and a 64% increase over the first quarter of 2013. Pre-tax earnings on a GAAP basis for the second quarter of 2013 were $87.5 million, a 71% increase over the first quarter of 2013. The largest normalizing item is a net addition to reserves of $52.8 million for an expected contribution to a consumer relief fund pursuant to a possible settlement with state and federal agencies. In addition, Ocwen incurred $26.5 million in transition expenses related to the recent Homeward, ResCap and Ally transactions. Lastly, the normalization reverses $0.9 million of income contribution from sold operations.
>
> "We are pleased with Ocwen's strong core earnings and cash flow which should continue to grow with the boarding of our new acquisitions," commented Bill Erbey, Ocwen's Chairman. "Ocwen's recently announced acquisition of OneWest Bank's $78 billion servicing portfolio combined with other large bank transfers points toward continued growth as banks strategically reposition their mortgage servicing operations. Our current pipeline of potential new business opportunities on a probability-weighted basis exceeds $400 billion in unpaid principal balance (UPB). Moreover, regulatory and market trends, including greater prospects for GSE legislation and more private capital flowing into mortgage credit, provide excellent long-term prospects for Ocwen. We continue to build capacity in anticipation of further acquisitions to meet our obligations to our clients, borrowers, RMBS investors and shareholders."
>
> Mr. Erbey continued, "We believe that higher interest rates will have little negative impact on earnings, as we have only a modest component of income related to originations, and assets and debt are match funded. Higher employment and an improving housing market, on the other hand, should boost Ocwen's

earnings. The majority of Ocwen's earnings come from our non-prime portfolio which produces higher earnings as employment and home price improvement result in lower delinquencies."

28.     On August 6, 2013 the Company filed its quarterly report for the period ended June 30, 2013 on Form 10-Q with the SEC that was signed by Defendant Britti. In addition to repeating the Company's false and misleading financial results from the August 1, 2013 press release, the Form 10-Q stated the following:

*Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC.* As of June 30, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 23% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 9% of the common stock of Residential and approximately 25% of the common stock of AAMC.

\*\*\*

*We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

29.     Defendants Faris and Britti also made substantially the same false statements in the signed certifications pursuant to SOX contained in the Form 10-Q for the first quarter of 2013.

30.     On October 31, 2013 the Company issued a press release reporting its false and misleading financial and operating results for the quarter ending September 30, 2013. The press release also failed to disclose that the rates charged by Altisource were not fair market value and failed to disclose the involvement of Defendant Erbey, along with other directors and officers, in approving conflicted transactions. The press release stated in part as follows:

Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $67.0 million, or $0.44 per share, for the third quarter of 2013 compared to Net income of $51.4 million, or $0.37 per share, for the third quarter of 2012. Ocwen generated revenue of $531.2 million, up 128% from the third quarter of 2012. Income from operations grew by 32% to $185.0 million for the third quarter of 2013 as compared to $140.0 million for the third quarter of 2012.

Net income for the nine months ended September 30, 2013 is $188.9 million, or $1.27 per share, as compared to $115.6 million, or $0.84 per share, for the same period in 2012. Revenue in the first nine months of 2013 increased 144% from the first nine months of 2012 to a total of $1.48 billion.

Pre-tax earnings on a GAAP basis for the third quarter of 2013 were $76.3 million, a 6% decline as compared to the third quarter of 2012. Ocwen's normalized pre-tax earnings for the third quarter of 2013 were $147.0 million, an 82% increase from the third quarter of 2012. Ocwen incurred a total of $70.7 million in normalized expenses in the third quarter of 2013. There were no normalizing items in the third quarter of 2012.

"Ocwen's revenue growth and cash-flow remain very strong with revenue from our existing portfolio trending ahead of projections," commented Bill Erbey, Ocwen's Chairman. "Notwithstanding our record revenues, revenues were suppressed due to delays, that have now been resolved, in boarding the OneWest transaction. As expected, margins were below historical levels due to the timing involved in transitioning ResCap and OneWest. We have been quite cautious in our servicing transfers making certain that we have sufficient resources to support the transition of these portfolios. In the case of OneWest, we were fully-staffed well in advance of boarding the loans. We feel very comfortable that once we have completed the ResCap transition to the Ocwen technology platform, we will return to our historical margins. Prepayment rates fell substantially in the quarter, which bodes well for future revenues. The Company's current pipeline of potential new business opportunities remains at about $400 billion in unpaid principal balance (UPB). We anticipate that at least $100 billion in UPB will be awarded by sellers before the end of the year."

31.    On November 5, 2013 the Company filed its quarterly report for the period ended September 30, 2013 on Form 10-Q with the SEC that was signed by Defendant Britti.   In addition to repeating the Company's false and misleading financial results from the October 31, 2013 press release, the Form 10-Q stated the following:

*Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential*

*Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC.* As of September 30, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 23% of the common stock of Altisource, approximately 1% of the common stock of HLSS and approximately 9% of the common stock of AAMC. Mr. Erbey's percentage interest in Residential declined to 4% as a result of an additional public offering by Residential that closed on October 1, 2013.

\*\*\*

*We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

32.     Defendants Faris and Britti also made substantially the same false statements in the signed certifications pursuant to SOX contained in the Form 10-Q for the first quarter of 2013.

33.     The statements set forth above were materially false and misleading and/or omitted material facts regarding the Company's business, operations, financial results and mortgage servicing practices, including that: (i) Altisource was charging exorbitant fees to Ocwen to enable Defendants to funnel as much as $65 million in questionable fees; (ii) Defendant Erbey's personal involvement in approving conflicted transactions with Altisource and other related entities; (iii) the Company's failure to comply with applicable laws and regulations, including lending regulations designed to protect homeowners; (iv) that the Company's financial statements during the Class Period were artificially inflated and did not provide a fair presentation of the Company's finances and operations; (v) that the Company lacked adequate internal and financial controls; and (vi) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times. As such, Defendants' statements discussed above during the Class Period lacked in any reasonable basis when made.

## VI.    <u>THE TRUTH SLOWLY EMERGES</u>

34.     On December 19, 2013 only the tip of the iceberg with regard to the Company's

illicit activities was revealed. Indeed, a *New York* Times article titled "Big Subprime Mortgage

Loan Servicer Agrees to $2.2 billion Settlement" stated:

> A $2.2 billion agreement is settling accusations against a large but little known player in the mortgage industry that escaped last year's sweeping mortgage settlement.
>
> **The Ocwen Financial Corporation**, which has ridden its specialty in servicing subprime loans to become the fourth-largest mortgage servicer in the country, *was accused of improperly handling the loans of homeowners after the financial crisis.* The agreement with the Consumer Financial Protection Bureau and 49 states covers similar ground to a $25 billion settlement made last year with the largest banks.
>
> Ocwen was not included in the larger settlement because its nonbank status allowed it to slip through the cracks of the different regulatory agencies. The company, which is publicly traded, now falls under the oversight of the bureau, which began in 2011.
>
> Ocwen has prided itself as a specialist at the tricky work of servicing mortgages, something the banks have struggled to do well. *But the agreement announced Thursday, which still requires court approval, made it clear that Ocwen has had many of the same problems as those banks.*
>
>                                 \*\*\*
>
> *"We believe that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process,"* Richard Cordray, the director of the bureau, said in a conference call on Thursday.
>
> *The settlement covers several types of activities from 2009 to 2012 by Ocwen and two other companies it recently acquired, Litton Loan Servicing, which used to be owned by Goldman Sachs, and Homeward Residential Holdings.*
>
> The companies are accused of charging borrowers unauthorized fees, deceiving consumers about foreclosure alternatives and providing false or misleading information about the status of foreclosure proceedings. Mr. Cordray said that because of these violations, *"Ocwen made troubled borrowers even more vulnerable to foreclosure."*
>
> Ocwen did not have to admit wrongdoing as part of the settlement. The company

said in a statement that the agreement "is in alignment with the same ultimate goals that we share with the regulators -- to prevent foreclosures and help struggling families keep their homes."

\*\*\*

Ms. [Lisa] Sitkin, [a lawyer at Housing and Economic Rights Advocates] said that when something goes awry for a customer, *Ocwen's stripped-down operation, which helps its profits, can make the company difficult to communicate with.*

"There's a certain automated quality to all the interactions with them -- it doesn't feel as if someone is watching," Ms. Sitkin said. "When anything goes wrong, which it does, it's extremely difficult to unravel it."

\*\*\*

The bulk of the money in the settlement, $2 billion, will go to principal reductions for people whose loans are serviced by Ocwen. The biggest banks agreed to do something similar last year, and it has proved to be controversial, with many complaints from homeowners who said that the banks had too much control over the process.

An additional $125 million will be divided among people whose homes were foreclosed on by Ocwen. The Florida attorney general, Pam Bondi, estimated that most homeowners would receive about $1,200.

35.    On January 22, 2014, Ocwen issued a press release announcing that it had entered into an agreement with Wells Fargo Bank, N.A. for the purchase of residential mortgage servicing rights on a portfolio consisting of approximately 184,000 loans with a total principal balance of $39 billion.

36.    The Company announced in a February 6, 2014 press release, that the Wells Fargo transaction was halted by the NY Department of Financial Services only two weeks after its announcement.  The press release stated as follows:

*[A]t the request of the New York Department of Financial Services ("NY DFS"), its mortgage servicing arm has agreed to put an indefinite hold on its previously announced purchase from Wells Fargo Bank, N.A. of mortgage servicing rights on a portfolio consisting of approximately 184,000 loans with a total principal balance of $39 billion.*

*Ocwen will continue to work closely with the NY DFS to resolve its concerns about Ocwen's servicing portfolio growth.*

37.     As a result of the NY Department of Financial Services' review of the Company's transaction with Wells Fargo, a little more regarding the Company's practices was brought to light.  Indeed, the NY Department of Financial Services issued the first of its letters expressing concerns regarding the Company's business transactions with related companies and Mr. Erbey's and other officers' and directors' involvement in approving transactions with affiliated companies (i.e. Altisource).  As noted in a *Bloomberg* article dated February 26, 2014 titled, "Lawsky Cites Ocwen Conflicts as He Reviews Wells Fargo Deal":

> New York's top bank regulator asked Ocwen Financial Corp. for information about potential conflicts of interest between the firm and its vendors as it seeks to buy $39 billion of home loans from Wells Fargo & Co. Ocwen shares tumbled 7 percent.
>
> Ocwen Chairman William Erbey is the largest shareholder in companies that provide mortgage-management services to Ocwen, Benjamin Lawsky, superintendent of New York's Department of Financial Services, said today in a letter to the Atlanta-based firm.
>
> ***Erbey's stakes in Ocwen affiliates "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," Lawsky said in the letter.***
>
> Wells Fargo's planned sale of mortgage-servicing rights to Ocwen was halted by Lawsky, who's concerned that the company will struggle to properly administer the loans, a person briefed on the matter said earlier this month. Ocwen agreed to "put an indefinite hold" on the deal with San Francisco-based Wells Fargo, the biggest U.S. home lender.
>
> Ocwen dropped to $36.76 in New York, the worst performer in the 228-company Russell 1000 Financial Services Index. The stock is down 34 percent this year.
>
> Stock Options
>
> ***"Ocwen's management owns stock or stock options in the affiliated companies," Lawsky said in the letter. "This raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."***

Lawsky's review of Ocwen's operations also revealed that the company's chief risk officer served in the same role for Altisource Portfolio Solutions, one of Ocwen's vendors, and "reported directly to Mr. Erbey in both capacities," the regulator wrote. The officer was removed as a result of the review.

Lawsky asked that Ocwen provide detailed information about the financial interests of Ocwen officers, directors and employees in several affiliated companies, and documentation showing the nature and extent of business relationships between Ocwen and those firms.

38.    Despite this partial disclosure of Defendants' fraud, the Company's common stock remained inflated due to Defendants' continued false and misleading statements and omissions.

39.    For instance, the Company continued to make false and misleading statements and omissions regarding the Company's mortgage servicing practices, including the fairness of rates charged by Altisource for services provided to Ocwen and the personal involvement of several Company insiders, including Defendant Erbey, in approving conflicted transactions with Altisource.    Indeed, on February 27, 2014, the Company issued a press release reporting additional false and misleading financial and operating results for the quarter and fiscal year ending December 31, 2013.  The press release stated in part as follows:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $105.3 million, or $0.74 per share, for the fourth quarter of 2013 compared to Net income of $65.3 million, or $0.47 per share, for the fourth quarter of 2012.  Ocwen generated revenue of $556.0 million, up 135% from the fourth quarter of 2012. Income from operations grew by 56% to $215.1 million for the fourth quarter of 2013 as compared to $137.5 million for the fourth quarter of 2012.

> Full year Net income for 2013 is $294.1 million, or $2.02 per share, as compared to $180.9 million, or $1.31 per share, for 2012. Revenue for 2013 of $2.0 billion is a 141% increase from 2012.

> Pre-tax earnings on a GAAP basis for the fourth quarter of 2013 were $120.1 million, a 57% increase as compared to the fourth quarter of 2012. Ocwen's normalized pre-tax earnings for the fourth quarter of 2013 were $166.9 million, a 100% increase from the fourth quarter of 2012.  Ocwen incurred a total of $46.8

million in normalized expenses in the fourth quarter of 2013 that are primarily transition-related expenses associated with 2013 transactions.

Full year pre-tax earnings on a GAAP basis for 2013 were $335.2 million, a 30% increase over 2012. Full year normalized pre-tax earnings for 2013 increased by 101% over 2012 from $289.4 million to $581.2 million.

"Our solid financial performance enabled us to initiate a stock repurchase program in the fourth quarter while maintaining the strongest capital ratios among our peers," commented Bill Erbey, Ocwen's Chairman. *"We are working cooperatively with the New York Department of Financial Services to address its concerns that led to an indefinite hold on our transaction with Wells Fargo.* Longer-term we believe developments remain positive for our business, particularly in three areas. First, prepayments continue to trend lower, lengthening the duration of our assets. Secondly, Ocwen's continued ability to help homeowners with foreclosure alternatives along with an improving economy continues to drive down delinquencies on loans we service and further slows prepayments. Lastly, the OASIS financing that we just closed should enhance our prime origination business. Oasis enables us to reduce our exposure to prepayment risk and lower our cost of capital disadvantage vis-à-vis commercial banks."

40.     On March 3, 2014, the Company filed its false and misleading annual report for the year ended December 31, 2013 on Form 10-K with the SEC that was signed by, among others, Defendants Faris, Britti, and Erbey.  In addition to repeating the Company's false and misleading financial results from the February 27, 2014 press release, the Form 10-K stated as follows:

> *We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource*, HLSS, *AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities. We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors),* and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.
>
> ***
>
> *We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

41.     In addition, Defendants Faris and Britti made additional false statements in the signed certifications pursuant to SOX contained in the Form 10-K.

42.     On May 1, 2014, the Company issued a press release reporting its false and misleading financial and operating results for the quarter ending March 31, 2014. The press release also failed to disclose that the rates charged by Altisource were not fair market value and failed to disclose the involvement of Defendant Erbey, along with other directors and officers, in approving conflicted transactions. The press release stated in part as follows:

> Ocwen Financial Corporation, (NYSE:OCN), a leading financial services holding company, today reported Net income of $75.8 million, or $0.54 per share, for the first quarter of 2014 compared to Net income of $45.1 million, or $0.31 per share, for the first quarter of 2013. Ocwen generated revenue of $551.3 million, up 36% from the first quarter of 2013. Income from operations grew by 24% to $202.1 million for the first quarter of 2014 as compared to $163.6 million for the first quarter of 2013.

> Pre-tax earnings on a GAAP basis for the first quarter of 2014 were $89.0 million, a 73% increase as compared to the first quarter of 2013. Ocwen's normalized pre-tax earnings for the first quarter of 2014 were $114.0 million, a 12% increase from the first quarter of 2013. Ocwen incurred a total of $25.0 million in normalized expenses in the first quarter of 2014 that were primarily transition-related expenses.

> The following items, not included in normalization, representing a change of $59.4 million should be taken into account when comparing earnings for the fourth quarter of 2013 and the first quarter of 2014.

> - There was a $5.1 million loss on the $7.6 billion portion of the mortgage servicing rights ("MSR") portfolio marked at fair value as compared to a fourth quarter 2013 gain of $19.1 million. There was also an MSR impairment reversal of $2.4 million for the fourth quarter. Combined, these changes produced a $26.6 million change quarter-over-quarter.
> - Reserves for uncollectible servicing receivables increased by $24.3 million versus an increase of $5.7 million in the fourth quarter of 2013.
> - The lending segment generated earnings of $0.6 million compared to $14.8 million in the fourth quarter of 2013. The reverse mortgage business posted a $6.3 million loss versus a $0.3 million loss in the prior quarter. Forward lending profit fell from $15.1 million to $6.9 million.

"Going forward, we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business. We consider our solid balance sheet, National Mortgage Settlement compliance and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages. Ocwen is the only non-bank servicer to be subject to its own National Mortgage Settlement that applies across the entire servicing portfolio, and we maintain the strongest capital ratios among large non-bank servicers. In fact, we hold more capital relative to mortgage servicing rights than most banks," commented Bill Erbey, Ocwen's Chairman. "However, increased compliance and operational risk management does not come without a cost, as you can see from our first quarter normalized earnings."

\*\*\*

*"Ocwen continues to work cooperatively with the New York Department of Financial Services to address their concerns that led to an indefinite hold on our Wells Fargo transaction," said Ron Faris, President and CEO. "We believe that increased regulatory scrutiny will, over time, benefit the industry and Ocwen by building greater confidence in the system and rewarding those with efficient and effective servicing processes.* Nevertheless, new requirements and the associated investments have raised costs for the industry, including Ocwen. This places an increased premium on operational scale and proficiency in operations, two areas of competitive strength for Ocwen."

43.     On May 2, 2014 the Company filed its quarterly report for the period ended March 31, 2014 on Form 10-Q with the SEC that was signed by Defendant Britti. In addition to repeating the Company's false and misleading financial results from the May 1, 2014 press release, the Form 10-Q stated the following:

*Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource,* HLSS, *Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC.* As of March 31, 2014, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 27% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 25% of the common stock of AAMC and approximately 4% of the common stock of Residential. At March 31, 2014, Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable. On April 22, 2014, Mr. Erbey surrendered 1,000,000 of his options to purchase Ocwen common stock. At March 31, 2014, Mr. Erbey held 873,501 options to purchase Altisource common stock and 87,350 options to purchase AAMC common stock, all of which were exercisable.

\*\*\*

*We believe the rates charged under these agreements [with Altisource] are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

44.     Defendants Faris and Britti also made substantially the same false statements in the signed certifications pursuant to SOX contained in the Form 10-Q as those made in the Form 10-Q for the first quarter of 2013.

45.     On August 4, 2014, the NY Department of Financial Services issued its second letter[1] to Ocwen.    The letter expressed concern regarding the Company's "troubling" arrangement with related company Altisource in connection with the provision of force-placed insurance to customers.   The letter also questioned the role of Defendant Erbey in approving the arrangement, given the Company's public statements wherein it represented that Defendant Erbey recused himself from such involvement.   The NY Department of Financial Services' letter stated in pertinent part as follows:

> *As part of the Department's ongoing examination of Ocwen's mortgage servicing practices, we are reviewing a troubling transaction involving Ocwen's related company, Altisource Portfolio Solutions, S.A. ("Altisource"), and the provision of force-placed insurance. Indeed, this complex arrangement appears designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work. Additionally, the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings.*

\*\*\*

> As you know, the Department has previously expressed concerns about Ocwen's use of related companies to provide fee-based services such as property inspections, online auction sites, foreclosure sales, real estate brokers, debt collection, and many others. *Because mortgage servicing presents the extraordinary circumstance where there is effectively no customer to select a*

---

[1] The NY Department of Financial Services' August 4, 2014 letter can be found at: http://www.dfs.ny.gov/about/press2014/pr140804-ocwen-letter.pdf

*vendor for ancillary services, Ocwen's use of related companies to provide such services raises concerns about whether such transactions are priced fairly and conducted at arms-length.*

The Department now seeks additional information about Ocwen's provision of force-placed insurance through related companies. As you are aware, the Department's recent investigation into force-placed insurance revealed that mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies, in violation of New York Insurance Law section 2324's anti-inducement provisions. The Department discovered that servicers' own insurance agencies had an incentive to purchase force-placed insurance with high premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates. The extra expense of higher premiums, in turn, can push already struggling families over the foreclosure cliff. In light of this investigation, the Department last year imposed further prohibitions on these kickbacks to servicers or their affiliates.

However, as part of our broader review of ancillary services provided by non-bank mortgage servicers, we are concerned that certain non-bank mortgage servicers are seeking to side-step those borrower protections through complex arrangements with subsidiaries and affiliated companies. Indeed, in recent weeks, we halted one such arrangement at another non-bank mortgage servicing company.

### Agreements with SWBC and Altisource

*Based on its investigation and through the Monitor's work, the Department understands that Ocwen's force-placed arrangement with Altisource features the use of an unaffiliated insurance agent, Southwest Business Corporation ("SWBC"), apparently as a pass-through so that Ocwen and Altisource are not directly contracting with each other, but Altisource can still receive insurance commissions and certain fees seemingly for doing very little work.*

These are the facts established by documents Ocwen provided to the Monitor: In August 2013, Ocwen appointed an Altisource subsidiary called Beltline Road Insurance Agency, Inc. ("Beltline") as its exclusive insurance representative, purportedly to negotiate and place a new force-placed insurance program for Ocwen. Ocwen's existing force-placed arrangement with the insurer Assurant was set to expire in March 2014, and Beltline's stated task was to find an alternative arrangement. In January 2014, Altisource provided a memo to the Credit Committee of Ocwen Mortgage Servicing, Inc., recommending, among other things, replacing Assurant with SWBC as Ocwen's managing general agent. SWBC would then be charged with managing Ocwen's force-placed insurance program, including negotiating premiums with insurers. As part of this

arrangement, Altisource recommended itself to provide fee-based services to SWBC.

In emails dated January 15 and 16, 2014, the transaction was approved by the three members of the Credit Committee: William Erbey, Duo Zhang, and Richard Cooperstein. The Credit Committee did not meet to discuss this proposal, no minutes were taken of the Credit Committee's consideration of this proposed transaction, and the proposed transaction apparently was not presented for review or approval to any member of the Ocwen Board of Directors except Mr. Erbey, as Mr. Zhang and Mr. Cooperstein are not members of the Ocwen Board of Directors.

*Just one month after this Credit Committee approval, on February 26, 2014, the company received the Department's letter raising concerns about potential conflicts of interest between Ocwen and its related public companies. In that letter, we identified facts that "cast serious doubts on recent public statements made by the company that Ocwen has a 'strictly arms-length business relationship' with those companies," and we specifically referenced the multiple roles played by Mr. Erbey as an area of concern.*

*Disregarding the concerns raised in our letter, Ocwen proceeded to execute contracts formalizing this new force-placed arrangement, apparently without further consideration by any Board member other than Mr. Erbey. Those contracts, dated as of June 1, 2014, indicate that Altisource will generate significant revenue from Ocwen's new force-placed arrangement while apparently doing very little work. Indeed, a careful review of these and other documents suggests that Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself.*

*First, Altisource will reap enormous insurance commissions for having recommended that Ocwen hire SWBC. Under the contracts, Ocwen promises to give its force-placed insurance business to SWBC. SWBC does the work of negotiating premiums, preparing policies, and handling renewals and cancellations. For these services, SWBC receives commissions from insurers. SWBC then passes on a portion of those commissions, constituting 15% of net written premium on the policies, to Altisource subsidiary Beltline, for "insurance placement services." Documents indicate that Ocwen expects to force-place policies on its borrowers in excess of $400 million net written premium per year; a 15% commission on $400 million would be $60 million per year. It is unclear what insurance placement services, if any, Altisource is providing to justify these commissions.*

*Second, Altisource will be paid a substantial annual fee for providing technology support that it appears to be already obligated to provide.* This fee relates to monitoring services, whereby Ocwen pays a company to monitor

24

whether its borrowers' insurance remains in effect. Such monitoring is necessary to establish which borrowers have lapsed on their payments and need to have insurance force-placed upon them. *Prior to 2014, Ocwen was paying ten cents per loan per month to Assurant for monitoring. In this new arrangement, however, Ocwen agrees to pay double the prior amount – twenty cents per loan per month now paid to SWBC, for each of the approximately 2.8 million borrowers serviced by Ocwen. SWBC, in turn, agrees to pass on fifteen out of that twenty cents to Altisource, or an estimated $5 million per year. Altisource provides only one service in exchange for this fee: granting SWBC access to Ocwen's loan files.* Altisource, of course, only has access to Ocwen's loan files through its own separate services agreements with Ocwen, which appear to contractually obligate Altisource to provide this access to business users designated by Ocwen to receive such access.

Third, the contracts require SWBC to use Altisource to provide loss draft management services for Ocwen borrowers; to pay Altisource $75 per loss draft for these services; and to pay Altisource an additional $10,000 per month for certain other services.

***

## Ocwen's Public Statements Concerning Transactions with Related Companies

*In addition to the issues raised above, the Department has serious concerns about the apparently conflicted role played by Ocwen Executive Chairman William Erbey and potentially other Ocwen officers and directors in directing profits to Altisource,* which is "related" to Ocwen but is formally a separate, publicly-traded company. As you know, Mr. Erbey is Ocwen's largest shareholder and is also the Chairman of and largest shareholder in Altisource. In fact, Mr. Erbey's stake in Altisource is nearly double his stake in Ocwen: 29 percent versus 15 percent. *Thus, for every dollar Ocwen makes, Mr. Erbey's share is 15 cents, but for every dollar Altisource makes, his share is 29 cents.*

*The Department and its Monitor have uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies. Mr. Erbey's approval of this force-placed insurance arrangement as described above appears to be a gross violation of this supposed recusal policy.*

***

*Finally, Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, but Ocwen has not been able to provide the Monitor with any analysis to support this assertion.* (emphasis added)

46.     An August 6, 2014 article by *The Palm Beach Post* titled, "N.Y. probe of Ocwen widened; Focus centers on $65 million in fees to a spinoff company" additionally highlighted Ocwen's illicit scheme citing to the NY Department of Financial Services August 4, 2014 letter. The article states as follows:

> New York's Department of Financial Services deepened its investigation this week of West Palm Beach-based Ocwen Financial Corp. with a letter questioning an arrangement that ***"appears designed to funnel as much as $65 million in fees annually from already distressed homeowners"*** *to a spinoff company doing minimal work.*
>
> In the Monday letter to Ocwen General Counsel Timothy Hayes, New York Superintendent of Financial Services Benjamin Lawsky asks for more information regarding the mortgage servicing firm's involvement with "related company" Altisource Portfolio Solutions regarding forced-placed insurance.
>
> Forced-placed insurance, which can cost five to 10 times more than what a homeowner can get independently, has been charged to borrowers whose policies lapse as they fall behind on mortgage payments.
>
> Banks, including HSBC, JPMorgan Chase and Wells Fargo, have paid hundreds of millions of dollars to settle complaints that they took kickbacks or otherwise colluded with forced-placed insurance companies to collect commissions on policies.
>
> In a statement, Ocwen said it will "continue to cooperate with the New York Department of Financial Services and provide the information requested, as we have done with all previous requests from the department."
>
> Lawsky said in his letter that New York has taken steps to minimize abuses of forced-placed insurance but is concerned that non- bank mortgage servicers may be side-stepping borrower safeguards through arrangements with subsidiaries and related companies.
>
> *According to Lawsky,   Ocwen and Altisource are using an unaffiliated insurance agent, Southwest Business Corp. , "apparently" as a pass-through so that the two companies are not directly contracting with each other and Altisource can still receive insurance commissions and certain fees seemingly for doing "very little work."*
>
> Lawsky's letter also calls out Ocwen Executive Chairman William C. Erbey's role in the arrangement. Erbey*, according to the letter, may have engaged in*

*"gross violation" of claims made publicly by Ocwen that Erbey recuses himself from decisions concerning related companies.*

Erbey is Ocwen's largest shareholder, and is also the chairman of and largest shareholder in Altisource, according to Lawsky.

47.     The full extent of Ocwen's fraud was revealed when the Company disclosed additional problems with its business and operations on August 12, 2014, when it announced that it would be restating financial results for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014 as a result of certain transactions with *yet another* related company in which Defendant Erbey holds a substantial stake—HLSS.  The Company further announced that it expects to report material weaknesses in its internal controls as a result thereof. The Form 8-K announcing the restatement states in pertinent part as follows:

> On August 12, 2014, the Board of Directors and the Audit Committee of the Board of Directors ("Audit Committee") of Ocwen Financial Corporation (the "Company"), after consultation with Deloitte & Touche LLP ("Deloitte & Touche"), the Company's independent registered public accounting firm, determined that the Company's financial statements for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014 can no longer be relied upon as being in compliance with generally accepted accounting principles ("GAAP"). Accordingly, the Company will restate such financial statements. Similarly, related press releases, Deloitte & Touche's reports on the financial statements, including the effectiveness of internal control over financial reporting, and shareholder communications describing the Company's financial statements for these periods should no longer be relied upon. The decisions of the Board of Directors and Audit Committee to restate these financial statements follows a recommendation by management.
>
> ***
>
> The changes we are contemplating principally relate to the valuation methodology of our Financing Liability – MSRs Pledged *in connection with certain rights to receive servicing fees, excluding ancillary income, with respect to certain mortgage servicing rights ("Rights to MSRs"), a Level 3 asset, sold to a third party, Home Loan Servicing Solutions, Ltd. ("HLSS").* At March 31, 2014, the Financing Liability – MSRs Pledged, the valuation of which is the cause of the restatement, had a reported carrying value of $634.4 million, or approximately 10% of total liabilities.  We have not had any additional sales of Rights to MSRs in 2014. See Note 5 – Fair Value to the Consolidated Financial Statements on the Company's Form 10-K for the fiscal year ended December 31, 2013.

***

Based on our preliminary evaluation, the Company intends to amend its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, as appropriate, on or prior to August 18, 2014. *The Company anticipates it will determine that a material weakness existed in the relevant time periods in the adequacy of our controls relating to how we monitor and implement the impact of applicable accounting conventions.* Should the Company make such a determination, it will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with the amended filings.

48.     As a result of this disclosure, Ocwen's stock price declined an additional $1.18 per share, or 4.48%, on higher than average trading volume.

49.     Overall, in response to these disclosures, the Company's stock price plummeted an aggregate 55%, from a closing of $56.00 on December 18, 2013 to a closing price of $25.16 on August 12, 2014.

## VII.   SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Ocwen, their control over, and receipt or modification of Ocwen's allegedly materially misleading statements, and their associations with the Company which made them privy to confidential proprietary information concerning Ocwen, participated in the fraudulent scheme alleged herein.

28

## VIII.   PRESUMPTION OF RELIANCE

51.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  At all relevant times, the market for Ocwen common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities.

52.   Specifically, the market for Ocwen's publicly traded common stock was an efficient market for the following reasons, among others:

a)  Ocwen common stock met the requirements for listing and was listed and actively traded under the ticker symbol "OCN" on the NYSE, a highly efficient and liquid market;

b)  As a regulated issuer, Ocwen filed periodic public reports with the SEC;

c)  Ocwen regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)  Ocwen was followed by numerous securities analysts employed by major brokerage firms throughout the Class Period who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

53.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

54.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Ocwen's securities and operated as a fraud or deceit on Class Period purchasers of Ocwen's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Ocwen's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Ocwen securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

55.    By failing to disclose the true state of the Company's financial statements and business practices, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Ocwen's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Ocwen to conceal the truth.

56.    Defendants' false and misleading statements had the intended effect and caused Ocwen's securities to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

57.    The decline in the price of Ocwen's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to

investors and the market.  The timing and magnitude of Ocwen's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Ocwen's securities and the subsequent decline in the value of Ocwen securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### X.     NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint.   Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

### XI.     CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Ocwen common stock during the Class Period and who were damaged thereby (the

"Class"). Excluded from the Class are Defendants, other officers and directors of Ocwen at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ocwen common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ocwen or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

   a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

   b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ocwen;

   c)     whether the Individual Defendants caused Ocwen to issue false and misleading financial statements during the Class Period;

   d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e)    whether the prices of Ocwen common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.    Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal law that is complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in class action securities litigation.   Plaintiff has no interests which conflict with those of the Class.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this suit as a class action.

## XII.    COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT ONE
**For Violation of § 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

65.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

66.    Plaintiff asserts this Count pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all Defendants.

67.     During the Class Period, Defendants disseminated or approved the false statements set forth above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a) employed devices, schemes, and artifices to defraud;

b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Ocwen common stock during the Class Period.

69.     By virtue of their positions at Ocwen, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior executive managers and/or directors of Ocwen, the Individual Defendants had knowledge of the details of Ocwen's internal affairs.

71.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ocwen.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ocwen's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Ocwen securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Ocwen's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ocwen securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

72.     Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Ocwen common stock.  Plaintiff and the other members of the Class would not have purchased Ocwen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO
### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

73.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

74.     Plaintiff asserts this Count pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

75.     The Individual Defendants, by virtue of their executive leadership positions in Ocwen, had the power and authority to cause Ocwen to engage in the wrongful conduct complained of herein, and to control the contents of Ocwen's annual and quarterly reports and press releases.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

76.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ocwen's financial condition and results of operations, and to correct promptly any public statements issued by Ocwen which had become materially false or misleading.

77.     Because of their positions of control and authority as senior executive officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ocwen disseminated in the marketplace during the Class Period concerning Ocwen's results of operations.  Each of the Individual Defendants exercised control over the general operations of Ocwen, and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.  The Individual Defendants therefore, were "controlling persons" of Ocwen within the

meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ocwen securities.

78.     Ocwen violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in the Complaint, and as a direct and proximate result of those violations, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

79.     By reason of their control of Ocwen, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for Ocwen's violations of Section 10(b) and Rule 10b-5, to the same extent as Ocwen.

## XIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the other members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding Plaintiff such other or further relief as the Court may deem just and proper.

## XIV.    JURY DEMAND

Plaintiff, on behalf of the Class, hereby demands a trial by jury.

Dated: August 12, 2014

Respectfully submitted,

By: _____
Lester R. Hooker

**SAXENA WHITE P.A.**
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
2424 North Federal Highway, Suite 257

Boca Raton, Florida 33431
561-394-3399 Telephone
561-394-3382 Facsimile
Email: jwhite@saxenawhite.com
Email: lhooker@saxenawhite.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 12, 2014, I presented the foregoing to the Clerk of

the Court for filing and uploading to the CM/ECF system.


Lester R. Hooker