**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

_____
                                                          )
In re Ocwen Financial Corporation      )   CASE NO. 14-CIV-81057-WPD
Securities Litigation                            )
_____)

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. INTRODUCTION ................................................................................... 1

II. NATURE OF THE ACTION ................................................................. 1

III. JURISDICTION AND VENUE ........................................................... 18

IV. PARTIES ............................................................................................... 19

 A. Lead Plaintiff .......................................................................... 19

 B. Defendants ............................................................................... 19

 C. Confidential Witnesses ........................................................... 20

V. BACKGROUND .................................................................................. 22

 A. Ocwen And The Erbey Companies........................................ 22

  1. Ocwen's Servicing Business Relies Upon Its Ability To Acquire Mortgage Servicing Rights ......... 25

  2. Defendant Erbey's Related Companies Are Inextricably Linked To Ocwen .......................... 28

   a. Altisource Portfolio Solutions................................... 28

   b. Altisource Residential Corporation........................... 30

   c. Altisource Asset Management Corporation................ 32

   d. Home Loan Servicing Solutions ............................... 32

 B. Subprime Mortgage Servicing Has Been Heavily Scrutinized Following The Subprime Crisis To Ensure That Homeowners Are Not Treated Unfairly.......... 33

 C. Following The Subprime Crisis, Ocwen Sought To Capitalize On The Increased Regulatory Scrutiny Of Subprime Mortgage Servicers ........................................ 35

 D. Regulators Raise Concerns Over Ocwen's Ability To Manage Its Expanding Servicing Portfolio In A Manner That Treats Homeowners Fairly ..................... 37

 E. In An Effort To Assuage Market Concerns, Ocwen Publicly Touts Its Compliance With Regulatory Obligations........................ 39

 F. As Ocwen's Portfolio Expands, The NY DFS Imposes Additional Restrictions To Ensure That Ocwen's Servicing Practices Are Not Harming Borrowers........ 43

VI. OVERVIEW AND SUMMARY OF DEFENDANTS' FRAUD.................... 46

 A. Defendants Falsely Tout Ocwen's Ability To Service Loans At A Greatly Reduced Cost And In Compliance With Regulatory Requirements.................... 46

 B. Ocwen's Purported Ability To Service Loans At A Lower Cost And In Compliance With Regulatory Obligations Fuels The Company's Class Period Growth ............................ 51

i

C.     Ocwen Completes Its Negotiations Of A Settlement With The CFPB Over Its Past Mortgage Servicing Practices ........................................................ 53

D.     Following The Consent Judgment, Ocwen Continues To Falsely Dispel Concerns Regarding Its Ability To Meet Its Regulatory Obligations ................. 55

E.     Ocwen Also Assures The Market That Controls Are In Place To Prevent Related-Party Transactions From Harming Homeowners And Investors ........... 57

F.     Ocwen's Mortgage Servicing Practices And Related-Party Transactions Did Not Comply With Regulatory Requirements ........................................................ 58

      1.     Ocwen's Decision To Shutter ResCap's FiServ Platform In Favor Of Altisource's REALServicing Platform Decreased The Company's Compliance Capabilities ........................................................ 59

      2.     Due To Its Deficient Compliance Capabilities, Ocwen Violated Its Regulatory Obligations By Backdating Homeowner Communications ... 65

      3.     Ocwen's Lack Of Controls Over Related-Party Transactions Exacerbated Its Severe Compliance Deficiencies ...................................... 68

            a.     Ocwen's Chief Risk Officer And Other Senior Managers Were Simultaneously Employed By Altisource ..................................... 68

            b.     Ocwen Agrees To Pay Above-Market Rates To Altisource For Hubzu Listings ........................................................ 70

            c.     Defendant Erbey Directly Approved A Force-Placed Insurance Transaction That Funneled $65 Million Annually From Ocwen To Altisource ........................................................ 71

      4.     Ocwen's Improper Practices Enriched Defendant Erbey ........................ 74

G.     The Truth Regarding Defendants' Misconduct Is Gradually Revealed ............... 76

      1.     The NY DFS Places An Indefinite Hold On The Wells Fargo Transaction And Identifies Numerous Compliance-Related Concerns In Multiple Public Letters To The Company ........................................................ 76

      2.     The NMS Monitor Publicly Identifies Material Deficiencies In Ocwen's IRG And Severe Flaws In The Company's REALServicing Platform ..... 82

      3.     Defendant Erbey Resigns As Ocwen Belatedly Reveals The True Extent Of Its Compliance Deficiencies ........................................................ 84

H.     Post-Class Period Events ........................................................ 88

VII.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 89

VIII.     SUMMARY OF SCIENTER ALLEGATIONS ........................................................ 148

A.     Direct Evidence Of Defendants' Scienter ........................................................ 148

B.     Additional Evidence of Defendants' Scienter ........................................................ 155

      1.     Defendant Erbey's Financial Motivation To Conceal Facts From Investors ........................................................ 155

2.      Defendant Erbey's And Defendant Faris's Positions Within Ocwen And The Erbey Companies Raise A Strong Inference Of Their Scienter ................................................................................. 157

3.      The Magnitude Of The Backdating Scandal .......................................... 160

4.      Ocwen's Decision To Dismantle ResCap's FiServ Platform In Favor Of REALServicing .................................................................................. 160

5.      Regulators' Increased Focus On The Timing And Substance Of Ocwen's Borrower Communications During The Class Period ............. 161

IX.     LOSS CAUSATION .................................................................................................. 162

X.      THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES ....................................... 171

XI.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE ....................................... 172

XII.   CLASS ACTION ALLEGATIONS ........................................................................... 173

XIII.  CAUSES OF ACTION .............................................................................................. 174

JURY DEMAND ..................................................................................................................... 181

iii

## I.    INTRODUCTION

Lead Plaintiff Sjunde AP-Fonden ("Lead Plaintiff" or "AP7") makes the following allegations against defendants Ocwen Financial Corporation ("Ocwen" or the "Company"), William C. Erbey ("Erbey") and Ronald M. Faris ("Faris") (collectively, "Defendants").[1]  Except as to allegations specifically pertaining to Lead Plaintiff and Lead Plaintiff's counsel, the allegations herein are based upon an investigation undertaken by Lead Plaintiff's counsel, which included, but was not limited to, the review and analysis of:  (1) Ocwen's public filings with the United States Securities and Exchange Commission ("SEC"); (2) securities analysts' reports about Ocwen; (3) transcripts of Ocwen's conference calls; (4) Ocwen press releases; (5) media reports concerning Ocwen, including online news sources; (6) numerous interviews with former Ocwen employees; (7) publications by regulatory agencies, including the New York Department of Financial Services and the Consumer Financial Protection Bureau; and (8) public filings by entities related to Ocwen.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations herein after Lead Plaintiff has had a reasonable opportunity to conduct discovery.

## II.    NATURE OF THE ACTION

1.    This case arises from the Defendants' misrepresentations and omissions during the Class Period concerning Ocwen's compliance with its regulatory obligations, its competitive advantages in complying with these obligations at a substantial discount to its competitors, and commitments that it did not place the self-dealing transactions between Ocwen and its network of related companies above the interests of homeowners whose mortgages Ocwen serviced.  The truth that has been revealed about Ocwen's practices during the Class Period, as discussed below, has forced the Company to dismantle its business plan, led to Defendant Erbey being

---

[1] All emphasis is added unless otherwise noted.

1

banned from any involvement in Ocwen or its related companies, and devastated Ocwen's share price.

2.       Beginning in 2010, Ocwen grew rapidly by acquiring mortgage servicing rights ("MSRs") from major bank mortgage servicers.  During this period, Ocwen's mortgage servicing portfolio grew from 351,595 residential loans with $50 billion in unpaid principal balance ("UPB") to 2,861,918 loans with $464.7 billion in UPB as of December 31, 2013.

3.       Ocwen acquired many of these MSRs from regulated financial services companies, which had traditionally serviced mortgage loans.  These companies shed their servicing responsibilities as they came under increasing regulatory scrutiny because of shoddy and abusive servicing practices.  Regulators began to demand greater capital requirements for banks that serviced mortgages.  Regulators also extracted a $25 billion settlement in February 2012 (the "National Mortgage Settlement" or "NMS") with five of the then-largest bank mortgage servicers (GMAC/ResCap, Bank of America, Citi, JP Morgan and Wells Fargo).  The NMS also required these servicers to implement changes in how they serviced mortgage loans, handled foreclosures and provided information to bankruptcy courts.  Moreover, capital requirements proposed by Basel III, or the Third Basel Accord, a global, voluntary regulatory standard on bank capital adequacy, stress testing, and market liquidity risk, made it difficult and less profitable for banks to retain servicing rights on loans they originated.

4.       Starting in 2010, Ocwen began acquiring MSRs from a number of banks through increasingly larger acquisitions.  In 2010, it acquired the MSR assets for 38,000 loans from Saxon Mortgage Services, Inc. ("Saxon") (a unit of Morgan Stanley) and the HomEq Servicing platform ("HomEq") for 134,000 loans from Barclays Bank PLC ("Barclays").  Ocwen's sudden increase by nearly 50% in its loan servicing portfolio acquired from regulated banks drew the

attention of the New York State Department of Financial Services ("NY DFS") and its Superintendent, Benjamin M. Lawsky.  In connection with Ocwen seeking approval from the NY DFS for its proposed purchase of MSRs for 245,000 loans from Litton Loan Servicing L.P. ("Litton") in 2011, the NY DFS expressed concerns with Ocwen's rapid growth and its capacity to properly service a significant portfolio of distressed loans.  Consequently, on September 1, 2011, the NY DFS required Ocwen to enter into an Agreement on Mortgage Servicing Practices (the "DFS Agreement") and promise to comply with any national mortgage standards applicable under federal regulations.

5.     Only because Ocwen had consented to the DFS Agreement with the NY DFS in September 2011 was the Company able to enter into transactions in 2012 to buy MSRs for 221,000 loans from JP Morgan, Bank of America, and Saxon.  In December 2012, after a spot review by the NY DFS found that Ocwen was not satisfactorily complying with the DFS Agreement, Ocwen was required to enter into a consent decree with the NY DFS (the "DFS Consent Order"), pursuant to which it agreed to install an independent compliance monitor (the "Monitor") and to adhere to strict protocols to ensure that the homeowners whose mortgages it serviced were treated fairly.

6.     In early 2013, Ocwen acquired Homeward Residential Holdings, LLC (formerly American Home Mortgage) ("Homeward") via merger and Residential Capital, LLC (formerly GMAC ResCap, Inc.) ("ResCap") pursuant to a plan under Chapter 11 of Title 11 of the U.S. Bankruptcy Code.  These operating companies serviced 421,000 and 1,740,000 mortgage loans respectively, dwarfing Ocwen's loan portfolio at that time.  In acquiring the operations of these companies and their servicing platforms, Ocwen told the market that it could profit at higher margins by more efficiently servicing these loans while complying with strict servicing

3

standards.  Ocwen also proclaimed that it intended to integrate the servicing platforms of its acquisitions onto a proprietary servicing platform called REALServicing, which could provide high-quality servicing at 70% less cost than its competitors, while being fully scalable, and thus able to handle the massive influx of loans acquired from Homeward and ResCap.

7.    REALServicing was a platform owned and leased by Ocwen from Altisource Portfolio Solutions, S.A. ("Altisource"), a sister corporation of Ocwen also chaired by Defendant Erbey, which had been spun off from Ocwen in 2009 as a separate public company.  Altisource is only one of a bevy of vertically integrated yet separate public companies, with interchangeable and shared employees, for each of which Defendant Erbey acted as Chairman during the Class Period and in which he owns a significant stake.  As of December 31, 2013, Defendant Erbey owned 13% of Ocwen's shares and 26% of Altisource's outstanding shares.  All of these vertically integrated companies owned partially by Defendant Erbey derive most, if not all, of their revenue from Ocwen's servicing activities and/or foreclosures resulting from delinquent loans.

8.    For example, if Ocwen determines to foreclose on a delinquent loan – a decision made by software provided by Altisource – Altisource would handle the foreclosure listing through an online realty company called Hubzu, in which Defendant Erbey also owns a stake. Hubzu sold 25,000 homes in foreclosure in 2012.  Altisource may convert some foreclosed homes into rental properties to be leased out by Altisource Residential Corporation ("RESI"), a company in which Defendant Erbey owned 5% of the outstanding shares.  Altisource Asset Management Corporation ("AAMC"), in which Defendant Erbey owned a 27% interest, acts as Residential's asset manager for rented properties under management.  Another related company, Home Loan Servicing Solutions ("HLSS"), buys assets from Ocwen and leases them back to

Ocwen to reduce the Company's capital carry.  Defendant Erbey also owned a 1% stake in HLSS's publicly traded shares.  As described herein, it was through activities with many of these related companies that Defendants would run afoul of the servicing standards prescribed under the DFS Consent Order and the NMS.

9.    In building Ocwen's servicing business, Defendant Erbey had focused meticulously on cost efficiencies that he believed Ocwen could uniquely achieve.  The vast majority of Ocwen's employees who have day-to-day responsibilities for servicing Ocwen's portfolio of loans work in India and the Philippines.  These employees implement a computer-aided dialogue system developed by Ocwen – but owned by Altisource after the spin-off – to coax homeowners to make payments on their delinquent loans, or alternatively, modify the loan terms, and if this is deemed unsuccessful by the software, foreclose.  In an October 2013 interview with the online publication, TheStreet.com, Defendant Erbey likened Ocwen's servicing platform to HAL, the computer villain in a *2001 Space Odyssey*.  Ocwen called its platform REALServicing, which Ocwen had developed in connection with its prior focus on distressed, subprime mortgages – well before it began its expansion.

10.    Investors were drawn to Ocwen because of the projected revenues from its acquisitions, coupled with Defendants' representations to the market that the Company could cost-effectively manage these loans while complying with all applicable regulations.  Defendants repeatedly touted Ocwen's ability to service loans it acquired at 70% less cost than its competitors through the use of its specialized technologies.

11.    At the same time, Ocwen assured that its low-cost servicing model could also comply with its responsibilities under the DFS Consent Decree and the NMS, stating, for example, in the Company's annual report filed with the SEC on Form 10-K for fiscal year 2013

(the "2013 Form 10-K") that its "[s]calable and [c]ompliant servicing platform . . . enables us to operate in a compliant manner in an increasingly complex and highly regulated environment."

12.    In other words, Ocwen claimed that lower costs and higher revenues did not come at the expense of regulatory risk and non-compliance with servicing guidelines.   Indeed, Ocwen's inability to comply with applicable servicing regulations would prevent it from acquiring bank loans, the pipeline for more revenues.   And failing to do so cost-effectively would render Ocwen no different than its competitors.

13.    Thus, throughout the Class Period, Ocwen assured its investors that it had established a robust set of controls to ensure compliance with the demands of the NY DFS.   For instance, in a press release announcing the Company's fourth-quarter and full-year 2013 ("4Q/FY 2013") financial results attached to a Form 8-K that Ocwen filed with the SEC on February 27, 2014 (the "February 27, 2014 Press Release"), Defendant Faris represented that "[w]e continue to focus our attention on regulatory compliance and on assisting struggling homeowners.  ***During 2013 we made significant progress in enhancing our compliance management system***."   Similarly, in Ocwen's 2013 Form 10-K, the Company represented that "[w]e continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and the regulatory changes we are facing.   ***We devote substantial resources to regulatory compliance*** . . ."

14.    Meanwhile, Defendants knew that Ocwen's peculiar inter-relationships with the other companies that Defendant Erbey controlled, while part of Ocwen's overall strategy of reducing costs and creating efficiencies, created the specter that adverse decisions by Ocwen against homeowners could be made simply to fuel profits for Defendant Erbey's other companies.   To allay investor concerns about potential regulatory risk and scrutiny associated

with Ocwen's related-party transactions, the Company repeatedly pronounced in its public disclosures that all business decisions concerning Defendant Erbey's related companies were made independently, at arm's length and without Defendant Erbey's involvement whatsoever. For instance, as disclosed by Defendant Erbey at the Company's Investor Days Conference held on December 3 and 4, 2013 (the "December 2013 Conference"):

> One of the things that I like to stress again is that the strategic allies are not affiliates, that each company has its own separate Board of Directors, the majority of whom are independent, and we have robust related party transaction approval process. ***Any related party transactions between the companies I actually recuse myself from that decision.***

15. As investors belatedly learned, Defendants' representations regarding Ocwen's compliance with regulatory requirements and the arm's-length nature of its related-party transactions were materially false and misleading.  Starting with its massive acquisition of ResCap's servicing platform and portfolio of loans in February 2013, which were already subject to the NMS guidelines, Ocwen's REALServicing platform was internally revealed to be wholly deficient and incapable of managing the servicing compliance mandates imposed by the NMS, let alone the standards that Ocwen had signed onto through the DFS Consent Decree.  Numerous confidential witnesses ("CWs") have confirmed and corroborated that ResCap used its own platform created by FiServ, one of Altisource's direct competitors, to address the NMS requirements, and its entire compliance team had been acquired as well.  Although the expectation from these employees was that Ocwen would adopt ResCap's superior platform, Ocwen soon announced that it would require ResCap's loans to be transferred to REALServicing, the Altisource-owned platform.  While Ocwen's senior management also internally recognized the superior capabilities of the FiServ platform, Ocwen told the market that

the transition to REALServicing would allow Ocwen to service ResCap's loans more cheaply and at greater margins than its competitors did while still maintaining compliance.

16.     For example, on October 31, 2013, during the Company's conference call with analysts and investors to discuss its financial results for the period ended September 30, 2013 ("3Q 2013") (the "October 31, 2013 Conference Call"), Defendant Erbey noted with respect to the transfer of ResCap's portfolio onto Ocwen's REALServicing platform that "we have been able to maintain our margins aside from the transition costs in the face of rather large increases in regulatory costs through improvements in technology, and we have a lot of projects in place to try to continue to improve both our efficiency and effectiveness."  Indeed, he assured, "[w]e feel very comfortable we will be able to [return to historic margins.]  One thing we know how to do [is] to manage costs."  Similarly, in Ocwen's 2013 Form 10-K, the Company emphasized that "we have a strong, sustainable cost advantage with respect to competing mortgage servicers[,]" as "our cost of servicing non-performing, non-Agency loans on the REALServicing platform is approximately 70% lower than industry averages[,] [and] [o]ur analysis of the businesses that we have acquired and our discussions with other market participants have also confirmed our belief that we are an industry leader in terms of our cost to service non-performing loans."  Consistent reporting to Ocwen's risk officers, and up the chain to Defendants, documented the deficiencies of the REALServicing platform, but Ocwen ignored these critical flaws and ploughed ahead because of cost savings, rendering Defendants' statements about compliance materially false and misleading.

17.     In addition, as would ultimately be discovered by the NY DFS a year later, a systemic problem in the REALServicing platform was the backdating of thousands of default notices to homeowners, which caused them, among other draconian costs and penalties, to

sometimes forfeit their homes.  This problem, although pervasive and severe, was only one of many internally recognized breaches of the NMS and NY DFS regulatory requirements that Defendants encountered – and ignored – in scaling Ocwen's servicing platform to the regulatory demands of the millions of loans Ocwen had suddenly added to its portfolio.

18.     Moreover, Ocwen's risk management was in complete disarray during the Class Period.  Through the ResCap acquisition, Ocwen had inherited a large staff of experienced compliance officers from ResCap, including its chief servicing officer, all of whom had worked with the FiServ platform in ensuring that its capabilities matched the new NMS requirements. These employees were increasingly marginalized in favor of Ocwen's existing compliance teams.  For example, Mr. S.P. Ravi, an individual based in India, served as Ocwen's Chief Risk Officer and was charged with overseeing the ResCap business.  However, unbeknownst to even Ocwen's compliance staff, let alone Ocwen's regulators, Mr. Ravi simultaneously served as the Chief Risk Officer of Altisource.  Following the ResCap acquisition, many of ResCap's experienced compliance officials left Ocwen, as some believed that they could not meet compliance requirements using Ocwen's servicing platform, while others were laid off for cost-saving measures.

19.     Meanwhile, in investor presentations during the Class Period, Defendants continued to mislead investors about the efficacies of REALServicing by maintaining that claim that they would realize a 70% savings on the servicing of Homeward's and ResCap's mortgage loans by the adoption of Altisource's platform, and that REALServicing was "highly scalable with the lowest operating cost in the industry."  Even after its formal adoption of the NMS in December 2013, Ocwen informed its shareholders in May 2014 that while industry costs increased for servicing in light of the additional documentation and steps required by the NMS,

the NMS "had raised the bar on quality[,]" which "strengthens Ocwen's competitive advantage." According to Ocwen, other servicers did not have platforms such as Ocwen's that were "capable of automating the new requirements efficiently or effectively." Thus, Ocwen claimed that its "margins and competitive advantage should improve."

20.     Ocwen's representations to investors concerning its ability to integrate ResCap's and Homeward's large portfolios in compliance with the NMS and NY DFS requirements while also keeping costs 70% below industry standards were a sham. As discussed more fully below, Ocwen's supposedly "robust" compliance protocols were hopelessly deficient, while its controls purportedly implemented to manage Defendant Erbey's conflicts of interest as against homeowners were non-existent and/or knowingly ignored altogether on a consistent basis.

21.     The truth began to emerge in connection with Ocwen's attempt to acquire $39 billion worth of MSRs from Wells Fargo in January 2014. The Wells Fargo transaction was an important deal for Ocwen because the overall amount of MSRs available from banks was finite and Wells Fargo's $39 billion deal represented 40% of the estimated MSRs available for sale at the time. Indeed, Ocwen had publicly disclosed on November 5, 2013 in its quarterly report filed with the SEC on Form 10-Q for 3Q 2013 (the "3Q 2013 Form 10-Q") that "[w]e are currently aware of potential MSR acquisition opportunities with an aggregate UPB of approximately $400 billion over the next 12 to 18 months, with at least $100 billion in the next few months." As a result, the market recognized that without deals such as the announced Wells Fargo acquisition, Ocwen's growth would be severely curtailed.

22.     On February 6, 2014, NY DFS Superintendent Lawsky halted the massive Wells Fargo loan acquisition pending the Monitor's review of Ocwen's compliance, expressing "concerns about Ocwen's servicing portfolio growth." Three weeks later, on February 26, 2014,

Superintendent Lawsky wrote an open letter (the "February 26, 2014 Letter") disclosing his concerns about his discovery that S.P. Ravi, the Chief Risk Officer at Ocwen, was also the Chief Risk Officer at Altisource – a dual role that had not previously been disclosed to Ocwen's investors.  For Superintendent Lawsky, this "raised potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely related."

23.     The following day, during the Company's conference call with analysts and investors to discuss its 4Q/FY 2013 financial results (the "February 27, 2014 Conference Call"), Defendant Erbey addressed the February 26, 2014 Letter, asserting that the Company's agreements with related parties were fully disclosed and on an arm's-length basis.  Furthermore, in its 2013 Form 10-K, filed on March 3, 2014, Ocwen repeated that Defendant Erbey recused himself from all negotiations or approvals of related-party transactions and moreover, with respect to mortgage holders, any services that Ocwen's related parties provided to it were charged at "market rates."   Relying on the Company's disclosures, analysts concurred that Ocwen had disclosed its related-party transactions and that Defendant Erbey recused himself from such decisions.  For example, on February 26, 2014, analyst Piper Jaffray & Co. ("Piper Jaffray") wrote: "Based on our knowledge, we believe OCN and its affiliates . . . disclose all contracts and relationships.  These have been filed with the SEC.  We believe these relationships are all above board and appropriate."

24.     Yet, on April 21, 2014, Superintendent Lawsky issued another letter (the "April 21, 2014 Letter") exposing Ocwen's purported controls over related-party transactions as patently untrue.  As set forth in the April 21, 2014 Letter, the Monitor had uncovered an arrangement that subjected homeowners whose loans were serviced by Ocwen and foreclosed upon by Altisource to realty fees that were three times higher than those charged for other non-

Ocwen properties.  Thus, Ocwen's claims that its related parties charged market rates for fees assessed against Ocwen's homeowners through contracts negotiated at arm's-length were clearly false.

25.     On May 1, 2014, Ocwen filed a Form 8-K with the SEC that attached a press release announcing the Company's financial results for the quarterly period ending March 31, 2014 ("1Q 2014") (the "May 1, 2014 Press Release").  In the May 1, 2014 Press Release, Ocwen disclosed for the first time that regulatory demands had increased its costs for servicing non-conforming loans, and that these costs were eating into servicing margins.  Defendant Faris stated that same day on the Company's conference call with analysts and investors to discuss its 1Q 2014 financial results ("the May 1, 2014 Conference Call"), however, that Ocwen stood to benefit from an industry-wide phenomenon of increasing servicing costs.  According to him, "[w]hile the regulatory environment has raised costs for Ocwen and the industry, we believe that we are better positioned than competitors to respond to these higher costs that improve margin over time because of our scale and demonstrated process management and automation capability."  Defendant Faris further stated, "we estimate that industry average variable costs for servicing nonperforming loans have risen by approximately $50 to $60 per year.  We would estimate our own variable costs have gone up by about $30 to $40 per year per nonperforming loan . . .  no doubt that the impact of all of this has been to erode margins in the short run.  Longer term we believe this strengthens Ocwen's competitive advantage because the changes increase the importance of scale and efficiency . . ."  Thus, while disclosing increasing costs in the short term for regulatory compliance, Ocwen claimed that it had a competitive advantage because it was better suited than its competitors to efficiently comply with regulatory

requirements on its existing platform.  Ocwen's shares responded to the 1Q 2014 earnings release by falling 7.4%.

26.     In June 2014, Defendant Faris presented at an investor conference, during which he spoke optimistically about the approval of the Wells Fargo transaction and Ocwen's ability to compete for the pipeline of loans coming to market that year.  As TheStreet.com reported on June 4, 2014, "Ocwen Shares Rise on Optimism Wells Fargo Deal will Proceed."

27.     The actual costs of the increased regulatory focus on Ocwen's questionable practices towards homeowners, and Ocwen's inability to ensure compliance with the NMS and NY DFS requirements were still unknown to the market.  On July 31, 2014, Ocwen surprised the market by revealing the falsity of its repeated claims to have integrated the loan portfolios of Homeward and ResCap onto its "fully scalable" platform while achieving a 70% reduction in servicing costs.  On this day, Ocwen announced its financial results for the period ended June 30, 2014 ("2Q 2014"), which revealed that increased compliance costs were having a devastating impact on the Company.  In particular, Ocwen disclosed that regulatory costs had reached $12 million in the second quarter alone for New York State and national monitors and projected an additional $9 million for such costs in the next quarter, which were "a significant element of [Ocwen's] cost base."   On this announcement, Ocwen's stock fell $4.49 per share, or 13% on heavy trading, eliminating more than $600 million in market capitalization.  In response to news of compliance costs eating into Ocwen's earnings and detracting from its putative low-cost but high-compliance servicing platform, analyst Piper Jaffray commented that same day, "[w]e believe more clarity on expense levels or resolution of regulatory issues are needed to drive shares higher."

28.     While Ocwen was only beginning to come clean about the true costs of complying with the NMS and NY DFS regulations and revealing the falsity of its prior claims about compliance and cost efficiencies, the truth about Ocwen's ongoing violations of the NY DFS and NMS compliance mandates, and their impact on Ocwen's business, was yet to be revealed.

29.     On August 4, 2014, the NY DFS, through the work of the Monitor, disclosed in a letter (the "August 4, 2014 Letter") additional related-party transactions at Ocwen that were unfair to homeowners.  In one particular transaction, Ocwen was accused of using a pass-through, unrelated entity called Southwest Business Corporation ("SWBC"), to kick back fees to Altisource for the placement of force-placed insurance on homeowners whose loans Ocwen was servicing.  This transaction had been approved by Defendant Erbey, did not reflect terms negotiated at arm's length and was put into effect after the NY DFS had raised its concerns in the February 26, 2014 Letter about Ocwen's related-party transactions.  Moreover, it violated prohibitions on kickbacks relating to force-placed insurance.  Ocwen's share price fell in response to this disclosure by 2.5% on heavy trading.

30.     The concealed risk of Ocwen's failures to adequately install compliance protocols necessary to service the Homeward and ResCap loans, as well as others, was partially revealed on October 21, 2014.  On that date, the NY DFS, through its ongoing investigation of Ocwen's compliance, revealed in another open letter (the "October 21, 2014 Letter") that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of thousands" of borrowers in violation of the Company's legal and regulatory obligations.  This was a devastating disclosure, as its truth would essentially end Ocwen's ability to grow through the purchase of more loans and permanently stall the Wells Fargo loan purchase.  As the NY DFS

14

declared: "The stakes for borrowers and investors are enormous.  If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law."  Ocwen's share price collapsed with this disclosure, falling $4.78 per share, or 18.2%, on extremely heavy trading, despite trading being halted briefly during the day.

31.    In an effort to halt the slide in its stock price, Ocwen, issued a hasty and reckless press release that same day (the "October 21, 2014 Press Release").  While admitting to the backdating problem, the Company asserted that the October 21, 2014 Letter was overblown because the actual number of borrowers whose loans had been affected in New York State was limited to 283, and the issue had been completely resolved.  After markets closed on October 21, 2014, Ocwen then revealed that the October 21, 2014 Press Release was inaccurate and accordingly retracted it, admitting that, in fact, the Company was unsure how many borrowers were impacted.  As the October 21, 2014 Letter disclosed, Ocwen had known about the backdating problem – caused by its faulty REALServicing platform – as early as November 2013 but had ignored repeated warnings to fix it.  On October 22, 2014, when Ocwen's shares resumed trading, their price fell a further 11.36%   Between October 21, 2014 and October 22, 2014, Ocwen had lost $7.22 in its share price, or $908.35 million from its market capitalization.

32.    On this news, the Wells Fargo deal together with Ocwen's ability to compete for more MSRs, was widely pronounced as dead and, in fact, on November 13, 2014, Ocwen and Wells Fargo mutually agreed to cancel the deal.

33.    Then, on December 16, 2014, Joseph A. Smith, Jr., the independent monitor tasked with overseeing compliance with the NMS (the "NMS Monitor") issued a scathing report regarding Ocwen's progress for the testing periods ended March 31, 2014 ("Test Period 7") and June 30, 2014 ("Test Period 8") (the "NMS Compliance Report"), which confirmed the

inadequacies of Ocwen's REALServicing platform and revealed further weaknesses in the Company's internal control processes related to its obligations under the NMS. In particular, the NMS Monitor determined that for Test Period 7 – the first period that loans on REALServicing were tested – the work of Ocwen's Internal Review Group ("IRG") responsible for evaluating Ocwen's compliance with the NMS was unreliable because: (1) Ocwen and the IRG were experiencing "difficulty identifying and extracting valid loan testing populations" due to "[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ[;]" and (2) investigation into a current IRG employee's claims of irregularities and improprieties in the IRG's operations uncovered that "the IRG's processes and procedures . . . lacked the critical keys to integrity mandated in the Enforcement Terms" of the NMS. As a result, the NMS Monitor engaged an independent accounting firm, McGladrey LLP ("McGladrey"), to retest Ocwen's performance on a number of metrics for Test Periods 7 and 8 and to oversee the IRG's work for subsequent testing periods. In addition, effectively conceding these deficiencies, Ocwen undertook a number of remedial actions, such as adopting corporate governing principles regarding the independence of the IRG and the integrity of its work, restructuring the IRG, providing the NMS Monitor with enhanced access to loan-testing information, and establishing a hotline to the NMS Monitor's office for IRG employees to report issues concerning the IRG and its operations.

34.     Separately, the NMS Monitor revealed in the NMS Compliance Report that, after demanding a full explanation from Ocwen concerning the letter-backdating issue disclosed in the October 21, 2014 Letter, Ocwen represented, among other things, that the issue was "limited to its REALServicing platform because FiServ letters are processed differently."

16

35.     Finally, in a stunning confirmation of REALServicing's compliance deficiencies and Defendants' fraudulent misconduct throughout the Class Period, Ocwen announced on December 22, 2014 that it had entered into yet another consent order with the NY DFS (the "December 22, 2014 Consent Order").  Despite previously denying any wrongdoing in response to the concerns raised by the NY DFS, Defendant Erbey shockingly agreed to resign from his positions as Executive Chairman of Ocwen and as the Chairman of Altisource, RESI, AAMC and HLSS as part of the December 22, 2014 Consent Order.  In addition, Ocwen and Defendant Faris admitted to much of the misconduct alleged herein, including, among other things, the severe deficiencies in its REALServicing platform, Defendant Erbey's participation in the negotiation and approval of numerous related-party transactions, Ocwen's agreement to pay above-market rates to related parties, and the Company's abject failure to comply with its legal and regulatory obligations throughout the Class Period.  Indeed, as reflected in the December 22, 2014 Consent Order, the NY DFS's limited review of 478 loans foreclosed upon by Ocwen revealed a startling *1,358* compliance violations, or approximately three violations per each foreclosed loan.  These violations included, among other things, "dual tracking" (i.e. "pursuing . . . foreclosure while loan modification applications were pending"), failing to ensure that statements made by Ocwen to the court in connection with foreclosure proceedings were correct, and failing to confirm that Ocwen had the right to foreclose on a home before initiating foreclosure proceedings.

36.     As the true extent of Ocwen's fraud was laid bare to the market on December 22, 2014, the Company's share price collapsed, falling by nearly *27%* and erasing an additional *$740 million* in market capitalization.  In total, Ocwen's common share price declined by a staggering 63% between February 5, 2014 and December 22, 2014.

17

37.     This federal securities class action is brought on behalf of all persons who purchased Ocwen common stock between May 2, 2013 and December 19, 2014, inclusive (the "Class Period"), and were damaged thereby (the "Class"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  Lead Plaintiff and the putative Class seek to recover their losses due to Defendants' false statements and omissions during the Class Period regarding Ocwen's business practices, its compliance with NY DFS and NMS regulations, the efficacy and cost-effectiveness of its servicing platforms in connection with such compliance, the nature of its controls to ensure its related party transactions did not violate regulatory requirements, and its ability to successfully compete for new MSRs to acquire.

## III.     JURISDICTION AND VENUE

38.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

39.     Venue is proper in the Southern District of Florida pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in this District.  In addition, the Company is incorporated in the State of Florida and has substantial business operations in West Palm Beach, Florida.

40.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV.   PARTIES

### A.    Lead Plaintiff

41.    Lead Plaintiff AP7 is part of the Swedish national pension system and is located in Stockholm, Sweden.  AP7 manages approximately $18 billion in premium pension assets on behalf of more than 6 million Swedish investors.  As reflected on the certification attached as Exhibit A hereto, AP7 purchased shares of Ocwen common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered losses as a result of the conduct complained of herein.

### B.    Defendants

42.    Defendant Ocwen is incorporated in Florida and headquartered in Atlanta, Georgia.  It maintained during the Class Period executive offices in St. Croix, U.S.V.I. and West Palm Beach, Florida.  The Company provides mortgage loan servicing and origination in the United States.  Ocwen common stock is traded on the NYSE under the symbol "OCN."

43.    Defendant Erbey served as the Executive Chairman of the Board of Directors of Ocwen during the Class Period.  In addition, Defendant Erbey served as the Chairman of the Boards of Directors of Altisource, RESI, AAMC, and HLSS during the Class Period.

44.    Defendant Faris served as the President, Chief Executive Officer ("CEO"), and director of Ocwen during the Class Period.

45.    Defendants Erbey and Faris are referred to collectively herein as the "Individual Defendants."

46.    The Individual Defendants are liable for making the false and misleading statements that are alleged herein.  In addition, each of the Individual Defendants, by reason of

19

his status as a senior executive officer and/or director, and his day-to-day responsibilities over Ocwen, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Ocwen's business and are liable for any false and misleading statements alleged herein attributable to Ocwen.

47.    Specifically, because of their positions within the Company, the Individual Defendants controlled the contents of the Company's public statements made during the Class Period.  The Individual Defendants were provided with, or had access to, copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

48.    Because of their positions and access to material non-public information, the Individual Defendants recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were materially false and misleading.  As a result, the Individual Defendants are, and were, responsible for the accuracy of Ocwen's corporate statements and are therefore responsible and liable for the representations contained therein.

### C.    Confidential Witnesses

49.    CW 1 was an employee of GMAC from 2008 until it was acquired by Ocwen. Following the acquisition, CW 1 worked as a Supervisor in Ocwen's IRG.  The IRG was responsible for compliance of Ocwen's portfolio of loans acquired from a GMAC entity called ResCap.  CW 1 reported to IRG Vice President Ed Watson, who in turn reported to S.P. Ravi, Ocwen's (and Altisource's) Chief Risk Officer based in India.  CW 1 continued in this role until March 2014.  As a Supervisor, CW 1 was responsible for overseeing the transfer of ResCap loan

data from the FiServ platform, ResCap's loan servicing platform, to REALServicing, the servicing platform used by Ocwen.  In this role, CW 1 performed testing functions to ensure that the Company was complying with applicable regulations, and to document compliance-related issues with REALServicing.  In performing these functions, CW 1 gained extensive firsthand experience with the FiServ and REALServicing platforms.

50.     CW 2 was employed by GMAC from July 2008 until it was acquired by Ocwen. Following the acquisition and until CW 2's resignation in December 2013, CW 2 worked as a Supervisor in Ocwen's Default Timeline Management and Loss Mitigation Control group and reported to Vice President Gemma Camp.  Camp, in turn, reported to Scott Anderson.  CW 2 was responsible for ensuring that the foreclosure procedures being employed by Ocwen complied with the terms of the National Mortgage Settlement and the Consumer Financial Protection Bureau's ("CFPB") regulations.  In this role, CW 2 was directly responsible for tracking mortgages subject to loss mitigation proceedings, and for postponing foreclosure activities while such proceedings were pending.  In performing these functions, CW 2 gained extensive, firsthand experience with both the FiServ and REALServicing platforms and, in particular, their capabilities with respect to ensuring compliance with the National Mortgage Settlement and CFPB regulations.

51.     CW 3 was employed as a Relationship Manager in Ocwen's Home Retention Department from January 2012 until February 2014.  CW 3 reported to Victoria Kubos, a Manager in the Home Retention Department.  CW 3 assisted delinquent homeowners in getting their accounts current through, among other things, loan modifications.  In this role, CW 3 communicated directly with homeowners whose loans were serviced by Ocwen, and also

interacted regularly with Ocwen underwriters who were responsible for having loan modification letters mailed out to homeowners.

52.    CW 4 was employed as a Senior Compliance Analyst at Ocwen's West Palm Beach, Florida office from January 2012 through September 2014.  CW 4 reported to Ryan McIntyre, a Senior Manager of Loss Mitigation, who reported to Anna Demidova, Ocwen's Director of Loss Mitigation, Compliance Risk.  CW 4 worked in Ocwen's Making Home Affordable ("MHA") compliance group, a unit that handled compliance for the Company's MHA program.  This group was responsible for addressing compliance issues for approximately 20% of Ocwen's servicing portfolio.  As a Senior Compliance Analyst, CW 4 met regularly with examiners from the U.S. Department of Treasury who were responsible for identifying compliance issues within Ocwen's MHA portfolio.  CW 4 also has firsthand knowledge of the measures taken by the Company to address compliance issues identified by the Treasury, as well as compliance issues identified internally by the Company.  CW 4 also interacted with Ocwen's Correspondence Department, which was responsible for disseminating communications to homeowners.

## V.    BACKGROUND

### A.    Ocwen And The Erbey Companies

53.    Founded in 1988 by Defendant Erbey, Ocwen initially operated as a thrift that purchased non-performing residential and commercial mortgage loans for the purpose of restoring them to performing status and then securitizing them – a practice otherwise known as "reperforming loan securitization."   After going public in 1996, however, the Company transitioned its business model from the capital-intensive practice of acquiring distressed loans to servicing delinquent loans for a fee on behalf of third parties, becoming one of the first residential mortgage special servicers.  In 2004, the Company made another strategic move by

exiting the thrift business.  Through the completion of this "dethrifting" process in 2005, Ocwen shed the core level capital requirements that had been inhibiting the Company's ability to grow its business.

54.     Until 2009, Ocwen was a relative small player in the servicing of subprime mortgages, and its reputation was that of a low-cost servicer of delinquent loans.  In 2009, the top five commercial banks, Bank of America, JP Morgan Chase, GMAC, IndyMac and Wells Fargo, accounted for 72% of the servicing of privately originated mortgage loans.  After the subprime crisis, as discussed below, Ocwen capitalized on the heightened capital and regulatory requirements imposed on bank-servicers by first acquiring from these banks their difficult-to-service subprime mortgages and then increasingly foraying into prime loans as well.  Between 2011 and 2014, Ocwen's acquisitions of MSRs increased four-fold, from approximately $100 billion of loans in its portfolio to approximately $400 billion by the beginning of 2014.

55.     Ocwen is now the fourth largest servicer of mortgages in the United States, and the largest non-bank mortgage servicer.  Defendant Erbey was Ocwen's largest shareholder during the Class Period, owning approximately 13% of Ocwen's shares as of December 31, 2013.  Together with a bevy of companies for which Defendant Erbey acted as Chairman and in which he owned a significant stake, Ocwen is the central operation in a vertical chain of Erbey-dominated companies involved in the loan origination, servicing and foreclosure business during the Class Period.  Focusing on subprime loans, Ocwen describes itself as "a leader in the servicing industry in foreclosure prevention and loss mitigation that helps families stay in their homes and improves financial outcomes for investors," while the other companies chaired by Defendant Erbey (and which were spun off as public companies but nonetheless rely almost exclusively on Ocwen's supply chain of distressed mortgages), are in the business of either

23

providing servicing-related business to Ocwen, foreclosing on distressed mortgages no longer serviced by Ocwen, listing the distressed properties for sale, managing them as REOs or "Real Estate Owned" – a term referring to foreclosed homes held by for sale or rent by the mortgagor – or managing them as rental properties, among other related functions.

56.     Ocwen's business plan of focusing on buying the rights to service distressed and/or subprime mortgages while at the same time, through its related entities, profiting from the foreclosure and sale of such mortgages when it determines them to be no longer serviceable, together with its dramatic increase in the portfolio of mortgage loans it services, put it under increased regulatory scrutiny beginning in 2011.

57.     As explained more fully below, prior to the start of the Class Period, the NY DFS, required Ocwen to adhere to strict protocols to ensure that the homeowners whose mortgages it serviced were treated fairly.  Ocwen's failure to establish to the NY DFS its satisfactory compliance with these strictures presented a risk that Ocwen would be prevented from acquiring new loans to service.  Ocwen's ability to increase its portfolio of new loans to service was its primary measure of growth and increasing valuation by its investors.  Indeed, Ocwen often disclosed the volume of MSRs available for sale and for which the Company was competing. For example, Ocwen noted in its 3Q 2013 Form 10-Q that there was only $400 billion in aggregate UPB of new MSRs available for sale within the next 12 to 18 months and $100 billion in aggregate UPB of new MSRs available in the next few months.

58.     Given the competition for this pipeline of loans to service, throughout the Class Period, Ocwen publicly assured its investors that it had established a robust set of controls to ensure compliance with the demands of the NY DFS, and otherwise maintained protocols to prevent the potential that Ocwen's decisions related to the foreclosure of loans were not in the

24

service of Defendant Erbey's other companies that stood to profit from foreclosures. As set forth below, these representations were false, as Ocwen's purportedly robust compliance protocols were hopelessly deficient, and any controls putatively implemented to manage Defendant Erbey's conflicts of interest as against homeowners were non-existent and/or intentionally disregarded altogether. Consequently, as the truth about Ocwen's willful disregard of the NY DFS's compliance mandates has been exposed, the NY DFS has halted Ocwen's ability to purchase new mortgages to service, and Ocwen's share price has plunged, causing harm to those putative Class members who purchased Ocwen's stock during the Class Period.

1.     **Ocwen's Servicing Business Relies Upon Its Ability To Acquire Mortgage Servicing Rights**

59.     Ocwen itself operates two primary lines of business – servicing and lending. Ocwen's servicing business accounted for the overwhelming majority of its revenues and profits during the Class Period. During fiscal year 2013, Ocwen's servicing business accounted for 89.5%, or $1.82 billion, of the $2.04 billion in Ocwen's total revenues. Similarly, Ocwen's servicing business accounted for 95%, or $804.4 million, of the Company's $845.2 million in revenues during fiscal year 2012.

60.     Through Ocwen's core residential servicing business, the Company purchases MSRs on subprime and other high-risk loans. Servicing involves the collection and remittance of principal and interest payments, the administration of escrow accounts, the collection of insurance claims, and the management of loans that are delinquent or in foreclosure. As part of its servicing operations, Ocwen evaluates loans for modification and foreclosure, and assists in the sale of properties following foreclosure.

61.     Ocwen also engages in subservicing activities, which involve Ocwen servicing loans where it does not own the MSRs on behalf of banks and other financial institutions that

own the MSRs, and master servicing, which involves collecting payments from other mortgage servicers and distributing the funds to investors in mortgage-related securities.

62.     Ocwen holds itself out as specializing in servicing subprime and other high-risk non-prime mortgages, and thus many of the loans in its portfolio are considered non-performing, or delinquent (*i.e.,* the borrower has failed to make his or her scheduled payments).  As part of its servicing operations, Ocwen seeks to resolve delinquent loans through, *inter alia*, loan modifications, discounted payoffs, deeds-in-lieu of foreclosure and/or foreclosures.

63.     The amount of revenues Ocwen earns from its servicing business is a function of the "unpaid principal balance," or "UPB," of the loans it services.  Ocwen typically earns fees for its servicing operations as a percentage of UPB for its servicing and subservicing arrangements.  Specifically, Ocwen disclosed in its 2013 Form 10-K that it generally earns annual fees "between 25 and 65 basis points of the average UPB of the loans serviced."  For its subservicing activities, Ocwen typically earns an annual fee "between 10 and 39 basis points of the average UPB, or on a per loan basis."  Per loan fees are typically varied based on delinquency status.

64.     The UPB of Ocwen's servicing portfolio increases when the Company obtains the right to service or subservice additional mortgages.  Conversely, UPB is reduced when homeowners make normal principal payments.

65.     Because Ocwen earns servicing fees as a percentage of the UPB of its MSRs and/or subservicing arrangements, increasing the size of Ocwen's portfolio of MSRs and/or subservicing arrangements was critical to growing the Company's revenues during the Class Period.  In fact, because UPB declines as homeowners make principal payments on their

mortgages, some amount of growth in the size of its servicing portfolio is necessary just to prevent Ocwen's revenues from declining.

66.     Ocwen acknowledged in its public filings that its continued financial success was dependent upon the growth of its servicing portfolio.  For instance, Ocwen identified aggregate UPB as a variable that has a "significant effect on [its] operating results" in its 2013 Form 10-K, stating that because "[s]ervicing and subservicing fees are generally expressed as a percentage of UPB,  . . . growth in the portfolio generally means growth in servicing and subservicing fees." Ocwen further noted in its 2013 Form 10-K that its "ability to maintain the size of [its] servicing portfolio depends on [its] ability to acquire the right to service or subservice additional pools of mortgage loans or to originate additional loans for which [it] retain[s] the MSRs."

67.     Ocwen's financial performance during fiscal year 2013 further confirms the link between its financial performance and the UPB of its servicing portfolio.  Between December 31, 2012 and December 31, 2013, the UPB of Ocwen's servicing and subservicing portfolios increased by 128%, from $204 billion to $465 billion.   During the same period, Ocwen's servicing revenues increased by 127%, from $804.4 million to $1.824 billion, and its share price increased by more than 60%, from $34.59 on December 31, 2012 to $55.45 on December 31, 2013.

68.     As of December 31, 2013, Ocwen had approximately 10,100 employees.  5,400 employees were located in the United States, while 5,700 were employed in 400 other foreign countries, including India, the Philippines and Uruguay.   The vast majority of Ocwen's employees work in call centers, principally overseas, and are involved in the day-to-day work of interfacing with homeowners in connection with servicing mortgages.

69.     As of December 31, 2013, Defendant Erbey, Ocwen's Executive Chairman during the Class Period, owned or controlled 13% of Ocwen's common stock and 4,620,498 options to purchase Ocwen common stock.

### 2.     Defendant Erbey's Related Companies Are Inextricably Linked To Ocwen

70.     In addition to serving as the Executive Chairman of the Board of Directors of Ocwen, Defendant Erbey also served as Chairman of the Board of – and is a major shareholder in – four other mortgage-related businesses, which he created and spun off from Ocwen: Altisource, RESI, AAMC and HLSS (collectively, the "Erbey Companies").  Despite being separate public companies, Ocwen and the Erbey Companies continued to derive a material amount of their revenues and services through agreements with one another following their separation.

### a.     Altisource Portfolio Solutions

71.     On August 10, 2009, Ocwen spun off its "Ocwen Solutions" line of business into Altisource, a separate publicly traded company.  Since then, Defendant Erbey has served as the Chairman of Altisource.  As of December 31, 2013, Defendant Erbey owned or controlled 26% of Altisource's common stock and 873,508 options to purchase Altisource common stock.

72.     Following Altisource's separation from Ocwen, these companies remain inextricably linked.  Upon Altisource's separation, Ocwen entered into several long-term agreements with Altisource all of which allow Altisource to profit from Ocwen's determination to foreclose on a mortgage.  For instance, the parties entered into a Services Agreement whereby "Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things."  Similarly, Ocwen and Altisource entered into a "Support Services Agreement," whereby Ocwen and Altisource provide

each other services "in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology."

73.    Most of Altisource's revenues are derived from services it provides to Ocwen. Altisource's principal revenue source is mortgage servicing technologies – in essence mortgage servicing computer applications – that are leased by Ocwen.  According to Altisource, "Ocwen purchases certain mortgage services and technology services from us under the terms of the master services agreements and amendments to the master services agreements," which extend into 2025.  As Altisource CEO Bill Shepro stated during Ocwen's December 2013 Conference, under this agreement, Altisource is "the provider of all the services that Ocwen would typically outsource" to third-party service providers.   According to Ocwen's 2013 Form 10-K, Altisource's servicing technology "integrates behavioral and psychological principals into the borrower communication process, which enhances our ability to provide solutions to borrowers."

74.    Altisource was also created for tax-saving purposes and is incorporated in Luxembourg.  Altisource CEO Bill Shepro stated during Ocwen's December 2013 Conference that the spin-off of Altisource from Ocwen and its incorporation in Luxembourg "helped us lower our global effective tax rate, which for 2013 has been at 6%, and that was done through our location of a headquarters in Luxembourg."  Indeed, in its annual report filed with the SEC on Form 10-K for fiscal year 2013 (the "Altisource 2013 Form 10-K"), Altisource reported an effective tax of 6.0%, half of Ocwen's 11.9% effective rate.  Likewise, for fiscal year 2012, Altisource's effective tax rate was 7.0%, less than a quarter of the 29.7% effective tax rate paid by Ocwen.  In this way, and given Defendant Erbey's larger stake in Altisource than Ocwen, a dollar earned by Altisource during the Class Period was worth significantly more to Defendant Erbey than a dollar earned by Ocwen.

75.     Altisource provides its REALServicing platform to Ocwen, which Ocwen uses to determine whether resolving non-performing loans through modification, deed-in-lieu of foreclosure or foreclosure will optimize its net present value.

76.     When Ocwen determines, through its use of Altisource's REALServicing platform, to foreclose on a loan, Altisource steps in to provide an array of foreclosure-related services, including asset management, insurance services, residential property valuation, default management services, and origination management services.  Altisource's asset management operations involve services such as REO asset management, title insurance, property preservation, and operation of the Hubzu consumer real estate portal.

77.     Hubzu is an online auction site for the sale of homes facing foreclosure and investor-owned properties following foreclosure.  A substantial portion of Ocwen's REO and short-sale properties are marketed on Hubzu, and the vast majority of Hubzu listings are of Ocwen-serviced properties.  Additionally, Ocwen uses a real estate agent employed by Altisource subsidiary REALHome Services and Solutions, Inc. to acts as the seller's agent for many of its listings on Hubzu.

78.     As set forth in the Altisource 2013 Form 10-K and Altisource's quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2014 ("3Q 2014"), for fiscal year 2013 and the 9 months ended September 30, 2014, Altisource reported that it earned 65% and 60% of its revenue, respectively, from Ocwen.

**b.     Altisource Residential Corporation**

79.     RESI was spun off from Altisource on December 21, 2012, and focuses on acquiring and owning single-family rental assets following foreclosure.  According to Altisource, RESI "is focused on acquiring and managing single family rental properties by acquiring portfolios of sub-performing and non-performing residential mortgage loans."  RESI's annual

report filed with the SEC on Form 10-K for fiscal year 2013 reported that Altisource contributed $100 million of equity to RESI in exchange for shares that were distributed to Altisource shareholders.  In Ocwen's 2013 Form 10-K, the Company reported that as of December 31, 2013, Defendant Erbey owned or controlled 5% of RESI's common stock and held 291,167 options to purchase RESI common stock.

80.     As with Altisource, RESI remains inextricably linked with the Ocwen enterprise. It has few if any of its own employees; like Altisource with Ocwen, RESI also entered into a Support Services Agreement, wherein Altisource could provide human resources, vendor management operations, corporate services, risk management services, quality assurance services, treasury, finance accounting, legal, tax and compliance services.  Moreover, it entered into a long-term master service agreements with Ocwen and Altisource on December 21, 2012 in which it provides property management, leasing and construction management services associated with the acquired single-family rental assets following foreclosure.

81.     Additionally, as set forth in the Company's 2013 Form 10-K, Ocwen entered into a 15-year servicing agreement with RESI's operating partnership, Altisource Residential, L.P. Pursuant to this agreement, Ocwen agreed to "service residential mortgage loans acquired by [RESI] and provide loan modification, assisted deed-in-lieu of foreclosure, assisted deed-for-lease and other loss mitigation programs."

82.     According to its quarterly report filed with the SEC on Form 10-Q for 3Q 2014, as of September 30, 2014, RESI's portfolio consisted of 12,090 mortgage loans, substantially all of which were non-performing, with an aggregate UPB of $3.2 billion and market value of underlying properties of $2.9 billion.  It also owned 2,984 REO properties valued at $460.1

million – 2,660 were held for use and 324 were held for sale.  It also owned 872 re-performing mortgage loans with a UPB of $204.3 million and property value of $267.7 million.

### c.    Altisource Asset Management Corporation

83.    As described in its annual report filed with the SEC on Form 10-K for fiscal year 2013, AAMC was incorporated in the U.S. Virgin Islands on March 15, 2012.  AAMC is an asset management company providing portfolio management and corporate governance services to Residential.

84.    AAMC serves as RESI's asset manager.  Under its asset management agreement with Residential, AAMC performs RESI's day-to-day operations, defines investment criteria, executes asset acquisitions for RESI, analyzes property sales, oversees Ocwen's servicing of RESI's loans, oversees Altisource's renovation, leasing and property management of RESI's properties, and performs asset management and corporate governance duties.  As of December 31, 2013, Defendant Erbey owned or controlled 27% of AAMC's common stock and 87,350 options to purchase AAMC common stock.

85.    According to Ocwen's 2013 Form 10-K, on December 31, 2013, the Company entered into a "support services agreement" with AAMC, whereby Ocwen agreed to "provide business development, analytical and consulting and administrative services to AAMC."

### d.    Home Loan Servicing Solutions

86.    According to Altisource, HLSS's "primary objective is the acquisition of mortgage servicing rights and related servicing advances, loans held for investment and other residential mortgage related assets."  HLSS primarily acquires MSRs from Ocwen and then contracts with Ocwen to service the loans.   As of December 31, 2013, Defendant Erbey owned or controlled 1% of HLSS's common stock.

32

87.     As set forth in the Company's 2013 Form 10-K, between March 5, 2012 and December 31, 2013, Ocwen sold to HLSS the rights to MSRs and related servicing advances for loans with a UPB of $202.3 billion.

88.     In addition, Ocwen and HLSS have agreed to provide each other with professional services, "including valuation analysis of potential MSR acquisitions, treasury management services, . . . legal licensing and regulatory compliance support services, risk management services and other similar services."

**B.      Subprime Mortgage Servicing Has Been Heavily Scrutinized Following The Subprime Crisis To Ensure That Homeowners Are Not Treated Unfairly**

89.     Following the 2008 housing crisis, the mortgage servicing industry was subjected to extensive regulation by state, federal and local governments, along with federal agencies, such as the CFPB, the Federal Trade Commission, and the SEC.  As a result, servicers like Ocwen are required to comply with a number of consumer protection laws, including the Gramm-Leach-Bliley Act, the Fair Debt Collection Practices Act, the Real Estate Settlement Procedures Act ("RESPA"), the Truth in Lending Act, the Fair Credit Reporting Act, the Servicemembers Civil Relief Act, the Homeowners Protection Act, the Federal Trade Commission Act and the Dodd-Frank Wall Street Reform and Consumer Protection Act.

90.     This increased regulatory scrutiny of mortgage servicers was necessitated by the widespread abusive and predatory practices employed by servicers throughout the housing crisis. These predatory practices included, among other things, "Robo-signing," which involves mortgage servicers signing affidavits of foreclosure without reviewing the documents and despite having no personal knowledge of the information contained therein.

91.     In February 2012, in an effort to curb such abusive practices, prior to the Class Period, the attorneys general of 49 states and the District of Columbia, the federal government,

and five banks and mortgage servicers (Bank of America, Citi, JPMorgan Chase, Wells Fargo and GMAC/ResCap) entered into the National Mortgage Settlement – an agreement that created heightened servicing standards, provided for relief to distressed homeowners and provided funding for state and federal governments.

92.     The servicers subject to the National Mortgage Settlement were required to provide $20 billion in consumer relief and $5 billion in additional payments.  Additionally, the servicers agreed to reform their mortgage servicing practices to, among other things, improve their communication with borrowers, provide adequate staffing levels and training, and implement appropriate standards for executing documents in foreclosure cases.  The National Mortgage Settlement also established the role of the NMS Monitor to asses the servicers' performance in meeting these requirements.  In this regard, the servicers agreed to file with the NMS Monitor regular reports detailing their compliance.  Based upon his review of these reports, as well as his independent oversight, the NMS Monitor issues his own compliance reports on a semi-annual basis.  As a non-bank, Ocwen was not an original party to the National Mortgage Settlement.

93.     Similarly, the NY DFS, which has jurisdiction over licensed mortgage servicers in New York State, took on a greater role in regulating the operations of mortgage servicers in the wake of the housing crisis.  For example, in August 2010, the NY DFS issued a series of new rules and regulations regarding the business practices of mortgage servicers in New York.  In particular, the regulations included a duty to avoid preventable foreclosures by pursuing modification efforts, and a requirement that foreclosure not occur when a homeowner is being considered for a loan modification.  The rules also regulated communications with borrowers and prevented other unfair and deceptive business practices.  According to Richard H. Neiman, the

Superintendent of Banks for the State of New York at the time, the heightened regulations ensured that "[f]rom the moment a mortgage is signed in New York State to the time it comes to its end, these loans must now be handled at every step of the process by individuals and companies that are accountable to homeowners."

94.     Further, when the NY DFS had concerns regarding a servicer's ability to service loans in accordance with borrowers' best interests, it exercised its authority to delay and/or prevent mortgage servicers from acquiring additional MSRs.  Accordingly, complying with the NY DFS's rules and regulations was critical to the growth of Ocwen's servicing portfolio, and thus its financial performance, during the Class Period.

95.      In addition to increased regulatory scrutiny, banking institutions were also subjected to added capital requirements in connection with their mortgage servicing portfolios following the housing crisis.  For instance, proposed Basel III regulations sought to limit banking institutions' mortgage servicing assets to 10% of the bank's Tier 1 common equity.  Non-bank servicers like Ocwen were not subject to these capital requirements.

C.     **Following The Subprime Crisis, Ocwen Sought To Capitalize On The Increased Regulatory Scrutiny Of Subprime Mortgage Servicers**

96.     As banks became the focus of heightened regulatory scrutiny and increased capital requirements, they began to divest their servicing portfolios.  Seizing upon this opportunity, non-bank servicers like Ocwen, which were not subject to the heightened capital requirements, began voraciously purchasing MSRs.  In fact, between 2010 and 2013, Ocwen executed a frenetic growth plan that resulted in a $400 billion increase in the UPB of its servicing and subservicing portfolio.

97.     For instance, on April 5, 2010, Ocwen filed a Form 8-K with the SEC announcing that it had entered into an agreement with an unidentified company (later identified as Saxon) to

35

purchase MSRs on approximately 38,000 mortgage loans with an aggregate UPB of approximately $6.9 billion.  In response to this disclosure, the Company's shares jumped over 10%, from a close of $11.29 per share on April 1, 2010 to close at $12.45 on April 6, 2010.

98.     On May 28, 2010, Barclays issued a news release stating that it had agreed to sell its MSR platform, HomEq, to Ocwen.  Following this announcement, on June 21, 2010, Moody's Investors Service ("Moody's") increased Ocwen's credit rating outlook to stable from negative to "reflect[] recent and pending residential mortgage servicing acquisitions[,]" including Ocwen's $6.9 billion purchase of MSR from Saxon in the second quarter of 2010 and its forthcoming acquisition of HomEq, which Ocwen anticipated would increase its MSR portfolio to approximately $85 billion after its completion in the third quarter of 2010.

99.     Similarly, on June 25, 2010, Standard & Poor's Rating Services ("S&P") upgraded its unsecured debt rating of Ocwen from 'B-' to 'B' based upon its "positive view of the ongoing implementation of Ocwen's more-focused business strategy."  In particular, S&P recognized that Ocwen's planned acquisition of HomEq demonstrated that the Company had "taken positive steps . . . through successfully bidding to acquire servicing assets, thereby fortifying its existing servicing operation."

100.    As Ocwen embarked upon this growth plan prior to the start of the Class Period, Defendants repeatedly assured the market that it had processes and systems in place to ensure its compliance with relevant regulations.  For example, in Ocwen's annual reports filed on Form 10-K for fiscal years 2010 (the "2010 Form 10-K") and 2011 (the "2011 Form 10-K"), respectively, the Company boasted that running its servicing platform on Altisource's "highly robust" IT system enabled it "to increase borrower acceptance rates of loan modifications and other resolution alternatives ***and at the same time increase compliance***."  Ocwen further indicated in

36

both the 2010 Form 10-K and the 2011 Form 10-K with respect to anticipated changes to applicable legal and regulatory requirements that it "expect[ed] to incur significant ongoing operational and system costs in order to prepare for compliance with these new laws and regulations."

101.    Similarly, on May 5, 2011, the Company hosted a conference call with analysts and investors to discuss its financial results for the first quarter of 2011 (the "May 5, 2011 Conference Call"), during which Defendant Faris stated that Ocwen was positioned to comply with all enhanced mortgage servicing requirements, even those that did not yet formally apply to Ocwen:

> In mid-April, federal regulators issued consent orders for 14 of the nation's largest bank servicers and two service providers. Ocwen has reviewed the substance of these consent orders and *we believe that we are well positioned to comply with the key requirements*. While these orders do not apply directly to Ocwen, we believe they are important in two ways. First, elements of the orders may become regulatory standards in the future. Second, because the requirements apply to the largest servicers in the country, they may become de facto standards for those seeking to buy servicing or provide sub servicing.
>
> In this way, *we think these orders enhance our ability to source new business* as existing servicers seek to either exit the business or eliminate non-core portions of their portfolios, all while the number of strong counter parties capable of complying with the new servicing standards shrinks.

**D.     Regulators Raise Concerns Over Ocwen's Ability To Manage Its Expanding Servicing Portfolio In A Manner That Treats Homeowners Fairly**

102.    On June 5, 2011, Ocwen announced its agreement with Goldman Sachs to purchase Litton, an acquisition that would increase Ocwen's servicing portfolio by over $38 billion, or more than 53% of the total UPB of Ocwen's servicing portfolio as of March 31, 2011. In response to this news, Moody's and Fitch Ratings, Inc. ("Fitch") re-affirmed the Company's credit ratings.

103.    On August 24, 2011, Ocwen asked the NY DFS to approve the Litton acquisition. However, in a September 1, 2011 letter to Ocwen, the NY DFS expressed serious concerns about whether "the post-acquisition entity, which would become the twelfth largest mortgage servicer in the United States with a significant portfolio of stressed loans, would be able to effectively handle the increased servicing volume and comply with HAMP requirements, internal loss mitigation policies and procedures, and laws and regulations governing mortgage loan servicing and foreclosure activities."

104.    As a result, the NY DFS conditioned its issuance of a "No Objection" letter in connection with the Litton acquisition "upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to" the DFS Agreement.

105.    Pursuant to the DFS Agreement, Ocwen was required to comply with the following mortgage servicing practices, among others:

a)  "Servicer shall perform or cause to be performed an independent review of each denial of a request for a loan modification. . . . If the independent review concludes that the loan modification denial was correct, Servicer shall promptly send a written non-approval notice to the borrower."

b)  "Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, including for GSE loans to the extent consistent with FHFA guidelines for GSE loans."

c)   "To the extent Servicer purchases a master hazard insurance policy for force-placed insurance, it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred.  In no event shall Servicer purchase a master hazard insurance policy from an affiliated entity."

d)  "Servicer shall adhere to this Agreement for any loans acquired or otherwise added to Servicer's portfolio subsequent to the signing of this Agreement."

106.    The DFS Agreement further stated that to the extent Ocwen "agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are

contained in this Agreement, such other provisions shall be incorporated by reference herein with respect to such party."

107.    Cognizant of the prior unfair and deceptive practices employed by subprime mortgage servicers throughout the subprime crisis, the NY DFS demanded that Ocwen enter into the DFS Agreement in order to ensure that the Company's growth would not come at the expense of homeowners.  Indeed, in announcing Ocwen's entry into the DFS Agreement, which was subsequently amended by the parties on December 15, 2011, Superintendent Lawsky stated that it "sets a new higher standard for the residential mortgage servicing industry, whose troubling foreclosure and servicing practices we have been investigating along with other regulators across the country."

108.    Further, in conditioning the Litton acquisition upon Ocwen's execution of the DFS Agreement, the NY DFS confirmed its authority (and willingness) to curb Ocwen's growth if it determined that Ocwen was not acting in the best interests of homeowners.  Ocwen's continued growth throughout the Class Period was thus contingent upon its ability to comply with the rules and regulations imposed by the NY DFS.

> ### E.    In An Effort To Assuage Market Concerns, Ocwen Publicly Touts Its Compliance With Regulatory Obligations

109.    Ocwen's entry into the DFS Agreement, and its representations regarding its compliance with regulatory obligations, paved the way for its continued growth.  Soon after Ocwen closed on its acquisition of Litton (and following its entry into the DFS Agreement), the Company announced on October 24, 2011 that it had entered into a purchase agreement with Morgan Stanley to acquire MSR assets from Saxon.  In response to this news, the Company's share price increased by 3%, from a close of $13.18 per share on October 21, 2011 to close at $13.58 per share on October 24, 2011.

110.    On the heels of its announced plans to acquire MSR assets from Saxon, Ocwen disclosed on November 9, 2011 in its quarterly report filed with the SEC on Form 10-Q for the period ended September 30, 2011 that it had entered into an agreement with JPMorgan Chase to purchase MSR for approximately 82,000 non-prime mortgage loans with a UPB of approximately $15 billion, or 14% of the total UPB of Ocwen's servicing portfolio as of September 30, 2011.

111.    On December 12, 2011, *The Wall Street Journal* published an article profiling the Company titled "Thinking Deeply On Risky Lending."  Commenting on Ocwen's astronomical growth, the article reported that "[t]he recent deals will make Ocwen the largest subprime servicer, responsible for roughly one in five subprime mortgages" and "the ninth-largest servicer overall, with $150.6 billion in loans[,]" rendering "[t]he company . . . more than tripled in size since the end of 2009, when it serviced $48.8 billion in mortgages and ranked seventh in subprime servicing."  The article further noted that Ocwen's "shares are up 43% this year, while most financial-services stocks have tumbled."

112.    Shortly after the Saxon transaction closed on April 2, 2012, the Company announced on May 23, 2012 that it had entered into an agreement with Bank of America, National Association ("BANA") to purchase MSR with respect to approximately 53,100 mortgage loans owned by a government-sponsored enterprise ("GSE") with an aggregate UPB of approximately $10.7 billion.

113.    Meanwhile, Defendants continued to tout Ocwen's ability to thrive under heightened regulatory scrutiny.  For example, on February 23, 2012, Ocwen hosted a conference call with analysts and investors to discuss its fourth-quarter and full-year 2011 financial results (the "February 23, 2012 Conference Call"), during which Defendant Faris reaffirmed his earlier

representation on the May 5, 2011 Conference Call that Ocwen was "***well positioned to comply***

***with the key requirements***" of the National Settlement Agreement, which would "***enhance [the***

***Company's] ability to source new business"*** as follows:

> We believe the federal and state settlement with the five large banks announced
> earlier this month could provide business opportunity for Ocwen as requirements
> imposed on the banks play to our strengths in modifications, particularly principal
> reduction modifications, where we have been the industry leader.  Ocwen is well
> positioned to provide cost-effective solutions to the banks that are party to the
> settlement.

> In addition, the settlement provides additional clarity around government
> intention for servicing standards.  ***We have carefully analyzed all of the known***
> ***requirements and our [sic] confident that we either already meet these***
> ***standards or can readily do so.***  Even though the servicing requirements in the
> settlement do not apply directly to Ocwen, it is our intention to treat them as de
> facto industry standards.

114.    During the question and answer session of the February 23, 2012 Conference

Call, Defendant Erbey also boasted about the Company's ability to meet the servicing standards

set forth under the National Mortgage Settlement in the following exchange:

> DeForest Hinman - Walthausen & Co. – Analyst

> Okay, that's helpful.  And can you kind of help us think about the big picture
> from a perspective of this $1 trillion of UPB that you just mentioned?  In the past
> we've done more platform transactions and more recently we did MSR purchase
> with JPMorgan.  Is there a bigger growth opportunity from subservicing at this
> point than there has been in the past?

> Bill Erbey - Ocwen Financial Corp. – Chairman

> First of all, let me clarify.  That is across the entire array of all products.  We
> wouldn't be interested in the lower return of more current portfolios, so we don't
> view that as our available market, just because it's very difficult to -- we don't like
> the prepayment risk where the return parameters are the more performing
> portfolios.  I think that what we are seeing right now is very heavily sales of
> servicing, but I do concur with Ron, that ***I think that with the AG settlement and***
> ***the focus on principal reductions, there may be increased level of activity in the***
> ***subservicing space there.  There are fairly significant penalties associated with***
> ***not meeting those goals set for the five large banks.  And I would point out, I***
> ***think, we believe we've done more principal reduction mods than the rest of the***

*industry, so we would hope that we would be a prime supplier for providing those services should banks elect to outsource that.*

115.    On May 3, 2012, during the Company's conference call with analysts and investors to discuss its financial results for the first quarter of 2012, Defendants Faris reiterated with respect to the servicing standards set forth under the National Mortgage Settlement that "these rules and practices present expansion opportunities as financial institutions will look to subservice more business to specialty servicers with scalable capacity and a demonstrated ability to meet compliance requirements. . . .  Ocwen is a pioneer in principal reduction modifications and we have developed substantial process technology and unique product offerings to support principal. . . ."

116.    During the Company's conference call with analysts and investors to discuss its financial results for the second quarter of 2012 on August 2, 2012, Defendant Faris again stated that Ocwen had systems and processes in place to ensure compliance with all servicing regulations, even those that did not yet formally apply to Ocwen:

> [W]e are seeing an increasing opportunity to provide sub-servicing for banks. These opportunities in sub-servicing are bolstered by the federal bank consent orders and the state AG federal agency settlements which have pushed banks to find partners that can help them meet government mandated goals. ***Ocwen has always viewed government settlements and agreements as de facto standards. But we have kept pace with the development by updating our systems and processes to adhere to these requirements.*** This has positioned Ocwen as a strong partner and solution provider for banks subject to the settlements.

117.    By the end of the second quarter of 2012, the Company's MSR portfolio had grown by nearly 83%, from approximately $70.8 billion in UPB as of June 30, 2011, to approximately $128 billion in UPB as of June 30, 2012.  Over the same one-year period, the Company's revenues increased by over 100% and its stock price rose by approximately 69%.

**F.      As Ocwen's Portfolio Expands, The NY DFS Imposes Additional Restrictions To Ensure That Ocwen's Servicing Practices Are Not Harming Borrowers**

118.    On October 3, 2012, the Company announced that it had reached an agreement to purchase Homeward's loan originating business and servicing platform from WL Ross & Co., LLC.  The price of Ocwen's common shares jumped over 20% in response, from a close of $28.96 on October 2, 2012 to close at $34.88 on October 3, 2012.

119.    News and investment commentary issued that same day touted the Homeward transaction as a reliable way for Ocwen to increase the UPB of its servicing portfolio.  For example, Dow Jones reported that "[t]he shift . . . will provide a steady supply of mortgages for [Ocwen] to service, which is important because major lenders have all but stopped issuing subprime loans."   Similarly, analyst Compass Point Research & Trading, LLC ("Compass Point") commented that "[t]his deal solves a big problem for OCN.  One of the biggest issues for OCN and the special servicers in general was: 'how do they sustain their servicing portfolios for the long-term when the major bulk servicing transactions dry up?'  We believe this acquisition is a clear positive for OCN as it adds origination capabilities and further legitimizes its agency strategy."   In addition, analyst Piper Jaffray stated that "[w]e believe this acquisition is a clear positive for OCN as it adds origination capabilities and further legitimizes its agency strategy."   Finally, analyst Sterne, Agee & Leach Inc. ("Sterne Agee") noted that "[t]he . . . Homeward acquisition should be meaningfully accretive to EPS and give OCN access to a mortgage origination platform.  We are increasing of FY 13 and FY 14 EPS estimates to capture this and raising our price target to $43 per share."

120.    Less than a month after announcing the Homeward deal, Ocwen submitted a winning $3 billion bid on ResCap's loan servicing platform at a bankruptcy auction on October 23, 2012, which would usher in MSR assets totaling more than $370 billion in UPB pending the

bankruptcy court's approval of the transaction on November 16, 2012.   Several analysts, including Piper Jaffray, Compass Point, and Sterne Agee uniformly expected the ResCap deal to be accretive to Ocwen's future earnings.

121.    In an article published on December 7, 2012, *The Wall Street Journal* reported that Ocwen's pending ResCap deal, which was expected to close in the first quarter of 2013, positioned the Company to become the fifth-largest subprime mortgage servicer in the United States.   In addition, the article noted that Ocwen's rapid expansion rendered the Company a "stock-market darling" and "favorite among investors," as its common stock was trading around $35.50 per share – an increase of over 250% over the past two years.

122.    However, the NY DFS did not share the market's enthusiasm over Ocwen's proposed acquisitions of Homeward and ResCap.   Rather, on December 5, 2012, the NY DFS again required Ocwen to submit to monitoring to ensure its compliance with the DFS Agreement, announcing that "an examination by the [NY DFS] found indications of Ocwen violating the Agreement."   In particular, the NY DFS stated:

> [T]he examination also preliminarily identified instances that the Department believes indicate non-compliance with the Agreement by Ocwen, including, in some instances: (1) failing to provide certain borrowers direct contact information for their designated loss mitigation staff or a single point of contact ("SPOC"); (2) pursuing foreclosure actions against certain borrowers who are seeking a loan modification (referred to in the Agreement as "dual tracking"); (3) failing to conduct an independent review of certain loan modification denials; (4) failing to demonstrate its adoption of policies and procedures to effectively track sanctioned third-party vendors, including local foreclosure counsel; (5) failing to demonstrate its implementation of policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account; and (6) failing to sufficiently document actions required to ensure that prior modification efforts are not rendered futile upon transfer of a servicing file to or from Ocwen[.]

123.    The NY DFS expressed concerns that these potential violations "deprived certain struggling homeowners in New York of many opportunities, including to cure the delinquencies on their loans before a foreclosure action was commenced."

124.    Due to these alleged potential violations of the DFS Agreement, Ocwen and the NY DFS entered into a further agreement titled "Consent Order Under New York Banking Law § 44."  Pursuant to the DFS Consent Order, Ocwen consented to the installation of an "independent on-site monitor" tasked with conducting "a comprehensive review . . . of Ocwen's servicing operations, including its compliance program and operational policies and procedures." In furtherance of its continued efforts to ensure that Ocwen was sufficiently protecting the rights of homeowners, the NY DFS required Ocwen to install the Monitor "so that [it] can be sure that the reforms are implemented and homeowners have a real chance to avoid foreclosure."

125.    As part of the DFS Consent Order, Ocwen vowed to cooperate fully with the Monitor and agreed that, in the event of Ocwen's breach of the DFS Consent Order, the NY DFS could pursue "all the remedies available under the New York Banking and Financial Services Laws and may use any and all evidence available to the Department for all ensuring hearings, notices, orders, and other remedies that may be available."

126.    By entering into the DFS Consent Order, Ocwen was able to proceed with closing on the Homeward acquisition in December 2012 as planned.  As a result, Ocwen managed to almost double the UPB of its residential servicing portfolio (an increase of 99.3% during fiscal year 2012) from $102.2 billion to $203.7 billion.  Over the same period, the Company's total revenue increased by 70.4%, and its share price rose 139%, from $14.48 per share on December 30, 2011 to $34.59 per share on December 31, 2012.

## VI.     OVERVIEW AND SUMMARY OF DEFENDANTS' FRAUD

### A.     Defendants Falsely Tout Ocwen's Ability To Service Loans At A Greatly Reduced Cost And In Compliance With Regulatory Requirements

127.     Throughout the Class Period, Defendants' public statements repeatedly identified, as a competitive advantage, Ocwen's purported ability to service loans in compliance with regulatory requirements.  In particular, Defendants attributed this alleged competitive advantage to the Company's use of REALServicing, the mortgage servicing platform Ocwen leased from Altisource.   Ocwen intended to transfer loans serviced on the platforms acquired from Homeward and ResCap to REALServicing.  Defendants praised REALServicing's "scalability" – its capacity to handle the rapid growth in Ocwen's servicing portfolio.

128.     For example, during a May 21, 2013 presentation at the Barclay's High Yield and Syndicated Loan Conference (the "May 21, 2013 Conference"), Ocwen's Chief Financial Officer, John V. Britti ("Britti"), stated that Ocwen has "the lowest cost platform in the industry," which provided the Company with "a substantial cost advantage."  In particular, Britti suggested that it cost Ocwen just $250 per year to service a non-performing loan, or 70% less than the more than $800 a year spent by Ocwen's competitors.  Defendant Erbey echoed these sentiments during an August 1, 2013 conference call with analysts and investors discussing the Company's financial results for the period ended June 30, 2013 ("2Q 2013") (the "August 1, 2013 Conference Call"), stating that "Ocwen's cost to service non-performing loans is 70% lower than the industry average," and that REALServicing allows Ocwen "to manufacture new capacity more efficiently and effectively than other servicers."

129.     In Ocwen's quarterly reports filed with the SEC on Form 10-Q for the periods ended March 31, 2013 ("1Q 2013") (the "1Q 2013 Form 10-Q"), June 30, 2013 ("2Q 2013") (the "2Q 2013 Form 10-Q") and September 30, 2013 ("3Q 2013") (the "3Q 2013 Form 10-Q"),

Ocwen similarly attributed its growth potential to the Company's "low cost and [ ] high-quality servicing platform," REALServicing.  For instance, the 1Q 2013 Form 10-Q stated:'

> We expect that other non−prime and prime servicing platforms and servicing portfolios will come to market in the next several months.  We are currently tracking potential MSR acquisition opportunities with a total UPB of approximately $375.0 billion.  We believe that servicing and subservicing opportunities with an aggregate UPB of up to $1.0 trillion could come to market in the next 2 to 3 years.  ***To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost and our high−quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.***

130.    Following the ResCap acquisition, Ocwen announced a plan to capitalize on REALServicing's purported cost benefits by transitioning ResCap's loans from FiServ, ResCap's servicing platform, onto Altisource's REALServicing platform.

131.    For example, during the Company's May 2, 2013 Conference call with analysts and investors to discuss its 1Q 2013 financial results (the "May 2, 2013 Conference Call"), Defendant Faris stated that the transition from the FiServ platform to REALServicing would lead to "various cost takeouts" associated with the ResCap acquisition, and also noted that the integration of ResCap loans onto REALServicing "demonstrates the unique scalability of our technology."

132.    Similarly, in the 2Q 2013 Form 10-Q and the 3Q 2013 Form 10-Q, the Company stated that because the FiServ platform "leverages third-party outsourcing for a variety of functions," Ocwen would be able to "absorb[] and/or diminish [these costs] as the ResCap assets transition to the REALServicing™ platform."  Similarly, both the 2Q 2013 Form 10-Q and the 3Q 2013 Form 10-Q attributed Ocwen's growth potential to its purported "low cost, high-quality servicing platform," which can be "quickly scale[d] . . . to handle acquired loan portfolios."

133.    During the October 31, 2013 Conference Call, Defendant Faris stated that REALServicing "has substantial cost advantages over the rest of the market."  In particular, Defendant Faris repeated the Company's mantra that the cost of servicing loans through the REALServicing platform was allegedly "70% lower then [sic] the industry average for non-performing loans."  Thus, according to Defendants, transitioning all of Ocwen's loans to the REALServicing platform would result in significant efficiencies and cost savings.

134.    Defendant Faris again referenced the cost savings associated with REALServicing during the December 2013 Conference, stating that the Company would realize a significant cost reduction by transitioning the ResCap portfolio from the FiServ platform to REALServicing: "We're paying more than we need to for technology.  There is certain technologies that hang off of the ResCap platform that we'll be able to shutter once we complete that transition."  Further, in the February 27, 2014 Press Release, Defendant Faris similarly noted that it was "nearing the end of [its] integration of the legacy ResCap loans onto Ocwen's servicing platform," and that this integration "will allow [Ocwen] to substantially lower expenses and reduce the operating complexities of running multiple platforms."

135.    In making these representations regarding the lower costs associated with servicing loans through the REALServicing platform, Defendants also emphasized that the transition of ResCap's portfolio from the FiServ platform to REALServicing would not come at the expense of compliance.  Indeed, during the Class Period, Ocwen recognized that, due to increased scrutiny from regulators such as the NY DFS, its failure to comply with enhanced servicing rules and regulations could restrict its ability to grow.  In Ocwen's public filings with the SEC, Defendants acknowledged that Ocwen's failure to comply with applicable laws and regulations could materially impact its business and lead to, among other things, "loss of licenses

48

and approvals to engage in the servicing of residential mortgage loans," "[g]overnmental investigations and enforcement actions," and an "[i]nability to execute on its business strategy, including its growth plans."  Elsewhere in its public filings, Ocwen stated that its failure to comply with government regulations could "adversely affect" and "hamper" Ocwen's "ability to grow."

136.    Thus, to allay any investor concerns that the lower costs associated with REALServicing would come at the expense of compliance, Defendants assured investors that the transition from the FiServ platform to REALServicing would result in increased efficiencies and reduced costs while maintaining the Company's ability to comply with all applicable regulations. For example, during the October 31, 2013 Conference Call, Defendant Faris stated that "[i]ntegration costs have been somewhat higher than expected *as we have been careful to assure excellent customer service and strong compliance throughout the transfer process*." Defendant Faris also represented during the December 2013 conference that the transition would result in "significant *reductions* in [Ocwen's] compliance burden."

137.    In fact, throughout the Class Period, Defendants repeatedly lauded as a competitive advantage Ocwen's ability to navigate its complex regulatory environment, and to service loans in compliance with its regulatory obligations, at a low cost.

138.    For example, Ocwen's 2013 Form 10-K repeatedly emphasized the Company's ability to service loans through REALServicing at a greatly reduced cost and in compliance with all of its regulatory obligations:

> Our analysis of the businesses that we have acquired and our discussions with other market participants have also confirmed our belief that *we are an industry leader in terms of our cost to service non-performing loans*.  We believe that our substantial cost advantages *are primarily a result of proprietary technology and processes* as well as through scale and global sourcing strategies.

\* \* \*

**Scalable and Compliant Servicing Platform**

\* \* \*

We also believe that our platform enables us to operate *in a compliant manner in an increasingly complex and highly regulated environment.* While we have and will continue to incur significant operating costs on compliance matters, if we are able to comply with all applicable regulatory requirements in a manner that is more effective and efficient than other operators, we will have a competitive advantage over these operators."

139.   Similarly, during the October 31, 2013 Conference Call, Defendant Faris stated in

pertinent part:

Moving on to the regulatory front. Earlier this month, the CFPB provided guidance to mortgage servicers for implementing new rules announced earlier this year and scheduled to take effect in 2014. As we stated before, we support efforts by the CFPB and other state and federal regulatory agencies to provide more clarity with regard to mortgage servicing and origination rules and requirements. Greater clarity reduces risk for the industry and allows us to plan appropriately for any necessary changes. *Ocwen is well positioned to comply with all the new requirements.*

140.   In the Company's investor presentation prepared in connection with the

December 2013 Conference and attached to a Form 8-K filed with the SEC on December 3, 2013

(the "December 2013 Investor Presentation"), Defendants lauded the following key functions of

Ocwen's "Compliance Management System:"

a) Establishes its compliance responsibilities;

b) Communicates those responsibilities to employees;

c) Ensures that responsibilities for meeting legal requirements and internal policies are incorporated into business processes;

d) Reviews operations to ensure responsibilities are carried out and legal requirements are met; and

e) Takes corrective action and updates tools, systems, and materials as necessary.

141.    During the December 2013 Conference, the Company went on to state:

I'll talk to you little bit about ways to envision the parts of a compliance management system and this slide breaks it into really four parts, four broad categories.  First is reporting, the second is assessing, third is policing, and the fourth is monitoring. . . .  *The important part from our perspective and that of our primary regulators is that these four functions are all covered.  And at Ocwen, we believe we have that structure*.

142.    Additionally, Defendants specifically informed investors that Ocwen was complying with the regulations implemented by the NY DFS.  In Ocwen's 1Q 2013 Form 10-Q, Defendants stated with respect to the DFS Consent Order:  "Ocwen's understanding is that NY DFS has selected the firm which will act as the Monitor, and *we intend to continue to cooperate with the NY DFS and the Monitor* once the NY DFS and the Monitor finalize the terms of the engagement."   Likewise, Defendants updated investors in the Company's 2Q 2013 Form 10-Q that the "NY DFS selected the firms that will act as the Monitor, and their formal engagement commenced effective July 1, 2013.  The engagement will last until July 1, 2015, and *we intend to continue to cooperate with the NY DFS and the Monitor*."   Defendants subsequently repeated this representation regarding the status of the Monitor's engagement and their willingness to cooperate with respect thereto in Ocwen's Form 3Q 2013 Form 10-Q.

**B.     Ocwen's Purported Ability To Service Loans At A Lower Cost And In Compliance With Regulatory Obligations Fuels The Company's Class Period Growth**

143.    As a result of the foregoing representations, 2013 was another year of record growth for Ocwen.  After the Company completed its acquisition of ResCap on February 15, 2013, Ally Financial Inc. announced on March 12, 2013 that it was selling a separate portfolio of MSR to Ocwen with a UPB of approximately $90 billion.  In a report issued that same day, Piper Jaffray stated "[w]e believe this is a solid deal for OCN and leverages some of its prime servicing capacity and emerging originations strategy."

144.     Continuing on its path toward rapidly becoming one of the nation's largest mortgage servicers, Ocwen announced on June 13, 2013 that it had entered into an agreement with OneWest Bank, FSB ("OneWest") to purchase approximately $78 billion in UPB of MSR. The Company's common stock price increased by approximately 3.58% following this news, from a close of $44.16 on June 12, 2013 to close at $45.74 on June 13, 2013.

145.     Analysts again responded favorably to the Company's June 13, 2013 announcement.  For instance, Piper Jaffray stated that same day "[w]e conservatively believe this is $0.50 to $.60 accretive for 2014 as the transaction is expected to close 2H2013."  The following day, Compass Point reiterated its "Buy" rating and raised its price target on Ocwen to $49 from $44.  Sterne Agee also positively reported on June 14, 2013 that "[t]he acquisition of $78 billion in servicing was done at a better price than expected and has the potential to contribute $0.40 to $0.50 per share from the servicing assets in FY14."

146.     Thereafter, Ocwen disclosed in its Form 8-K announcing the Company's 2Q 2013 financial results that, in addition to the OneWest deal, on June 26, 2013, it had entered into an agreement to purchase MSR and advances related to $8.3 billion of largely non-agency UPB from Greenpoint Mortgage Funding, Inc. ("Greenpoint").  Following this news, Ocwen's stock price increased by 7.33%, from a close of $47.62 per share on July 31, 2013 to close at $51.11 per share on August 1, 2013.

147.     Analysts reporting on Ocwen that same day considered its recent spate of transactions coupled with its pipeline of expected deals as positive indicators that the Company could continue to grow its MSR portfolio.  In particular, Piper Jaffray stated that "[i]t appears many are still selling servicing and OCN is a buyer."  Similarly, analyst Wells Fargo Securities,

LLC ("Wells Fargo Securities") described Ocwen's continued growth of its servicing portfolio "as a positive for not only OCN but for the industry."

### C. Ocwen Completes Its Negotiations Of A Settlement With The CFPB Over Its Past Mortgage Servicing Practices

148.   On December 19, 2013, the CFPB, along with the attorneys general of 49 states, concluded a long-standing investigation into Ocwen relating to its loan servicing practices between 2009 and 2012.  The investigation culminated in a settlement and simultaneous filing of a complaint which alleged that Ocwen had engaged in "unfair and deceptive" servicing practices, including: (1) "providing false or misleading information in response to borrower complaints"; (2) "failing to provide accurate and timely information to borrowers who seek information about loss mitigation services, including loan modifications"; (3) "misrepresenting that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts"; (4) "providing false or misleading information to consumers about the status of foreclosure proceedings where the borrower was in good-faith actively pursuing a loss mitigation alternative offered by [Ocwen]"; (5) "providing false or misleading reasons for denial of loan modifications"; and (6) "failing to properly calculate borrowers' eligibility for loan modification programs and improperly denying loan modification relief to eligible borrowers."

149.   The Consent Judgment that accompanied the complaint and resolved the allegations called for Ocwen's agreement to certain conditions.  In announcing the Consent Judgment, CFPB Director Richard Cordray stated that the action was filed because "Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process." Cordray stated that Ocwen "took advantage of consumers with servicing shortcuts and unauthorized fees," "misled consumers about alternatives to foreclosures," and "denied loan modifications for eligible homeowners," thereby making "troubled borrowers even more

vulnerable to foreclosure." It created remedies for homeowners whose loans were serviced by Ocwen between January 1, 2009 and January 31, 2012. Cordray went on to state that because of Ocwen's unlawful conduct during that period, the Consent Judgment subjects Ocwen to "standards above and beyond the rest of the [mortgage servicing] industry."

150.   As part of the Consent Judgment, Ocwen agreed to abide by the servicing reforms set forth in the National Mortgage Settlement. These reforms included the following:

a) "Servicer shall notify borrowers of the final denial of any first lien loan modification request within 10 business days of the denial decision."

b) "When a first lien loan modification is denied after independent review, Servicer shall send a written non-approval notice to the borrower identifying the reasons for denial and the factual information considered. The notice shall inform the borrower that he or she has 30 days from the date of the denial letter declination to provide evidence that the eligibility determination was in error."

c) "[B]orrowers shall have 30 days to request an appeal and obtain an independent review of the first lien loan modification denial in accordance with the terms of this Agreement. Servicer shall ensure that the borrower has 30 days from the date of the written non-approval notice to provide information as to why Servicer's determination of eligibility for a loan modification was in error."

d) "Servicer will not proceed to a foreclosure sale until . . . expiration of the 30-day appeal period."

151.   In addition, as part of the Consent Judgment, Ocwen agreed to establish the IRG – "an internal quality control group that is independent from the line of business whose performance is being measured" – to perform compliance reviews each calendar quarter and submit their results to the NMS Monitor, and authorized the CFPB and attorneys general to commence enforcement actions against the Company in the event of its noncompliance.

152.   The servicing reforms set forth in the Consent Judgment (and the National Mortgage Settlement) were also incorporated into the DFS Agreement pursuant to its provision stating that in the event Ocwen "agrees with any other regulator to adopt greater consumer

protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein."

> **D.      Following The Consent Judgment, Ocwen Continues To Falsely Dispel Concerns Regarding Its Ability To Meet Its Regulatory Obligations**

153.    In a Form 8-K filed on December 19, 2013 announcing the Consent Judgment, Ocwen dismissed the notion that the Consent Judgment subjected it to additional regulation, noting that it had already been "subject to substantially the same guidelines and oversight with respect to the portion of its servicing portfolio acquired from ResCap in early 2013."  Ocwen thus reaffirmed its ongoing compliance with, *inter alia*, NY DFS requirements that had been in place since December 2012.

154.    Further, during the February 27, 2014 Conference Call, Defendant Erbey addressed specifically the regulations imposed upon Ocwen by the CFPB, stating:

> [T]here is no doubt that the environment particularly with the implementation of the CFPB rules here recently, it is a different regulatory environment than it was a number of years ago and *I think we are as well positioned as others in the non-bank space or better positioned than others to over time demonstrate how well we do service loans and be a leader in the industry.  But we will have to continue to commit management time and resources to that and we are going to do that.*

155.    Additionally, in the May 1, 2014 Press Release, Defendant Erbey stated:

> Going forward, *we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business.*  We consider our solid balance sheet, *National Mortgage Settlement compliance* and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

156.    Likewise, during a conference call held on the same day, Defendant Erbey stated:

> Let me begin with an overview of the three trends that we believe reinforce Ocwen's competitive position in the marketplace.  First, regulators[,] legislators[,] sellers[,] and other stakeholders insist upon near perfection in servicing transfers, and as we will discuss, Ocwen has both unique capabilities, and a long history of success in this regard.  Second, it's important to be in sync with the fullest

55

regulatory mandates, and Ocwen is the only non-bank fully subject to the
National Servicing Settlement requirements.   More over Ocwen's records of
helping homeowners provides an exemplary record of complying with the spirit
of emerging consumer protection.   And third, capital and counterparty strength
are increasingly important to regulators, legislators and sellers.   Ocwen has the
strongest balance sheet of any large non-bank servicer.

*      *      *

Perhaps as importantly, Ocwen can point to facts that demonstrate that's [sic] ***we
are very much in sync with the spirit of the regulations that aim as we do, to
ensure that servicers are helping homeowners. . .***

157.    During this time period, Defendants again issued public statements specifically addressing their continued compliance with the servicing guidelines imposed by the NY DFS, stating in the Company's 2013 Form 10-K:    "We devote substantial resources to regulatory compliance, and we incur, and expect to continue to incur, significant ongoing costs with respect to compliance in connection with the Agreement on Servicing Practices and the work of the Monitor."

158.    In addition, Defendants also repeated their prior statements concerning Ocwen's ability to comply with its regulatory obligations at a lower cost than its peers through REALServicing.  For instance, Ocwen's 2013 Form 10-K stated that it is "an industry leader in terms of [its] cost to service non-performing loans," and that these "substantial cost advantages are primarily a result of proprietary technology and processes."  The 2013 Form 10-K also stated that REALServicing allows Ocwen "to operate in a compliant manner in an increasingly complex and highly regulated environment.

159.    Similarly, the 2013 Form 10-K and Ocwen's 1Q 2014 Form 10-Q repeated Defendants' prior representation that certain costs associated with operating ResCap's servicing platform "will be absorbed and/or diminish as the ResCap assets transition to" REALServicing.

### E.   Ocwen Also Assures The Market That Controls Are In Place To Prevent Related-Party Transactions From Harming Homeowners And Investors

160.    The intense regulatory focus on subprime mortgage servicers prior to and during the Class Period – and, specifically, the efforts of the NY DFS and other regulators to ensure that servicers were acting in the best interests of homeowners – presented a material risk to Ocwen's business growth.   This regulatory risk was amplified by Ocwen's tangled relationships with Defendant Erbey and the Erbey Companies.

161.    As discussed above, Defendant Erbey's formation of the Erbey Companies, which ensured that he stood to profit at every step of the mortgage life cycle, created the material risk that he would place his own interests ahead of the interests of homeowners in violation of regulatory controls designed to protect them.   Acknowledging investors' focus on the regulatory risk posed by Defendant Erbey's conflicting roles, Defendants assured the market throughout the Class Period that Ocwen had controls in place to manage potential conflicts with the Erbey Companies.

162.    For instance, during the December 2013 Conference, Defendant Erbey stated:

> One of the things I like to stress again is that the strategic allies are not affiliates, that each company has its own separate Board of Directors, the majority of whom are independent, and **we have robust related party transaction approval process[es].  Any related party transactions between the companies I actually recuse myself from that decision.**  And we make all of our – very importantly, we make all of our contracts between the companies publicly available to you on our website.

163.    Moreover, Ocwen represented to the market that Defendant Erbey recused himself from all negotiations and approvals concerning transactions between Ocwen and the Erbey Companies.   For instance, in its 2013 Form 10-K, Ocwen stated that because Defendant Erbey's "ownership interests could create, appear to create or be alleged to create conflicts of

interest with respect to matters potentially or actually involving or affecting [Ocwen] and Altisource, HLSS, AAMC and Residential," the Company has:

> adopted policies, procedures and practices to avoid potential conflicts with respect to [its] dealings with Altisource, HLSS, AAMC and Residential, *including our Executive Chairman [Erbey] recusing himself from negotiations regarding, and approvals of, transactions with these entities.   We also manage potential conflicts of interest through oversight by independent members of our Board of Directors* (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.

164.    In a further effort to allay any concerns for the potential risk that Defendant Erbey could place his personal interests above those of homeowners and thus create regulatory risk, Ocwen also represented that it "believe[d] the rates charged under [its related party] agreements *are market rates* as they are materially consistent with one or more of the following fees:  the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other services providers."

## F.   Ocwen's Mortgage Servicing Practices And Related-Party Transactions Did Not Comply With Regulatory Requirements

165.    Unbeknownst to investors and in direct contravention of Defendants' public representations, Defendants' Class Period representations regarding Ocwen's compliance with applicable regulations and its related-party controls were materially false and misleading. Indeed, in sharp contrast to their public representations, Defendants knew and/or recklessly disregarded that the Company was not complying with, and did not have systems and processes in place to ensure its compliance with, its regulatory obligations, and that achieving compliance would lead to dramatically increased servicing costs.  To the contrary, the deficiencies within Altisource's REALServicing platform rendered Ocwen incapable of satisfying these obligations. These deficiencies facilitated Ocwen's shocking practice of backdating its communications with

borrowers throughout the Class Period.  Ocwen's severe compliance issues were magnified by the fact that, contrary to Defendants' representations, the Company did not have a "robust" related-party approval process.  The lack of such related-party controls facilitated Defendants' shuttering of ResCap's superior FiServ platform in favor of a deficient servicing platform operated by Altisource.  Moreover:  (1) numerous risk management executives at Ocwen were also employed by Altisource during the Class Period; (2) the rates charged to borrowers and/or Ocwen under certain of these related-party transactions were not market rates, and instead vastly exceeded the rates charged to non-Ocwen parties; and (3) Defendant Erbey was directly involved in negotiating and approving transactions between Ocwen and the Erbey Companies.  Moreover, increased regulatory scrutiny over these improper practices has greatly increased Ocwen's compliance costs and restricted its ability to grow.

**1.**      **Ocwen's Decision To Shutter ResCap's FiServ Platform In Favor Of Altisource's REALServicing Platform Decreased The Company's Compliance Capabilities**

166.      Throughout the Class Period, Ocwen represented to shareholders that its decision to transition ResCap's loans from the FiServ platform to Altisource's REALServicing platform would allow the Company to reduce costs without sacrificing its ability to comply with its regulatory obligations.  However, numerous former Ocwen employees have established the falsity of these statements, and have confirmed that Defendants' decision to dismantle ResCap's FiServ platform in favor of REALServicing, which was operated by a related party controlled by Defendant Erbey, effectively ensured that Ocwen would ***not*** be able to meet its regulatory obligations.

167.      CW 1, who worked as a Supervisor within Ocwen's IRG between February 2013 and March 2014, oversaw the transfer of data associated with the ResCap loans from the FiServ platform to REALServicing.  In particular, CW 1 was responsible for testing the REALServicing

platform to ensure that loans were being serviced in compliance with applicable regulations. CW 1 noted that during the course of this data migration, CW 1 and numerous other Ocwen employees raised compliance-related complaints concerning REALServicing and its ability to ensure compliance with Ocwen's regulatory obligations.  For example, while the FiServ platform required servicers to enter a single code into the servicing platform in order to open a new loan modification, REALServicing required the entry of up to ten different codes, which, according to CW 1 created significant compliance issues because there was no consistency among Ocwen departments as to how to apply such codes.  Indeed, Ocwen and Defendant Faris would later admit in the December 22, 2014 Consent Order that REALServicing had an "unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative." Similarly, CW 1 found that, unlike the FiServ platform, REALServicing lacked certain necessary compliance capabilities such as tracking, note taking, and the ability to efficiently search within the platform.

168.    Of particular note, CW 1 stated that REALServicing's coding issues led to force-placed insurance being improperly applied to certain condominium properties.  In particular, when the mortgages for these properties were entered into REALServicing, they were coded incorrectly, leading to the placement of force-placed insurance on the properties.  CW 1 stated that this compliance deficiency became so severe that testing for this force-placed insurance metric was ultimately halted.  The deficiency remained unresolved when CW 1 left Ocwen in March 2014.

169.    CW 1 also stated that in REALServicing, it was not possible to discern if late fees applied to a mortgage were carried over from the FiServ platform, or if the borrower incurred the

fees after Ocwen began servicing the loan.  The only way for Ocwen employees to make such a determination was to compare REALServicing's records to those maintained in the FiServ platform.

170.    As a result, CW 1 and others at Ocwen believed that the FiServ platform was a "clearly better" and a "much more superior" servicing platform from a compliance perspective than REALServicing.  Further, as CW 1 and others at Ocwen identified compliance-related issues with REALServicing, these complaints were communicated directly to S.P. Ravi, who (unbeknownst to CW 1 and Ocwen's regulators, as would later be revealed) also served as the Chief Risk Officer of Altisource at the time, through weekly reports.  The weekly reports were also provided to Defendant Faris.  Moreover, Ravi also participated in weekly conference calls with CW 1 and others that addressed these compliance-related concerns with REALServicing.

171.    CW 1's statements were corroborated by other former Ocwen employees and, ultimately, by Ocwen itself.  For instance, CW 2 was responsible for ensuring that the ResCap loans purchased by Ocwen were in compliance with the National Mortgage Settlement and CFPB regulations.  In particular, CW 2 was responsible for tracking mortgages subject to loss mitigation proceedings to ensure, among other things, that foreclosure proceedings were not initiated during the pendency of any loss mitigation efforts.  Prior to the transition to REALServicing, CW 2 carried out these duties using the FiServ platform.  According to CW 2, because the ResCap loans were subject to the National Mortgage Settlement, the FiServ platform had already been modified to ensure compliance with the National Mortgage Settlement and CFPB regulations.  REALServicing, by contrast, was not prepared to ensure compliance with these requirements.  Moreover, as later disclosed in the NMS Compliance Report, Ocwen informed the NMS Monitor following the conclusion of Test Period 7 on March 31, 2014 that

the Company and the IRG "were having difficulty identifying and extracting valid loan testing populations" for one of the metrics used to evaluate Ocwen's compliance with the NMS due to "[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ."

172.   CW 2 attended a meeting in the spring of 2013 where his superiors, Joseph Pensabene and Gemma Camp, conveyed to CW 2 and others in attendance that Ocwen's management acknowledged that REALServicing was not as "friendly" and "looked a little more basic" than the FiServ platform.  Pensabene expressed hope that Ocwen would ultimately adopt the FiServ platform because REALServicing did not have the capabilities to ensure compliance with applicable regulations.

173.   CW 2 agreed that REALServicing was "far from ready" to ensure compliance efficiently, and described the transition from the FiServ platform to REALServicing as "moving from a Mercedes to a Scion."  In particular, CW 2 stated that the FiServ platform could handle a large volume of loans, whereas REALServicing could not, and that REALServicing required the entry of four or five codes to complete a single process.  In fact, while the FiServ platform had approximately 100-150 codes that were used to service loans, REALServicing had about 2,000.  Ocwen and Defendant Faris would later admit in the December 22, 2014 Consent Order that REALServicing actually had "***more than 8,400***" codes.  Likewise, REALServicing did not have codes necessary to track holds that were being placed on loans, whereas the FiServ platform had such capabilities.  CW 2 stated that due to these coding issues, many mortgages were on hold longer than they needed to be, while others that should have been placed on hold were not.  CW 2 expressed concerns regarding REALServicing to Gemma Camp.

174.   CW 4, a Senior Compliance Analyst in Ocwen's Making Homes Affordable Compliance Group, identified similar deficiencies with Ocwen's compliance.  In this role, CW 4

met with representatives from the United States Department of Treasury, which was investigating compliance-related issues at the Company.  In particular, CW 4 noted that in or around June 2012, Treasury representatives identified at least 25,000 Ocwen letters that were issued to rental property owners, which failed to mention that the rental properties qualified for home loan modifications.  Ocwen failed to remediate the issue for approximately seven months.

175.    Similarly, CW 4 stated that in the spring of 2013, following the Homeward acquisition, Homeward's compliance department discovered that certain borrower information had not migrated from Homeward's platform onto REALServicing.  Ocwen had not remediated the problem as of August 2014, *fifteen months* after the problem was discovered.  CW 4 further noted that because the problem had been identified internally by the Company, it was never reported to the Treasury.  CW 4 asked his manager whether the issue should have been reported to the Treasury, and CW4's manager responded:  "Heck no."  Due to Ocwen's delays in remediating a number of compliance issues identified by Treasury representatives, Ocwen executive Scott Anderson was required to speak with Treasury examiners in Washington, D.C. on a monthly basis.

176.    Despite receiving numerous complaints regarding REALServicing's inability to service loans in compliance with applicable regulations, and acknowledging that REALServicing was inferior to the FiServ platform, Ocwen management ultimately dismantled ResCap's FiServ platform in favor of REALServicing.  CW 1 and CW 2 were informed that the decision was not made for compliance reasons, but instead to cut costs.  In particular, even though REALServicing was unable to "support the functions" necessary to comply with Ocwen's regulatory requirements, Ocwen wanted to avoid incurring the $24 million a year necessary to operate the FiServ platform.

177.     Ultimately, CW 2 resigned because REALServicing prevented CW 2 from doing CW 2's job adequately.  As of December 2013 when CW 2 left the Company, REALServicing was not prepared to ensure compliance with applicable regulations.

178.     Several other senior compliance employees who were responsible for compliance with respect to the ResCap and Homeward loan portfolios also departed, including the Chief Servicing Officer at ResCap, Joseph Pensabene, who left Ocwen in August 2013.

179.     Thus, while the decision to shutter ResCap's FiServ platform in favor of REALServicing transferred business to Altisource and away from one of its direct competitors, (thereby ensuring that Altisource and Defendant Erbey would continue to profit from Ocwen's use of the platform), it created the material, undisclosed risk that REALServicing's inability to ensure regulatory compliance would dramatically increase the Company's compliance and regulatory costs.

180.     In fact, notwithstanding Defendants' Class-Period representations to the contrary, Ocwen and Defendant Faris ultimately admitted that the REALServicing platform was "inadequate" from a compliance perspective in the December 22, 2014 Consent Order.  In addition, Ocwen and Defendant Faris admitted that the Company's reliance on REALServicing "led it to employ fewer trained personnel than its competitors."  The December 22, 2014 Consent Order goes on to state:

> For example, Ocwen's Chief Financial Officer recently acknowledged, in reference to its offshore customer care personnel, that Ocwen is simply "training people to read the scripts and the dialogue engines with feeling." Ocwen's policy is to require customer support staff to follow the scripts closely, and Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens. In some cases, this policy has frustrated struggling borrowers who have complex issues that exceed the bounds of a script and have issues speaking with representatives at Ocwen capable of addressing their concerns. Moreover, Ocwen's customer care representatives in many cases provide conflicting responses to a borrower's question. Representatives have also

64

failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower.

> **2.**  **Due To Its Deficient Compliance Capabilities, Ocwen Violated Its Regulatory Obligations By Backdating Homeowner Communications**

181.  As noted above, contrary to Ocwen's representations to the market, Altisource's REALServicing platform was unable to manage the growth in Ocwen's servicing portfolio during the Class Period while ensuring compliance with all applicable regulations.  In the October 21, 2014 Letter, the NY DFS revealed that the Monitor uncovered one such severe regulatory shortcoming: the Company's widespread and shocking practice of backdating certain loan modification denial letters that Ocwen sent to its borrowers during the Class Period.

182.  In particular, as discussed herein, within ten days of Ocwen denying a homeowner's loan modification request, it was required under its agreements with the CFPB and NY DFS to "notify borrowers of the final denial of any first lien loan modification request within 10 business days of the denial decision."  In this "written non-approval notice," Ocwen was required to identify the reasons for the denial and inform the borrower that he or she had 30 days to appeal the decision.  However, in connection with "potentially hundreds of thousands" of denial letters, the denial letter sent by Ocwen "was dated more than 30 days prior to the date that Ocwen mailed the letter."  As a result, by the time the homeowner received Ocwen's denial letter, the mandatory thirty-day appeal period had already expired.

183.  Similarly, Ocwen issued letters to homeowners facing foreclosure that included a date by which to cure their default and avoid foreclosure, but the cure dates listed in many Ocwen letters expired before homeowners ever received the letter from Ocwen.  According to news reports, Ocwen had been backdating homeowner letters since 2010.

184. On June 19, 2014, the Monitor installed by the NY DFS identified the backdating issue when it discovered an Ocwen denial letter that was dated June 14, 2012 but was not sent to the homeowner until July 25, 2012, 41 days after the date appearing on the letter.

185. After demanding an explanation from Ocwen, Ocwen informed the Monitor that the problem affected 6,100 letters, that Ocwen discovered the issue in April or May of 2014 (just one or two months before the Monitor uncovered the problem), and that Ocwen changed its systems in May 2014 to resolve the problem.

186. The NY DFS determined that "[e]ach of these representations turned out to be false." When the Monitor undertook its own investigation, it determined, after just a few days, that there were nearly 1,000 backdated letters in addition to the 6,100 identified by Ocwen. The NY DFS thus concluded that "Ocwen identified only a fraction of the instances of backdating that had already been uncovered by the Monitor."

187. In addition, while Ocwen repeatedly told the NY DFS that it first discovered the backdating issue in April or May 2014, Ocwen later admitted that it had become aware of the backdating issue months earlier. In fact, Ocwen admitted that in November 2013, an employee informed senior management, including the Company's Vice President of Compliance, of the backdating issue. Yet upon learning about the serious backdating issue, Ocwen and its Vice President of Compliance did nothing – the Company did not inform its regulators, borrowers, investors or any other interested parties that it had wrongly backdated borrower communications that affected, in the NY DFS's estimation, "potentially hundreds of thousands of letters to borrowers," nor did it undertake any efforts to remediate the issue.

188. After five months of inaction, the same employee raised the backdating issue with senior management in April 2014. Again, Ocwen failed to notify its regulators, homeowners,

investors or any other interested parties of this issue, nor did it undertake any investigation into the cause or scope of the backdating problem.  Instead, it continued to represent to investors that Ocwen was in full compliance with its regulatory obligations.  Additionally, while Ocwen allegedly "fixed" the issue in May 2014, it took no steps to ensure that the issue was completely resolved.  Similarly, Ocwen did not attempt to determine what impact its prior practice of backdating may have already had on unwitting borrowers.

189.    The NY DFS ultimately determined that Ocwen's "fix" had failed to properly address the backdating issue in May 2014, and Ocwen admitted the same in a September 10, 2014 memorandum to the NY DFS.  Upon information and belief, Ocwen has not yet fully remediated this backdating issue.

190.    The Monitor's review identified numerous egregious instances of backdating by Ocwen.  For instance, the Monitor identified a pre-foreclosure notice sent to an Ocwen borrower that was dated May 23, 2013, yet Ocwen's internal records indicated that the letter was created nearly one year later, on April 9, 2014.  Another letter reviewed by the Monitor informed a borrower that it would be in danger of foreclosure if it failed to make a payment by August 7, 2013.  However, the letter was dated October 29, 2013, nearly three months after the payment deadline.

191.    According to the NMS Monitor, Ocwen admitted that its practice of backdating of homeowner communications was facilitated by the Company's use of the REALServicing platform "because FiServ letters are processed differently and do not use the trigger date as the date of the letters."

192.    Ocwen's backdating of such notices created the risk of disastrous consequences for homeowners, as such a practice can cause homeowners to unwittingly waive their right to

appeal a loan modification denial or, even worse, unknowingly enter into foreclosure. Ocwen may never be able to quantify the true extent of harm its backdating scandal has inflicted on homeowners.

193.   CW 1 confirmed that the timely dissemination of communications to homeowners was "a big problem" at Ocwen during the Class Period. CW 1 was aware of many problems at Ocwen that caused borrowers to receive letters with an improper date, and also noted that Ocwen had difficulty getting letters to borrowers on a timely basis. CW 1 stated that this problem was attributable in part, to Ocwen's use of the REALServicing platform.

194.   Similarly, CW 3, who worked as a Relationship Manager in Ocwen's Home Retention Department between January 2012 and February 2014, confirmed that while employed at the Company, homeowners complained about receiving denial letters "too late." According to CW 3, Ocwen actually convened a meeting to discuss delays in mailing borrower communications. CW 3 also noted that the issue of correspondence delays was referenced in the Company's newsletter.

3.   **Ocwen's Lack Of Controls Over Related-Party Transactions Exacerbated Its Severe Compliance Deficiencies**

a.   **Ocwen's Chief Risk Officer And Other Senior Managers Were Simultaneously Employed By Altisource**

195.   As described in the February 26, 2014 Letter, the Monitor also discovered that – contrary to Ocwen's representations that it had "robust" systems in place to manage potential conflicts between Ocwen and the Erbey Companies – Altisource's Chief Risk Officer, S.P. Ravi, was simultaneously serving as *Ocwen's* Chief Risk Officer and "reported directly to Mr. Erbey in *both* capacities." In addition, while Ravi's salary was paid by Ocwen, Ravi did not know

whether Ocwen or Altisource paid the salaries of his risk management staff, which also provided services to both Ocwen and Altisource.

196.    Not only did Ocwen intentionally and/or recklessly disregard this obvious conflict, it also failed to disclose Ravi's dual roles in its public disclosures.  Rather, an amended registration statement filed by Altisource on July 21, 2009 stated that Ravi "served as Ocwen's Vice President and Chief Risk Officer since June 2008 and **_will move into this capacity_** for Altisource subsequent to the Separation," without disclosing that Ravi would continue to serve as Ocwen's Chief Risk Officer following this "move."  In fact, CW 1, who worked under Ravi as a Supervisor in Ocwen's IRG during the Class Period, was not aware that Ravi was simultaneously serving as the Chief Risk Officer of Altisource.

197.    Ravi was not the only Ocwen executive who was also employed by Altisource. CW 4, a Senior Compliance Analyst at Ocwen from January 2012 to September 2014, stated that it was not uncommon for Ocwen employees to work for Altisource as well.  CW 4 identified numerous individuals, including a Director of Quality Assurance, a Senior Vice President of Risk Management, and a Senior Manager at Ocwen, who were also employed by Altisource during the Class Period.  CW 4 stated that, internally, Ocwen and Altisource employees were treated as if they worked for the same company because regardless of which company you worked for, "you worked for Bill Erbey, bottom line."  In fact, CW 4 recalled that at one point during the Class Period the Director of Quality Assurance was uncertain as to whether he was employed by Ocwen or Altisource.

198.    As noted by the NY DFS in the February 26, 2014 Letter, these employees' dual roles at Ocwen and Altisource "raise[] the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of

affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's shareholders as a result." Moreover, Ocwen's failure to disclose the dual roles played by Ravi and other executives (and the inherent conflicts they presented) further undermine the Company's representations that it had "robust" controls in place to ensure the fairness of its related-party transactions.

199.   In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that the Monitor "discovered that Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource Portfolio" and "reported directly to Mr. Erbey in both capacities."

### b.   Ocwen Agrees To Pay Above-Market Rates To Altisource For Hubzu Listings

200.   Additionally, contrary to Defendants' public representations concerning the "market rates" it ensured homeowners received despite related-party transactions, Ocwen investors and borrowers paid above-market fees for services provided by Hubzu, which is owned by Altisource. During the course of its investigation into Ocwen, the Monitor uncovered that while Ocwen used Altisource's Hubzu portal as its principal online auction site for the sale of both homes facing foreclosure and investor-owned properties following foreclosure, Hubzu charged Ocwen-serviced properties an above-market auction fee of 4.5% for listing on its website. This fee was *up to three times* the fees Hubzu charged to non-Ocwen customers. As revealed by the NY DFS in the April 21, 2014 Letter:

> In other words, when Ocwen selects its affiliate Hubzu to host foreclosure or short sale auctions on behalf of mortgage investors and borrowers, the Hubzu auction fee is 4.5%; when Hubzu is competing for auction business on the open market, its fee is as low as 1.5%. These higher fees, of course, ultimately get passed onto the investors and struggling borrowers who are typically trying to mitigate their losses and are not involved in the selection of Hubzu as the host site.

201.    The Monitor further uncovered that "the underlying HTML code" for Hubzu's website actually queries whether Ocwen is the seller of the property being listed on Hubzu.  For those properties where Ocwen was the seller, the NY DFS concluded that the auction fees paid to Hubzu were higher.

202.    In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

203.    Ocwen's agreement to pay inflated listing rates to Hubzu, and thus Altisource, contradicted Defendants' public commitment to paying "market rates" to the Erbey Companies, and resulted in excess money being transferred from Ocwen homeowners and investors to Altisource and, ultimately, Defendant Erbey.

       **c.**      **Defendant Erbey Directly Approved A Force-Placed Insurance Transaction That Funneled $65 Million Annually From Ocwen To Altisource**

204.    Contrary to Defendants' representations that Defendant Erbey recused himself from any transactions involving the Erbey Companies, the Monitor also uncovered that Defendant Erbey had, in fact, approved an agreement between Ocwen and a third-party insurance agent, SWBC, which had the effect of funneling over $65 million in annual fees from Ocwen to Altisource "for doing very little work."

205.    Specifically, as publicly revealed by the NY DFS in the August 4, 2014 letter, "[i]n August 2013, Ocwen appointed an Altisource subsidiary named Beltline Road Insurance Agency, Inc. ('Beltline') as its exclusive insurance representative."  Beltline was tasked with finding an insurance company to provide Ocwen with force-placed insurance, as its existing force-placed arrangement with Assurant was set to expire in March 2014.

206.    Force-placed insurance is an insurance policy placed by a lender, bank or loan servicer on a home when the property owner's insurance is canceled, has lapsed, or is deemed insufficient, and the borrower does not secure a replacement policy.  Force-placed insurance is typically a more expensive alternative to hazard insurance, and can result in large increases in borrowers' monthly payments.  For this reason, and because borrowers typically have no input into the terms of force-placed insurance policies, federal legislation, including the Dodd-Frank Act and the Consumer Protection Act, strictly regulates the force-placed insurance market.

207.    In particular, the NY DFS noted in the August 4, 2014 Letter that in a recent investigation, it had uncovered evidence suggesting that "mortgage servicers were setting up affiliated insurance agencies to collect commissions on force-placed insurance, and funneling all of their borrowers' force-placed business through their own agencies."  These agencies "had an incentive to purchase force-placed insurance with higher premiums because the higher the premiums, the higher the commissions kicked back by insurers to the servicers or their affiliates."  These arrangements, according to the NY DFS, "can push already struggling families over the foreclosure cliff."

208.    In the August 4, 2014 Letter, the NY DFS revealed that Ocwen had entered into a force-placed insurance arrangement that threatened to have a similar deleterious effect on homeowners and operated to circumvent NY DFS regulations.  The NY DFS discovered that in January 2014, Altisource recommended that Ocwen use SWBC as its "managing general agent" to oversee the Company's force-placed insurance program and to negotiate premiums with other insurance companies.  Altisource then recommended itself to provide certain fee-based services to SWBC in connection with this arrangement.

209.    Altisource's proposal was presented to the Credit Committee of Ocwen Mortgage, Servicing, Inc., which consisted of Richard Cooperstein, Duo Zhang and Defendant Erbey. Neither Cooperstein nor Zhang are members of the Ocwen Board of Directors, and the transaction was not presented to any member of Ocwen's Board of Directors other than Defendant Erbey.

210.    Through e-mails dated January 15 and 16, 2014, Cooperstein, Zhang and Defendant Erbey approved of this related-party arrangement.  Based on Defendant Erbey's approval, and without any further consideration by other Ocwen directors or executives, Ocwen executed contracts formalizing this force-placed arrangement on June 1, 2014.  The NY DFS concluded from its review of internal Ocwen documentation related to this transaction in the August 4, 2014 Letter that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."

211.    Thus, not only did Defendant Erbey participate in the negotiation and approval of this related-party transaction, but also, in fact, he was the only member of Ocwen's Board of Directors to approve of the arrangement.  Defendant Erbey's role in negotiating and approving this transaction directly contradicts Defendants' representations to investors that Defendant Erbey recused himself from all negotiations and transactions with related parties like Altisource.

212.    This related-party transaction led to tens of millions of dollars being funneled from Ocwen to Altisource in exchange for "very little work."  In particular, Ocwen agreed to give all of its force-placed business to SWBC, and in exchange, SWBC agreed to pass on "15% of net written premiums on the policies" to Beltline, an Altisource subsidiary.  These fees, which were for "insurance placement services," amounted to roughly $60 million per year for

Altisource.  The NY DFS was unable to identify any actual "insurance placement services, if any, Altisource is providing to justify these commissions."

213.    Ocwen also agreed to pay an annual "technology support fee" to SWBC in the amount of 20 cents per loan per month – double the fee that Ocwen paid to Assurant, a non-related party, to provide similar services prior to 2014.  SWBC, in turn, passed on 75% of this fee, or 15 cents per loan per month, to Altisource – an amount estimated to total $5 million per year – in exchange for access to Ocwen's loan files.  However, Altisource's contractual arrangements with Ocwen already required it to provide such access to third parties designated by Ocwen, meaning that this arrangement resulted in Altisource receiving a $5 million annual income stream for services that it was "already obligated to provide."

214.    In sum, Ocwen's arrangement with SWBC was designed to funnel nearly $65 million in annual fees to Altisource, a figure that amounts to 50% of Altisource's net income for the entire fiscal year of 2013.  These fees appear to represent pure profit to Altisource, as it does not appear that Altisource was required to provide any discernible services to Ocwen or SWBC (beyond those services it was already obligated to provide) in exchange for them.

215.    In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Defendant Erbey "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

### 4.    Ocwen's Improper Practices Enriched Defendant Erbey

216.    As discussed above, Ocwen's wrongful mortgage servicing practices and improper related-party transactions harmed an untold number of homeowners and investors by, *inter alia*, servicing loans on a platform that was patently incapable of ensuring compliance with

the Company's regulatory obligations, siphoning money out of Ocwen and into other Erbey Companies, and causing homeowners and investors to pay above-market rates for mortgage-related services.

217.   By contrast, each of the improper servicing practices referenced above enriched Defendant Erbey by funneling revenue away from Ocwen and into affiliated businesses in which he had a large financial stake.  In particular:

a)   By dismantling ResCap's FiServ platform in favor of REALServicing, Defendant Erbey guaranteed that a steady stream of servicing-related revenues would flow from Ocwen to Altisource, and that revenues associated with the ResCap loans would be shifted away from FiServ, one of Altisource's direct competitors;

b)   By backdating borrower communications, Ocwen caused an untold number of borrowers to enter foreclosure, thereby enriching, *inter alia*, Altisource (and Defendant Erbey), which provided foreclosure-related services to Ocwen and listed Ocwen's foreclosed properties for auction on Hubzu;

c)   By installing a Chief Risk Officer and other senior employees at Ocwen that were also employed by Altisource, Defendant Erbey ensured that the interests of his affiliated companies would be placed above those of Ocwen's homeowners and investors;

d)   By paying inflated rates for Hubzu listings, Ocwen increased Altisource's revenue (along with the value of Defendant Erbey's investment in Altisource) to the detriment of homeowners and investors; and

e)   By entering into the force-placed insurance arrangement with SWBC, which Defendant Erbey approved, Ocwen transferred approximately $65 million to Altisource annually in exchange for little to no services, further increasing the value of Defendant Erbey's stake in Altisource.

218.   In turn, the above practices were in direct contradiction to Defendants' representations to Ocwen's investors that it was ensuring compliance with the NY DFS's requirements and appropriately managing Defendant Erbey's conflicts of interest.

G.      **The Truth Regarding Defendants' Misconduct Is Gradually Revealed**

219.    As the truth regarding Ocwen's improper related-party dealings and other wrongful servicing practices were revealed to the market between February 6, 2014 and December 22, 2014, Ocwen's share price plunged.

1.      **The NY DFS Places An Indefinite Hold On The Wells Fargo Transaction And Identifies Numerous Compliance-Related Concerns In Multiple Public Letters To The Company**

220.    On February 6, 2014, Ocwen revealed that the NY DFS was putting "an indefinite hold" on the proposed $39 billion Wells Fargo transaction due to "concerns about Ocwen's servicing portfolio growth."  Ocwen's share price declined $1.82 in response to this news, from a close of $43.20 on February 5, 2014 to $41.38 on February 6, 2014.

221.    Less than three weeks later, the NY DFS published the February 26, 2014 Letter to Ocwen regarding its concerns about "potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated."  In particular, the NY DFS identified S.P. Ravi's dual role as Chief Risk Officer of both Ocwen and Altisource, and indicated that it had uncovered other potential conflicts between Ocwen, Altisource, RESI, AAMC and HLSS. The NY DFS also noted that "Ocwen's management owns stock or stock options in the affiliated companies," which "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of the affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen's shareholders as a result."

222.    Nevertheless, when the Company filed its 2013 Form 10-K, it reaffirmed its previous representations that the Company has "policies, procedures and practices to avoid potential conflicts" with respect to its related-party transactions, that the Company entered into

related-party transactions at "market rates," and that Defendant Erbey "recus[es] himself from negotiations regarding, and approvals of, transactions with" the Erbey Companies.

223.    Shortly after Ocwen reaffirmed the effectiveness of its related-party controls, the NY DFS sent the April 21, 2014 Letter to Ocwen.  This time, the NY DFS publicly revealed the inflated rates Hubzu was charging Ocwen borrowers for the sale of homes facing foreclosure. The NY DFS stated in the April 21, 2014 Letter:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing.  In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting borrowers and mortgage investors.  Alternatively, if the lower fees are necessary to attract non-Ocwen business in the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs.

224.    The increased regulatory focus on Ocwen's servicing practices took a dramatic toll on the Company's financial position during the first half of 2014.  On May 1, 2014, upon releasing its 1Q 2014 financial results, the Company reported that higher industrywide compliance costs raised Ocwen's cost to service non-performing loans by as much as $40 per loan annually.  However, Defendant Erbey noted that even in this higher cost environment, Ocwen's continued compliance with the National Mortgage Settlement provided Ocwen with a "substantial competitive advantage[]" over its peers.

225.    On July 31, 2014, Ocwen revealed that – contrary to its prior representations concerning its ability to service loans in full compliance with its regulatory obligations at a 70% discount to other servicers – its compliance costs were actually much higher, and were having a devastating financial impact on the Company.  In particular, the Company revealed that during the second quarter of 2014 alone, it incurred "roughly $12 million of expenses for the New York state and national monitors," that it "expect[ed] to incur roughly $9 million in the third quarter in

ongoing monitoring costs," and that such costs "are a significant element of [Ocwen's] cost base."

226.    In the August 4, 2014 Letter, the NY DFS raised additional concerns regarding the Company's force-placed insurance agreement with Altisource and SWBC and, citing evidence indicating that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."

227.    The NY DFS went on to state in the August 4, 2014 Letter that "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings," noting that "despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies," Defendant Erbey was central to approving the force-placed transaction involving Altisource.  The NY DFS characterized Defendant Erbey's role in the approval of this force-placed program as a "gross violation of this supposed recusal policy."

228.    Moreover, the NY DFS disclosed in the August 4, 2014 Letter that it had "uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies," despite Defendants' contrary representations to the market.

229.    Oppenheimer analyst Ben Chittenden issued a report the same day noting that the August 4, 2014 Letter "indicates that little progress has likely been made in resolving the issues between OCN and the NYDFS, and that the overhang will remain for much longer than we had anticipated."  In light of this, Chittenden "remov[ed] all MSR acquisitions . . . from [his] model

between now and YE15," and as a result he downgraded Ocwen's shares and removed his $36 price target for the Company's common stock.

230.    The next day, Compass Point analyst Kevin Barker lowered his rating to Neutral from Buy and lowered his EPS estimates for fiscal years 2014 and 2015, indicating that the August 4, 2014 Letter increased the risk that the Wells Fargo servicing deal "gets cancelled and other servicing transfers remain on hold."

231.    Further evidencing the lack of controls over Ocwen's related-party transactions, Ocwen announced on August 12, 2014 that it was restating its financial statements for fiscal year 2013 and the first quarter of 2014.  In particular, the Company shifted $17 million in pre-tax income from the first quarter of 2014 to fiscal year 2013 due to a related-party transaction with HLSS, and announced that it "anticipates it will determine that a material weakness existed in the relevant time periods" concerning methodology for valuing transactions with HLSS.

232.    Keefe, Bruyette & Woods analyst Bose George noted that while the restatement "looks relatively benign by itself . . . the real issue is that they can't grow until they resolve the regulatory questions, and the regulatory problems are nowhere near resolved."

233.    A week later, on August 18, 2014, the Company filed with the SEC its quarterly report on Form 10-Q for 2Q 2014 (the "2Q 2014 Form 10-Q") and disclosed that on June 12, 2014, the Company "received a subpoena from the SEC requesting production of various documents related to our business dealings with Altisource, HLSS, AAMC and [RESI] and the interests of our directors and executive officers in these companies."

234.    Subsequently, the NY DFS exposed its findings concerning Ocwen's practice of backdating communications to its borrowers in the October 21, 2014 Letter.  In particular, the

NY DFS stated that Ocwen's egregious misconduct in backdating such letters constituted a clear failure to comply with its legal and regulatory obligations:

> Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings.  ***Ocwen is not meeting those obligations.  And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance***.

235.    In the October 21, 2014 Letter, the NY DFS concluded:

> The stakes for borrowers and investors are enormous.  If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.

236.    Media reports echoed these sentiments.  For example, in an article published on October 22, 2014 titled "Ocwen's Backdated Letters May Violate Consent Order," Bloomberg quoted Alys Cohen, staff attorney with the National Consumer Law Center, as stating Ocwen's backdating practice "appears to violate the consent order."  The article went on to note that under the Consent Judgment, "Ocwen has to ensure that borrowers have 30 days from the date of the written non-approval notice' to ask Ocwen to reconsider."

237.    Before the markets closed on October 21, 2014, Ocwen sought to minimize the impact of the backdating scandal by issuing the October 21, 2014 Press Release, in which it indicated that the backdating was "inadvertent," affected only 283 borrowers in New York, and had been fully resolved.  These statements were completely untrue and served to falsely reassure Ocwen's investors that the NY DFS's concerns were overstated.  After the markets closed, however, Ocwen issued a subsequent press release to "correct[]" its prior statements concerning the scope of the backdating issue.  In particular, Ocwen stated that, contrary to its representation that the backdating affected only 283 borrowers, it was "aware of additional borrowers in New

York who received letters with incorrect dates but does not yet know how many such letters there were."

238.   On October 24, 2014, following the NY DFS's public disclosure of Ocwen's backdating scandal, Ocwen issued a press release stating that it had written an open letter apologizing to homeowners for the backdating issue.  In the letter, Ocwen acknowledged that "letters were dated when the decision was made to create the letter versus when the letter was actually created," and that in some instances "there was a significant gap between the date on the face of the letter and the date it was actually generated."  The Company also announced that it was finally hiring an independent firm to investigate "how this happened in the first place" and "why it took . . . so long to fix it."

239.   On October 30, 2014, the Company filed a Form 8-K with the SEC attaching a press release announcing its financial results for the period ended September 30, 2014 ("3Q 2014") (the "October 30, 2014 Press Release").  In particular, Ocwen reported a net loss of $75.3 million, as compared to net income of $60.6 million for the third quarter of 2013, and announced that it had accrued a $100 million reserve for a potential settlement with the NY DFS related to its findings of impropriety at the Company.  In the October 30, 2014 Press Release, Defendant Faris attributed Ocwen's lackluster 3Q 2014 financial performance in part to "continued increases in our legal and compliance costs."

240.   Finally, analysts' prediction that Ocwen's compliance-related issues would kill the proposed acquisition of $39 billion in MSRs from Wells Fargo came to fruition on November 13, 2014.  On that date, Wells Fargo and Ocwen announced that they had mutually agreed to cancel the transaction.

      **2.**    **The NMS Monitor Publicly Identifies Material Deficiencies In Ocwen's IRG And Severe Flaws In The Company's REALServicing Platform**

241.    On December 16, 2014, the NMS Monitor filed in the United States District Court for the District of Columbia an interim report regarding Ocwen's compliance with the NMS. The NMS Compliance Report revealed critical flaws in Ocwen's REALServicing platform and compliance testing processes that rendered the IRG's work for Test Period 7 unreliable.

242.    By way of background, the NMS Compliance Report was the fourth periodic report issued with respect to the ResCap portfolio, the third periodic report issued with respect to Ocwen, and the first periodic report with respect to ResCap loans tested on the REALServicing platform.  In each of his prior reports, the NMS Monitor concluded that that IRG's qualifications and performance in connection with the testing of loans on ResCap's FiServ platform "conformed in all material respects to the requirements set out" under the NMS.

243.    In contrast to these earlier findings, the NMS Compliance Report identified two incidents occurring at the conclusion of Test Period 7 that "brought into question the independence, competence, and capacity of the IRG and the integrity of the testing processes conducted by the IRG."

244.    In the first incident, the Company informed the NMS Monitor at the conclusion of Test Period 7 that Ocwen and the IRG "were having difficulty identifying and extracting valid loan testing populations for Metric 19."  Metric 19 is titled "Loan Modification Document Collection Timeline Compliance."  Critically, the NMS Monitor reported that "*[t]he REALServicing platform to which the ResCap loans were being transferred from FiServ was said to be the reason for such difficulties*."

245.    In the second incident, which occurred in early May 2014, the NMS Monitor received emails from a current IRG employee alleging "irregularities and improprieties relative to the IRG and its work[,]" during Test Period 7.  In particular, the employee alleged that:  (1) Ocwen "was not complying with the terms and conditions" of the Consent Judgment; (2) "the IRG's processes and procedures were severely flawed[;]" (3) "the IRG's processes and procedures were not sufficiently independent[;]" and (4) "the results of the IRG's work could not be relied upon."

246.    Accordingly, the NMS Monitor undertook an investigation into these allegations and engaged an independent accounting firm, McGladrey to re-test a number of metrics for Test Period 7.  Through this investigation, the NMS Monitor uncovered "an under-staffed IRG . . . and a dysfunctional and chaotic working environment within IRG" that "led to serious problems and flaws in the processes and procedures by which the IRG tested loans against numerous Metrics during Test Period 7."  In particular, the NMS Monitor's investigation revealed:  (1) "the inability of the IRG Executive to certify the results for Test Period 7 without prior written assurances from a member of [Ocwen's] in-house legal department[;]" and (2) "Metric 19 being tested improperly, leading to the results for that metric being reported inaccurately."

247.    As a result of these investigative findings, the NMS Monitor concluded in the NMS Compliance Report that, at least in Test Period 7, Ocwen had failed to satisfy its obligations under the Consent Judgment with respect to the IRG because the Company lacked an internal quality control group that:  (1) was "independent from the line of business whose performance is being measured[;]" and (2) had "the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated" under the NMS.

248.    Acknowledging these internal control deficiencies, Ocwen sought to restore the integrity of the IRG by enacting various remedial measures, including:  (1) adopting corporate governing principles regarding the independence of the IRG and the integrity of its work; (2) reorganizing the IRG; (3) providing the NMS Monitor greater access to loan-testing information; and (4) establishing a hotline to the NMS Monitor's office for IRG employees to call to report concerns regarding the IRG and its operations.

249.    In addition, the NMS Compliance Report disclosed that, according to the Company, "the letter dating issue arose because of a mapping issue in the templates used to create correspondence on its REALServicing platform[,]" which "existed between the trigger date (i.e., the date [Ocwen] made a decision) and the generation or mail date (i.e., the date that the correspondence was sent) in relation to the letter date (i.e., the date reflected on the correspondence)."  Because Ocwen dated most of its letters according to the "trigger date," this process "create[d] a material impact on the accuracy of the letter date when there was a delay between the trigger date and the mail date."  In particular, Ocwen "represented that *the issue is limited to its REALServicing platform because FiServ letters are processed differently and do not use the trigger date as the date on the letters*."  Ocwen further identified at least nine metrics that the letter-backdating issue may have impacted.

### 3.    Defendant Erbey Resigns As Ocwen Belatedly Reveals The True Extent Of Its Compliance Deficiencies

250.    Before the markets opened on December 22, 2014, Ocwen shocked the market when it disclosed that, pursuant to yet another consent order it entered into with the NY DFS concerning its wrongful mortgage servicing practices, Defendant Erbey was resigning as the Company's Executive Chairman, and as the Chairman of Altisource, AAMC, RESI and HLSS.

251.    In the December 22, 2014 Consent Order, which was signed by Defendant Faris

and Timothy M. Hayes, Ocwen admitted the following facts, among others:

a)   The Monitor's review of 478 loans serviced by Ocwen that had been foreclosed upon "revealed *1,358 violations of Ocwen's legal obligations*, or about three violations per foreclosed loan," including "failing to confirm that it had the right to foreclose before initiating foreclosure proceedings," "failing to ensure that its statements to the court in foreclosure proceedings were correct," and "pursuing foreclosure even while modification applications were pending";

b)   "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies," and, "[a]s a result, *Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records*";

c)   "Ocwen's systems *have been backdating letters for years,*" and its "processes failed to identify and remedy these errors";

d)   "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance," and "ignored the issue for five months until the same employee raised it again";

e)   "Ocwen has not fully resolved the [backdating] issue to date, more than a year after its initial discovery";

f)   "Ocwen's core servicing functions rely on its inadequate systems";

g)   REALServicing relies on "an unnecessarily complex system of comment codes," including "more than 8,400" comment codes, "duplicate codes that perform the same function," and "50 different codes for the single function of assigning a struggling borrower a designated customer care representative";

h)   "Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors," and according to Ocwen's Chief Financial Officer, "Ocwen [was] simply 'training people to read the scripts and the dialogue engines with feeling.'" throughout the Class Period;

i)   "Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens" – a policy which "frustrated struggling borrowers who have complex issues that exceed the bounds of a script" and led to customer support staff "provid[ing] conflicting responses to a borrower's question";

j)   Ocwen "failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower";

85

k) "Ocwen's inadequate infrastructure and ineffective personnel *have resulted in Ocwen's failure to fulfill its legal obligations*," and "[p]rior to the [DFS] review, Ocwen *did not take adequate steps* to implement the reforms that it was legally obligated to implement pursuant to the 2011 Agreement";

l) Defendant Erbey and other Ocwen executives and directors "own significant investments in both Ocwen and the related parties," but "Ocwen does not have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies";

m) "Mr. Erbey has not in fact recused himself from approvals of several transactions with related parties," and instead "*has participated in the approval of a number of transactions* between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014";

n) "Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors"; and

o) "Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource" and "reported directly to Mr. Erbey in both capacities."

252.    In light of the above facts, Ocwen and Defendant Erbey agreed to the following

settlement terms, among others, as part of the December 22, 2014 Consent Order:

a) The payment of $150 million in penalties and restitution;

b) The appointment of an operations monitor, at the sole discretion of the NY DFS, to, among other things, "review and assess the adequacy and effectiveness of Ocwen's operations," determine "what constitutes a 'related party,'" and consult with the Board of Directors to determine whether any member of senior management should be terminated or retained to achieve the goals of complying with Ocwen's legal obligations;

c) Ocwen could only acquire additional MSRs "upon (a) meeting [the] benchmarks developed by the Operations Monitor concerning the adequacy of Ocwen's onboarding process for newly acquired MSRs and its ability to adequately service both those newly acquired and its existing loan portfolio, and (b) the [NY DFS's] approval, not to be unreasonably withheld";

d) Ocwen "will expand its Board of Directors by two independent board members . . . in consultation with the Compliance Monitor or the Operations Monitor," and the board members "will not own equity in any related party";

e)  "Ocwen will provide upon request by a New York borrower that borrower's complete loan file, which includes all information from all systems, including comment codes, at no cost to the borrower, regardless of whether such borrower's loan is still serviced by Ocwen";

f)  "Ocwen will provide every New York borrower who is denied a modification, short sale, or deed-in-lieu of foreclosure, a detailed explanation of the reasons for denial";

g)  "Ocwen will conduct semi-annual benchmarking studies of pricing and performance standards with respect to all fees or expenses charged to New York borrowers or to investors on New York property by any related party, to determine whether the terms offered by the related party are commensurate with market rates or, if market rates are not available, are reasonably related to actual expenses incurred by the related party";

h)  "Effective January 16, 2015, William Erbey will resign from his position as Executive Chairman of Ocwen, his position as Chairman of the Board of Directors of Altisource Portfolio, his position of Chairman of the Board of Directors of Altisource Residential Corporation, his position of Chairman of the Board of Directors of Altisource Asset Management Corporation, and his position of Chairman of the Board of Directors of Home Loan Servicing Solutions Ltd. Mr. Erbey will have no directorial, management, oversight, consulting, or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation. Effective at his resignation, Ocwen's Board members and management will not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders. In the event that Ocwen discovers a violation of the terms of this Paragraph, Ocwen will notify the Department of the violation within three (3) business days of discovery."

253.    Ocwen's share price plummeted in response to these disclosures, falling 26.89% from its closing price of $21.90 on Friday, December 19, 2014, to close at $16.01 on Monday, December 22, 2014.

254.    In response to this news, Sterne Agee analyst Henry J. Coffey, Jr. issued a report on December 22, 2014 stating that facts surrounding the Company's settlement with the NY DFS would likely "cripple profitability for some time."

H.     **Post-Class Period Events**

255.    After the close of trading on December 22, 2014, the Company hosted a conference call with analysts and investors to discuss the terms of the December 22, 2014 Consent Order (the "December 22, 2014 Conference Call").  During the December 22, 2014 Conference Call, Defendant Faris discussed several strategic shifts in Ocwen's core servicing business, including, among others: (1) selling the Company's agency MSRs in order to "focus [the] servicing business primarily on non-agency servicing[;]" (2) expanding the Company's origination business; and (3) executing on call rights to residential mortgage backed securities ("RMBS") that Ocwen owns as the servicer of approximately $200 billion in UPB on private-label mortgages.

256.    In response to Defendant Faris's statements on the December 22, 2014 Conference Call outlining changes in the Company's business strategy, the *Wall Street Journal* reported the following day that, according to Guy Cecala, the publisher of *Inside Mortgage Finance*, "***Ocwen announced what amounted to a significant plan to downsize going forward***." The article further quoted Mr. Cecala in pertinent part:  "The non-agency market is much, much smaller, so they are going to be a smaller company going forward.  ***They have to rethink their whole business strategy***."

257.    Also on December 23, 2014, Sterne Agee issued another report stating that "***[t]he settlement with the NY Department of Financial Services (DFS) went well beyond anything we were expecting***. . . . We are reducing our price target from $23 to $14."

258.    On January 12, 2015, the *Los Angeles Times* reported that the State of California was seeking to suspend Ocwen's mortgage license because of the Company's failure to turn over documentation confirming its compliance with the California Homeowner Bill of Rights.  In particular, the article stated that the California Department of Business Oversight ("CDBO")

88

began a routine examination of Ocwen in January 2013, and requested that Ocwen produce certain documentation during the course of this examination.  By October 2013, state examiners informed Ocwen that its document production was insufficient for the state to assess Ocwen's compliance with the Homeowner Bill of Rights.  The state contended that despite a series of demands, Ocwen had refused to provide all of the information that was requested of it, including reports on a sampling of 1,320 loans that the Company serviced in California.

259.    According to Tom Dressler, a spokesperson for the CDBO, Ocwen:  (1) "failed to comply with requests for information[;]" (2) "failed to comply with a subpoena for information[;]" (3) "violated a lawful order from the commissioner[;]" and (4) "failed to comply with an order from an administrative law judge."

260.    Thereafter, on January 23, 2015, Ocwen and the CDBO agreed to resolve the CDBO's claims against the Company by entering into a consent order (the "CDBO Consent Order").  Among other terms, the CDBO Consent Order:  (1) prohibits Ocwen from acquiring additional MSRs for loans secured by properties in California until the CDBO "is satisfied that Ocwen can satisfactorily respond to the requests for information and documentation made in the course of a regulatory exam[;]" (2) provides for the CDBO's appointment of an independent third-party auditor to assess the Company's compliance with state and federal laws and regulations; (3) entitles the CDBO to pursue an enforcement action against Ocwen based upon any violations that the auditor may discover during its review; and (4) required Ocwen to pay a penalty in the amount of $2.5 million.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

261.    During the May 2, 2013 Conference Call, Defendant Faris discussed the reduced costs that would purportedly result from the Company's integration of the loans purchased from Homeward and ResCap onto the REALServicing platform:

To date, the Homeward and ResCap integrations are proceeding according to plan. On April 15th, the last set of loans were transferred off of the Homeward servicing platform. Most had been moved in February or March. This rapid integration of almost $80 billion of UPB onto Ocwen's platform demonstrates the unique scalability of our technology. It also enables us to complete in Q2 our various cost takeouts associated with this specific acquisition.

With each large integration, we have improved the servicing transfer process, and the Homeward integration has been our best-executed transfer to date. As has been the case with our other acquisitions, we expect to see revenue on the Homeward portfolio begin to ramp up and costs to ramp down.

262.    The foregoing statement set forth in ¶ 261 regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform was materially false and misleading when made because Defendants knew and/or recklessly disregarded the fact that the REALServicing platform was patently inferior to the FiServ platform from a compliance perspective, and that such savings would come at the expense of compliance. Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies. In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations. Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

263.    In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to

RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

264.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."  Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems."  In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

1Q 2013 Form 10-Q

265.    On May 8, 2013, Ocwen filed with the SEC the 1Q 2013 Form 10-Q, which was signed by Britti and attached certifications that were signed by Britti and Defendant Faris pursuant to Sections 302 and 906 of the Sarbanes Oxley Act of 2002 ("SOX").

266.    The 1Q 2013 touted Ocwen's low-cost REALServicing platform in pertinent part as follows:

> We expect that other non−prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently tracking potential MSR acquisition opportunities with a total UPB of approximately $375.0 billion. We believe that servicing and subservicing opportunities with an aggregate UPB of up to $1.0 trillion could come to market

in the next 2 to 3 years.  ***To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost and our high−quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.***

267.    The foregoing statement set forth in ¶ 266 was materially false and misleading when made.  In sharp contrast to Defendants' statement touting the competitive advantages of Ocwen's "low-cost" and "high-quality" servicing platform, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.  Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the NMS and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations.  Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

268.    In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified

deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

269.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."  Ocwen and Defendant Faris further admitted, referring to REALServicing that "Ocwen's core servicing functions rely on its inadequate systems."  In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

270.    The 1Q 2013 Form 10-Q incorporated by reference the Risk Factors set forth under Item 1A of the Company's annual report on Form 10-K for the year ended December 31, 2012 filed with the SEC on March 1, 2013 (the "2012 Form 10-K"), including, *inter alia*, the following materially false and misleading disclosure concerning Ocwen's management of potential conflicts of interest arising from related-party transactions:

> We have adopted policies, procedures and practices to avoid potential conflicts involving significant transactions with related parties such as Altisource, including Mr. Erbey's recusal from negotiations regarding and credit committee and board approvals of such transactions.  We will also seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource and through oversight by independent members of our Board of Directors.

271.    The foregoing statement set forth in ¶ 270 concerning the Company's related-party controls was materially false and misleading when made because, as disclosed by the NY DFS in the February 26, 2014 Letter, the April 21, 2014 Letter, and the August 4, 2014 Letter and as admitted by Ocwen and Defendant Faris in the December 22, 2014 Consent Order, Defendants knew and/or recklessly disregarded that Ocwen did ***not*** have sufficient controls in place to prevent the Company's related-party transactions from causing harm to homeowners.  In fact, Ocwen and Defendant Faris admitted in the December 22, 2014 Consent Order that "Ocwen does ***not*** have a written policy in place that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."   These undisclosed facts concerning Ocwen's lack of related-party controls exacerbated the risk that the Company was not in compliance with its regulatory obligations to homeowners and, thus, the risk of additional regulatory action.

272.    Indeed, contrary to Defendants' representations in the 1Q 2013 Form 10-Q concerning the Company's adoption of policies, procedures, and practices designed to avoid potential conflicts of interest arising from related-party transactions, the February 26, 2014 Letter revealed "a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated[,]" which "cast serious doubts on the recent public statements made by the company that Ocwen has a 'strictly arm's-length business relationship' with those companies."

273.    Specifically, the February 26, 2014 Letter noted the "particularly alarming" fact that despite Ocwen's Chief Risk Officer, Ravi, also serving as Altisource's Chief Risk Officer and reporting directly to Erbey in both positions, neither Ravi nor Ocwen appreciated "the potential conflicts of interest posed by this dual role."  Ocwen and Defendant Faris admitted as

much in the December 22, 2014 Consent Order.  According to the NY DFS, this dual role, coupled with Erbey's interests in all five Ocwen-related companies, "raises the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."  Yet Defendants not only intentionally and/or recklessly disregarded this obvious conflict, but also failed to disclose Ravi's dual roles in the Company's public disclosures, further undermining Defendants' statements during the December 2013 Conference that the Company had "robust" controls in place to ensure the fairness of its related-party transactions.

274.    The 1Q 2013 Form 10-Q further discussed the Company's agreements with Altisource in pertinent part as follows:

> Our business is currently dependent on many of the services and products provided under these long-term contracts [with Altisource] which are effective through 2025.  The contracts include renewal provisions.  *We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.*

275.    The foregoing statement set forth in ¶ 274 regarding Ocwen's agreements with Altisource was materially false and misleading when made.   Contrary to Defendants' representation that the rates charged under Ocwen's agreements with Altisource were "market rates," the NY DFS's April 21, 2014 Letter reported that Altisource's subsidiary, Hubzu, had been charging Ocwen inflated fees that were "*up to three times the fees charged to non-Ocwen customers*."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."  In light of Ocwen's

relationship with Altisource, this finding, according to the NY DFS, "***raise[d] significant concerns regarding self-dealing***[,]" including, "[i]n particular, . . . questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors" or, "[a]lternatively, . . . whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs." The NY DFS's August 4, 2014 Letter further noted that "Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, but ***Ocwen has not been able to provide the Monitor with any analysis to support this assertion***."

August 1, 2013 Conference Call

276.    During the August 1, 2013 Conference Call, Defendant Erbey stated in pertinent part:

> ***Ocwen enjoys substantive and sustainable competitive advantages within the servicing business, both in terms of cost and performance. . . . Ocwen's cost to service non-performing loans is 70% lower than the industry average. Moreover, the design of our systems and platform allow us to manufacture new capacity more efficiently and effectively than other servicers.***

277.    The foregoing statement set forth in ¶ 276 touting the "70% lower" cost advantage of Ocwen's servicing platform together with its efficiency and effectiveness was materially false and misleading when made for the reasons stated above in ¶¶ 267-69.

2Q 2013 Form 10-Q

278.    On August 6, 2013, Ocwen filed with the SEC the 2Q 2013 Form 10-Q, which was signed by Britti and attached certifications that were signed by Britti and Defendant Faris pursuant to SOX Sections 302 and 906.

279.    The 2Q 2013 Form 10-Q touted Ocwen's low-cost REALServicing platform in pertinent part as follows:

96

We expect that other non-prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently aware of potential MSR acquisition opportunities with an aggregate UPB of approximately $400.0 billion. We believe that servicing and subservicing opportunities with an aggregate UPB of over $1.0 trillion could come to market in the next 2 to 3 years. *To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost, high-quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.*

280.    Further, the 2Q 2013 Form 10-Q discussed the cost savings that would result from Ocwen's decision to integrate the ResCap portfolio onto Ocwen's REALServicing platform, stating in pertinent part:

We also incurred additional outsourcing expenses primarily in connection with the acquired ResCap servicing platform. The ResCap platform leverages third-party outsourcing for a variety of functions. We anticipate these costs will be absorbed and/or diminish as the ResCap assets transition to the REALServicing platform.

281.    Each of the foregoing statements set forth in ¶¶ 279-80 regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform was materially false and misleading for the reasons stated above in ¶¶ 262-64.

282.    The 2Q 2013 Form 10-Q incorporated by reference the Risk Factors set forth under Item 1A of the Company's 2012 Form 10-K, including, *inter alia*, the disclosure concerning Ocwen's management of potential conflicts of interest arising from related-party transactions that is set forth above in ¶ 270. These statements were materially false and misleading for the reasons stated above in ¶¶ 271-73.

283.    The 2Q 2013 Form 10-Q further discussed the Company's agreements with Altisource in pertinent part as follows:

Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions. *We believe the rates charged under these agreements are market rates as they are*

***materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.***

284.    The foregoing statement set forth in ¶ 283 regarding the rates charged under Ocwen's agreements with Altisource was materially false and misleading for the reasons stated above in ¶ 275.

<u>September 2013 Investor Presentation</u>

285.    On September 9, 2013, Ocwen filed with the SEC a current report on Form 8-K that attached an investor presentation (the "September 2013 Investor Presentation").   The September 2013 Investor Presentation highlighted Ocwen's "***Highly Scalable Platform with Lowest Operating Cost***" and the "***70% cost advantage***" attributable to Ocwen's servicing platform, as set forth in the following slide:



1) Costs reflect second quarter 2013 MIAC cost per non-performing loan compared to Ocwen's marginal cost analysis for the same period.

286.    Each of the foregoing representations set forth in ¶ 285 regarding the Company's "Highly Scalable Platform with Lowest Operating Cost" and the "70% cost advantage" attributable to Ocwen's servicing platform was materially false and misleading when made for the reasons stated above in ¶¶ 267-69.

October 31, 2013 Conference Call

287.    During the October 31, 2013 Conference Call, Defendant Faris reaffirmed the Company's ability to comply with regulatory obligations, stating in pertinent part:

> Earlier this month, the CFPB provided guidance to mortgage servicers for implementing new rules announced earlier this year and scheduled to take effect in 2014.  As we stated before, we support efforts by the CFPB and other state and federal regulatory agencies to provide more clarity with regard to mortgage servicing and origination rules and requirements.  Greater clarity reduces risk for the industry and allows us to plan appropriately for any necessary changes. **Ocwen is well positioned to comply with all the new requirements.**

288.    The foregoing statement set forth in ¶ 287 was materially false and misleading when made.   In sharp contrast to Defendant Faris's statement regarding the Company's compliance with applicable state and federal regulatory requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.  Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations.  Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform,

Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

289.   In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

290.   Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."  Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems."  In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

291.   The October 21, 2014 Letter further confirmed the falsity of the foregoing statement by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with

state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "***Ocwen [was] not meeting those obligations***."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, send borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

292.    Additionally, with respect to the integration of ResCap's portfolio onto the REALServicing platform, Defendant Faris noted that "once we have consolidated on to a single platform, we are confident that we can make further productivity gains and overhead cost reductions."

293.    The foregoing statement set forth in ¶ 292 regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform was materially false and misleading for the reasons stated above in ¶¶ 262-64.

294.    Likewise, Defendant Erbey noted that Ocwen's costs during the quarter were "well above our historical . . . and long-term goals as we are taking a cautious approach to transitioning the RESCAP loans to the real servicing platform."  He went on to state that "[g]iven the current environment, we retained redundant staffing on both servicing platforms in order that the transfer went smoothly."

295.    The foregoing statement set forth in ¶ 294 regarding the Company's commitment to ensuring regulatory compliance while transferring the ResCap portfolio onto the REALServicing platform was materially false and misleading when made because Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations. Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies. In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations.  Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

296.    In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

297.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly

giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."   Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems."   In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

3Q 2013 Form 10-Q

298.    On November 5, 2013, Ocwen filed with the SEC the 3Q 2013 Form 10-Q, which was signed by Britti and attached certifications that were signed by Britti and Defendant Faris pursuant to SOX Sections 302 and 906.

299.    The 3Q 2013 touted Ocwen's low-cost REALServicing platform in pertinent part as follows:

> We expect that other non-prime and prime servicing platforms and servicing portfolios will come to market in the next several months. We are currently aware of potential MSR acquisition opportunities with an aggregate UPB of approximately $400 billion over the next 12 to 18 months, with at least $100 billion in the next few months. We believe that servicing and subservicing opportunities with an aggregate UPB of over $1.0 trillion could come to market in the next 2 to 3 years. ***To the extent that we find these opportunities to be attractive, we believe that we are positioned to effectively compete for such opportunities in light of our low cost, high-quality servicing platform. Our technology also provides us the ability to quickly scale our servicing operations to handle acquired loan portfolios.***

300.    Further, the 3Q 2013 Form 10-Q again referenced the cost savings that would result from the integration of the ResCap portfolio onto Ocwen's REALServicing platform, stating:

103

We also incurred $13.6 million outsourcing expenses primarily in connection with the acquired ResCap servicing platform.  The ResCap platform leverages third-party outsourcing for a variety of functions.  ***We anticipate these costs will be absorbed and/or diminish as the ResCap assets transition to the REALServicing platform.***

301.   Each of the foregoing statements set forth in ¶¶ 299-300 regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform was materially false and misleading for the reasons stated above in ¶¶ 262-64.

302.   The 3Q 2013 Form 10-Q also repeated the statement contained in the 2Q 2013 Form 10-Q regarding the rates charged under the Company's agreements with Altisource that is set forth above in ¶ 274.

303.   The foregoing statement set forth in ¶ 302 regarding the rates charged under Ocwen's agreements with Altisource was materially false and misleading for the reasons stated above in ¶ 275.

304.   The 3Q 2013 Form 10-Q incorporated by reference the Risk Factors set forth under Item 1A of the Company's 2012 Form 10-K, including, *inter alia*, the disclosure concerning Ocwen's management of potential conflicts of interest arising from related-party transactions that is set forth above in ¶ 270.

305.   The foregoing statement set forth in ¶ 304 concerning the Company's related-party controls was materially false and misleading when made for the reasons stated above in ¶¶ 271-73.

<u>November 12, 2013 Conference</u>

306.   On November 12, 2013, Ocwen presented at the Bank of America Merrill Lynch Banking & Financial Services Conference (the "November 12, 2013 Conference").  Also on November 12, 2013, Ocwen filed with the SEC a current report on Form 8-K attaching an investor presentation prepared in connection with the November 12, 2013 Conference (the

"November 2013 Investor Presentation").  The November 2013 Investor Presentation included the identical slide regarding Ocwen's "***Highly Scalable Platform with Lowest Operating Cost***" and the "***70% cost advantage***" attributable to Ocwen's servicing platform that is set forth above in ¶ 285.

307.   Commenting on the foregoing slide from the November 2013 Investor Presentation, Ocwen's Chief Financial Officer, John Britti, stated in pertinent part during the November 12, 2013 Conference:

> We've talked about this, and I'll show you a slide on this – ***we are the lowest cost provider in the industry.***  And I think that's a substantial advantage and one that we've maintained for a substantial period of time.
>
> \*        \*        \*
>
> As we've talked about, ***we have a 70% cost advantage***. ***If you look at non-agency nonperforming loans, we are substantially below the industry average. And I think if you look even at our relatively efficient nonbank peers, we have a substantial cost advantage.***
>
> \*        \*        \*
>
> I think another thing is, as I just talked about, ***we have lower cost to service***.  If you look at valuations that are done for the purposes of fair value, they look at industry-level costs. If you used our cost to service, rather than the industry cost to service, we would add almost another $850 million of value to our MSRs.  So it gives you an idea of the kind of intrinsic value baked into our book.

308.   Each of the foregoing statements set forth above in ¶¶ 306-07 touting Ocwen's "Highly Scalable Platform with Lowest Operating Cost" and the "70% cost advantage" attributable to Ocwen's servicing platform was materially false and misleading when made for the reasons stated above in ¶¶ 267-69.

<u>December 2013 Conference</u>

309.   The December 2013 Investor Presentation prepared in connection with the December 2013 Conference included the identical slide regarding Ocwen's [h]ighly scalable

platform with lowest operating cost in the industry" and the "70% cost benefit" attributable to

Ocwen's servicing platform that is set forth above in ¶ 285.

310.    Commenting on the foregoing slide from the December 2013 Investor

Presentation, Britti, stated in pertinent part during the December 2013 Conference:

> One of things that also sets us apart versus others in the industry is ***we have a very
> low cost, highly scalable platform***.
>
> *        *        *
>
> I think as we've discussed in the past, we have the lowest operating cost in the
> business.  ***We have about 70% cost advantage when it comes to non-performing
> non-agency loans and that's in the core of our capability***. But one thing I think
> that we need to point out is that when we show that ***we have a 70% cost
> advantage***, let's just talk about our operating cost advantage, just our right out of
> pocket cost for a non-performing loan.
>
> Our cost advantage and our competitive advantage is much greater than that.  And
> that's, we'll talk a bit about this, but the remainder of our advantage is in our
> performance advantage. And when we've done analysis of what we think our
> advantage is on a particular transaction versus our competition, about half of our
> advantage is in this piece is in fact that ***we actually can service loans cost
> sensibly than others***.
>
> *        *        *
>
> The other thing that I talked about earlier, ***we have a much lower cost to service
> than the rest of the industry.***  If you look at the way third-party brokers value
> MSRs, they value them based on average cost to service.  As we talked about, ***our
> cost to service particularly for non-performing loans is 70% lower***, so that
> means that there is embedded additional value just based on an operating expense
> differential in our book, and again we try to calculate that because it's relatively
> simple. We get the models from the third-party brokers.  If you just change their
> assumptions to match up with our actual cost to service, it's almost another $1
> billion or actually $900 million of value just in our MSRs from that.

311.    Each of the foregoing statements set forth above in ¶¶ 309-10 touting Ocwen's

"low-cost, highly scalable platform" and the "70% cost advantage" of Ocwen's servicing

platform was materially false and misleading when made for the reasons stated above in ¶¶ 267-

69.

312.    Also during the December 2013 Conference, when asked by an audience member to comment on the regulatory environment, Defendant Erbey stated in pertinent part:  "Certainly looking at regulations and being compliant is at the top of the list."

313.    In particular, the December 2013 Investor Presentation highlighted the Company's compliance management system in the following slide:

314.    The December 2013 Investor Presentation also contained the following slides touting Ocwen's ability to meet the CFPB's pending regulatory requirements, as well as its compliance with the standards set forth under the National Mortgage Settlement:



**Industry Regulatory Compliance Matters**

**CFPB Mortgage Servicing Rules**

- On January 10, 2014, the new CFPB rules for mortgage servicing will go into effect, amending RESPA and TILA
- Nine Major Topics covered in the rules: (1) periodic billing statements; (2) interest-rate adjustment notices for ARMs; (3) prompt payment crediting and payoff statements; (4) force-placed insurance; (5) error resolution and information requests; (6) general servicing policies, procedures and requirements; (7) early intervention with delinquent borrowers; (8) continuity of contact with delinquent borrowers; and (9) loss mitigation procedures
- Company believes it is on track for full compliance prior to the effective date



**Industry Regulatory Compliance Matters**

**OCC Consent Orders and National Mortgage Settlement**

- In April 2011, Federal Bank Regulators (OCC, OTS, FDIC and FRB) entered into Consent Orders relating to foreclosure practices of 14 mortgage servicers/banks and two third-party service providers
- In February 2012, 49 state attorneys general and the federal government entered into the National Mortgage Settlement ("NMS") with the 5 largest mortgage servicers
- Ocwen is not a party to these orders and settlements, but Ocwen services or subservices loans for parties which are subject to these settlements and therefore services in compliance with those standards as applicable
- Ocwen is subject to compliance with the NMS for the loans that were formerly part of the GMAC/Rescap portfolio, including monitoring by the Office of Mortgage Settlement Oversight ("OMSO")
- Ocwen has passed each metric in the publicly available quarterly OMSO reports

108

315.   Discussing the foregoing slides from the December 2013 Investor Presentation, Andrew Wein, Ocwen's Deputy Counsel, stated in pertinent part during the December 2013 Conference:

> I'll talk to you little bit about ways to envision the parts of a compliance management system and this slide breaks it into really four parts, four broad categories.  First is reporting, the second is assessing, third is policing, and the fourth is monitoring. . . .  ***The important part from our perspective and that of our primary regulators is that these four functions are all covered.  And at Ocwen, we believe we have that structure***."

316.   With respect to Ocwen's ability to comply with recent changes in the regulatory environment and the effectiveness of Ocwen's communications with homeowners, Wein additionally stated during the December 2013 Conference:

> The company believes that we're on track for full compliance [with the new rules promulgated by the CFPB] prior to the effective date.  When you listen to these nine major topics if in the presentations you've heard earlier, I want you to know of Ocwen and our history, which shouldn't surprise you that some of these are areas that we had already had quite bit of experience with in prior to these rules.  Loss mitigation is not a new thing for Ocwen.  Early intervention is not a new thing for Ocwen.  We don't need to be told to try to get in contact with borrowers when they come delinquent.  ***It's part of our existing business practice in our business model.***
>
> I also want to take a moment to talk about the interaction between Ocwen and the OCC consent orders and the National Mortgage Settlement.  In some ways, the OCC consent orders and the National Mortgage Settlement laid the foundation for what was eventually included in some of the CFPB's servicing rules.  Certain basic principles about maintaining contact with borrowers for prompt handling of loss mitigation requests are included in all three sets of standards, but in [ph] slightly different ways.  ***Given Ocwen's history as I've noted, these principles were very much in line with our existing business practices.***

317.   Each of the foregoing statements set forth in ¶¶ 312-16 was materially false and misleading when made.  In sharp contrast to Defendants' statements regarding the Company's compliance management systems and its compliance with applicable state and federal regulatory requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen

used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.   Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations. Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

318.    In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

319.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."  Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate

systems." In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

320.   The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "*Ocwen [was] not meeting those obligations*."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

321.   The December 2013 Investor Presentation also included the following slide concerning Ocwen's corporate governance policies with respect to related-party transactions:

322.    Consistent with the foregoing slide from the December 2013 Investor Presentation, Defendant Erbey discussed Ocwen's practices with respect to related-party transactions during the December 2013 Conference in pertinent part as follows:

> One of the things that I like to stress again is that the strategic allies are not affiliates, that each company has its own separate Board of Directors, the majority of whom are independent, and *we have robust related party transaction approval process.  Any related party transactions between the companies I actually recuse myself from that decision.*  And we make all of our – very importantly, we make all of our contracts between all the companies publicly available to you on our website.

323.    Each of the foregoing statements set forth in ¶¶ 321-22 concerning the Company's related-party controls was materially false and misleading when made for the reasons stated above in ¶¶ 271-73.

January 28, 2014 Lender Presentation

324.    On January 28, 2014, Ocwen filed a current report on Form 8-K with the SEC attaching a Lender Presentation in connection with the announced Wells Fargo acquisition (the "January 28, 2014 Lender Presentation").  The January 28, 2014 Lender Presentation included the identical slide touting Ocwen's "Highly Scalable Platform with Lowest Operating Cost" and

the "70% cost advantage" attributable to Ocwen's servicing platform that is set forth above in ¶

285.  These representations were materially false and misleading for the reasons stated above in

¶¶ 267-69.

February 27, 2014 Press Release

325.    Following the NY DFS's decision to delay Wells Fargo's sale of MSRs to Ocwen

on February 6, 2014, the Company issued the February 27, 2014 Press Release.  In the February

27, 2014 Press Release, Defendant Faris stated in pertinent part as follows:

> ***We continue to focus our attention on regulatory compliance and on assisting
> struggling homeowners.  During 2013 we made significant progress in
> enhancing our compliance management system.***  We helped a record number of
> struggling homeowners.  We expanded our partnerships with consumer housing
> counselors.  And, we will continue these efforts with even more vigor in 2014.

326.    Defendant Faris also discussed the integration of ResCap's portfolio to the

REALServicing platform in the February 27, 2014 Press Release, stating:

> [W]e are nearing the end of our integration of the legacy ResCap loans onto
> Ocwen's servicing platform.  We expect to be able to finish our consolidation by
> the end of the second quarter.  ***Consolidation will allow us to substantially lower
> expenses and reduce the operating complexities of running multiple platforms.***

327.    The foregoing statements set forth in ¶¶ 325-26 were materially false and

misleading when made.  In sharp contrast to Defendants' statements regarding the Company's

compliance management systems and its compliance with applicable state and federal regulatory

requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen

used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's

regulatory obligations.  Indeed, on a weekly basis throughout 2013, Ocwen management,

including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant

compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others,

urged the Company to use the FiServ platform – the servicing platform that ResCap had used to

113

comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations. Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

328.   In fact, the Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

329.   Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."  Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems."  In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for

114

example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

330.    The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "*Ocwen [was] not meeting those obligations*."  Moreover, the October 21 Letter disclosed that in November 2013, an employee at Ocwen had alerted the Company's Vice President of Compliance to this letter backdating issue but "[t]here [wa]s no indication that Ocwen did anything to investigate the problem [at that time], nor did it alert its regulators, borrowers, or other interested parties to this issue." In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

331.    For the same reasons, Defendant Faris's statements regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform were materially false and misleading because Defendants knew and/or recklessly disregarded the fact that the

REALServicing platform was patently inferior to the FiServ platform from a compliance perspective, and that such savings would come at the expense of compliance.  In fact, contrary to Defendant Faris's representations, Ocwen was dismantling the only servicing platform that was capable of complying with its regulatory obligations, and the additional costs associated with using the FiServ platform were necessary to ensure such compliance.

February 27, 2014 Conference Call

332.    During the February 27, 2014 Conference Call, Defendant Erbey touted the Company's commitment to complying with applicable regulatory standards as follows:

> Next let me talk broadly about our investments in servicing operations that reflect our commitment to quality servicing.  Comments from policymakers and regulators cover industrywide questions about loan servicing transfers.  We agree. Our leadership team and our employees embrace these conditions, these concerns. We will be the first to admit that we are not perfect and that our industry has a long way to go but we have worked hard to be part of the solution by raising standards for helping homeowners in distress for over two decades.

> Ocwen pioneered forbearance and loan modifications even before the government HAMP program came into being. Similarly, Ocwen has been a leader in such innovation as the shared appreciation modification for underwater homeowners and alliances with community groups that support more effective borrower outreach.  Moreover, we are making the investments required to continuously improve our service and quality and exceed compliant standards.

> We've also invested in and will continue to invest in more robust auditing, quality control and validation of our servicing, quality and compliance.  Notwithstanding our investments to date, we believe that there are many things we can do to be even more effective in addition in the future.  Our commitment stems from a deeply held belief that exceptional borrower experiences, positive investor outcomes and servicer efficiencies are not in conflict but in fact are very much aligned.

333.    Echoing this theme, Defendant Faris also stated during the February 27, 2014 Conference Call:

> As we look forward to this year, *we expect to maintain strong operating performance by investing in our compliance management infrastructure that will enhance our ability to demonstrate our compliance*, raising the bar on

116

customer service through continued investments in training, new processes and new technologies, improving our cost structure by consolidating onto a single operating platform and taking advantage of our scale to further reduce overhead expenses and building our lending business and utilizing our core competencies to invest in adjacent businesses.

334.    Defendant Erbey also addressed the concerns raised in the NY DFS's February 26, 2014 Letter regarding Ocwen's potential conflicts of interest with related parties, stating in pertinent part:

> We received a letter yesterday from the DFS asking about our relationships with four related companies, independent companies. ***I would note that the agreements among the companies are fully disclosed in our public SEC filings and we believe them to be on an arm's-length basis.*** We look forward to addressing the matters raised by DFS and will fully cooperate.

335.    During the question and answer session of the February 27, 2014 Conference Call, when specifically asked how the Company had previously addressed the issue of potential conflicts of interest with its affiliated companies, Defendant Erbey proclaimed that the Company had been "***very complete and open***" and had provided "***full disclosure***" about its business relationships with affiliated companies, as set forth in the following exchange:

> Brad Ball - Evercore - Analyst
> I have a couple of follow-up questions on the regulatory environment. Could you talk about how you have in the past addressed the question of potential conflicts among affiliated companies? Any prior SEC filings or with regulators in the past? Could you just discuss how that has been addressed?
>
> Bill Erbey - Ocwen Financial Corporation - Chairman
> I would refer you to just look at all of our SEC filings. ***I think that we have been very complete and open about what those relationships are.*** So you are welcome even on all the spins you will see all of the contracts are disclosed and that nature so whenever we take say spin one company out of another, you have the complete contract package to look at and evaluate. ***So the way we have dealt with it is to have full disclosure.***

336.    When further asked by an analyst during the question and answer session of the February 27, 2014 Conference Call as to "what . . . Ocwen needs to demonstrate to the various constituents that they are effectively doing what they are supposed to be doing" and to "clear

some of the misinformation as it relates to what regulators are suggesting the problems are at

Ocwen," Defendant Erbey responded in pertinent part:

> [T]here is no doubt that the environment particularly with the implementation of the CFPB rules here recently, it is a different regulatory environment than it was a number of years ago and ***I think we are as well positioned as others in the non-bank space or better positioned than others to over time demonstrate how well we do service loans and be a leader in the industry. But we will have to continue to commit management time and resources to that and we are going to do that.***

337.    Each of the foregoing statements set forth in ¶¶ 332-36 was materially false and

misleading when made.  In sharp contrast to Defendants' statements regarding the Company's

compliance management systems and its compliance with applicable state and federal regulatory

requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen

used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's

regulatory obligations.   Indeed, on a weekly basis throughout 2013, Ocwen management,

including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant

compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others,

urged the Company to use the FiServ platform – the servicing platform that ResCap had used to

comply with, among other things, the National Mortgage Settlement and applicable CFPB

regulations – to service its loans instead of REALServicing, which had not been modified to

comply with these regulations and was, in fact, incapable of complying with these regulations.

Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing

was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and

continued using Altisource's inadequate REALServicing platform, thereby subverting

compliance in order to reduce costs.

338.    In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.   Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

339.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."   Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems." In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

340.    The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.   Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings,"

at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "*Ocwen [was] not meeting those obligations*."  Moreover, the October 21 Letter disclosed that in November 2013, an employee at Ocwen had alerted the Company's Vice President of Compliance to this letter backdating issue but "[t]here [wa]s no indication that Ocwen did anything to investigate the problem [at that time], nor did it alert its regulators, borrowers, or other interested parties to this issue."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

341.    Also belying Defendants' statements regarding the Company's regulatory compliance, the NMS Compliance Report revealed Ocwen's failure to satisfy the NMS requirements based upon critical deficiencies in the IRG's processes and procedures, including: (1) "the inability of the IRG Executive to certify the results for Test Period 7 without prior written assurances from a member of [Ocwen]'s in-house legal department[;]" and (2) "Metric 19 being tested improperly, leading to the results for that metric being reported inaccurately." As a result of these findings, the NMS Monitor concluded:

> that the IRG's processes and procedures, at least in Test Period 7, lacked the critical keys to integrity mandated in the Enforcement Terms [of the NMS], namely "an internal quality control group that is independent from the line of business whose performance is being measured," and an internal quality control group with "the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated" in the Enforcement Terms [of the NMS].

342.    For the same reasons, Defendant Faris's statements regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform were materially false and misleading because Defendants knew and/or recklessly disregarded the fact that the REALServicing platform was patently inferior to the FiServ platform from a compliance perspective, and that such savings would come at the expense of compliance.  In fact, contrary to Defendant Faris's representations, Ocwen was dismantling the only servicing platform that was capable of complying with its regulatory obligations, and the additional costs associated with using the FiServ platform were necessary to ensure such compliance.

343.    In addition, Defendants' statements concerning the Company's related-party controls and the adequacy of its related-party disclosures were materially false and misleading when made because, as disclosed by the NY DFS in the February 26, 2014 Letter, the April 21, 2014 Letter, and the August 4, 2014 Letter, Defendants knew and/or recklessly disregarded that Ocwen did **not** have sufficient controls in place to prevent the Company's related-party transactions from causing harm to homeowners.  In fact, Ocwen and Defendant Faris admitted in the December 22, 2014 Consent Order that "Ocwen does **not** have a written policy in place that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."   These undisclosed facts concerning Ocwen's lack of related-party controls exacerbated the risk that the Company was not in compliance with its regulatory obligations to homeowners and, thus, the risk of additional regulatory action.  Indeed, contrary to Defendant Erbey's representations on the February 27, 2014 Conference Call that Ocwen's related-party transactions were both fully disclosed in the Company's SEC filings and conducted on an arm's-length basis, the NY DFS revealed in its April 21, 2014 Letter that Altisource's subsidiary, Hubzu, had been charging Ocwen inflated fees

that were "up to three times the fees charged to non-Ocwen customers."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."  In light of Ocwen's relationship with Altisource, this finding, according to the NY DFS, "raise[d] significant concerns regarding self-dealing[,]" including, "[i]n particular, . . . questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors" or, "[a]lternatively, . . . whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs."

344.    These representations were also belied by the NY DFS's revelation in the August 4, 2014 Letter that Defendant Erbey negotiated and was solely responsible for approving an undisclosed "troubling transaction" in mid-January 2014 involving the provision of force-placed insurance, pursuant to which Ocwen used an unaffiliated insurance agent as a pass-through to funnel as much as $65 million in annual fees to Altisource for performing minimal work. Moreover, contrary to Defendant Erbey's statement that related-party transactions were entered into on an arm's-length basis, the NY DFS stated in the August 4, 2014 Letter that it had "uncovered a growing body of evidence that Mr. Erbey has approved *a number of transactions* with [Ocwen's] related companies," and that Defendant Erbey's conduct was "*inconsistent with public statements Ocwen has made, as well as representations in company SEC filings*[,]" including, in particular, "Ocwen's and Altisource's public claims . . . that [Defendant Erbey] recuses himself from decisions involving related companies."

345.    Moreover, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Mr. Erbey has not in fact recused himself from approvals of several transactions

with the related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

2013 Form 10-K

346.   On March 3, 2014, Owen filed with the SEC the 2013 Form 10-K, which was signed by Britti, Defendant Erbey and Defendant Faris, and attached certifications signed by Britti and Defendant Faris pursuant to SOX sections 302 and 906.

347.   The 2013 Form 10-K highlighted Ocwen's "diligent" approach to regulatory compliance in pertinent part as follows:

> As a result of the current regulatory environment, we have faced and expect to continue to face increased regulatory and public scrutiny as well as stricter and more comprehensive regulation of our business. *We continue to work diligently to assess and understand the implications of the regulatory environment in which we operate and the regulatory changes we are facing. We devote substantial resources to regulatory compliance*, while, at the same time, striving to meet the needs and expectations of our customers and clients.

348.   With respect to the Company's ability to service loans through the REALServicing platform in compliance with its regulatory obligations and at a lower cost than its competitors, the 2013 Form 10-K stated:

> **Low Cost Structure**
> We believe we have a strong, sustainable cost advantage with respect to competing mortgage servicers. For example, based on a comparison of Mortgage Industry Advisory Corporation (MIAC) cost per non-performing loan as of the second quarter of 2013 to Ocwen's marginal cost study for the same period, our cost of servicing non-performing, non-Agency loans on the REALServicing® platform is approximately 70% lower than industry averages. *Our analysis of the businesses that we have acquired and our discussions with other market participants have also confirmed our belief that we are an industry leader in terms of our cost to service non-performing loans. We believe that our substantial cost advantages are primarily a result of proprietary technology and processes* as well as through scale and global sourcing strategies.

*     *     *

123

**Scalable and Compliant Servicing Platform**

\*       \*       \*

***We also believe that our platform enables us to operate in a compliant manner in an increasingly complex and highly regulated environment.*** While we have and will continue to incur significant operating costs on compliance matters, if we are able to comply with all applicable regulatory requirements in a manner that is more effective and efficient than other operators, we will have a competitive advantage over these other operators.

\*       \*       \*

We also incurred $34.3 million of outsourcing expenses, primarily in connection with the ResCap servicing platform. The ResCap servicing platform leverages third-party outsourcing for a variety of functions. ***We anticipate these costs will be absorbed and/or diminish as the ResCap assets transition to the REALServicing™ platform.***

349.    Additionally, the Risk Factors set forth under Item 1A of the 2013 Form 10-K included, *inter alia*, the following disclosure concerning Ocwen's management of potential conflicts of interest arising from related-party transactions:

> We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities.  We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential.

350.    The 2013 Form 10-K also repeated the statement contained in the 2Q 2013 Form 10-Q and 3Q 2013 Form 10-Q regarding the Company's agreements with Altisource that is set forth above in ¶ 274.

351.    The foregoing statements set forth in ¶¶ 347-50 were materially false and misleading when made.  In sharp contrast to Defendants' statements regarding the Company's compliance management systems and its compliance with applicable state and federal regulatory

requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.   Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations. Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

352.   In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

353.   Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."   Ocwen and

Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems." In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

354.    The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "***Ocwen [was] not meeting those obligations.***"  Moreover, the October 21 Letter disclosed that in November 2013, an employee at Ocwen had alerted the Company's Vice President of Compliance to this letter backdating issue but "[t]here [wa]s no indication that Ocwen did anything to investigate . . . the problem [at that time], nor did it alert its regulators, borrowers, or other interested parties to this issue."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's

126

inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

355.    Also belying Defendants' statements regarding the Company's regulatory compliance, the NMS Compliance Report revealed Ocwen's failure to satisfy the NMS requirements based upon critical deficiencies in the IRG's processes and procedures, including: (1) "the inability of the IRG Executive to certify the results for Test Period 7 without prior written assurances from a member of [Ocwen]'s in-house legal department[;]" and (2) "Metric 19 being tested improperly, leading to the results for that metric being reported inaccurately." As a result of these findings, the NMS Monitor concluded:

> that the IRG's processes and procedures, at least in Test Period 7, lacked the critical keys to integrity mandated in the Enforcement Terms [of the NMS], namely "an internal quality control group that is independent from the line of business whose performance is being measured," and an internal quality control group with "the appropriate authority, privileges and knowledge to effectively implement and conduct the reviews and metric assessments contemplated" in the Enforcement Terms [of the NMS].

356.    For the same reasons, Defendants' statements regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform were materially false and misleading because Defendants knew and/or recklessly disregarded the fact that the REALServicing platform was patently inferior to the FiServ platform from a compliance perspective, and that such savings would come at the expense of compliance.  In fact, contrary to Defendants' representations, Ocwen was dismantling the only servicing platform that was capable of complying with its regulatory obligations, and the additional costs associated with using the FiServ platform were necessary to ensure such compliance.

357.    In addition, Defendants' statements concerning the Company's related-party controls were materially false and misleading when made because, as disclosed by the NY DFS

in the April 21, 2014 Letter and the August 4, 2014 Letter, Defendants knew and/or recklessly disregarded that Ocwen did ***not*** have sufficient controls in place to prevent the Company's related-party transactions from causing harm to homeowners.  In fact, Ocwen and Defendant Faris admitted in the December 22, 2014 Consent Order that "Ocwen does ***not*** have a written policy in place that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."  These undisclosed facts concerning Ocwen's lack of related-party controls exacerbated the risk that the Company was not in compliance with its regulatory obligations to homeowners and, thus, the risk of additional regulatory action.

358.  Indeed, contrary to Defendants' representations in the 2013 Form 10-K that the Company had adopted policies, procedures, and practices designed to avoid potential conflicts of interest arising from related-party transactions, and that the rates charged under Ocwen's agreements with Altisource were "market rates," the NY DFS reported in the April 21, 2014 Letter that Altisource's subsidiary, Hubzu, had been charging Ocwen inflated fees that were "***up to three times the fees charged to non-Ocwen customers***."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."  In light of Ocwen's relationship with Altisource, this finding, according to the NY DFS, "***raise[d] significant concerns regarding self-dealing***[,]" including, "[i]n particular, . . . questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors" or, "[a]lternatively, . . . whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs."  In the August 4, 2014 Letter, the NY DFS further

128

noted that "Ocwen and Altisource state in their public filings that rates charged under agreements with related companies are market rate, but ***Ocwen has not been able to provide the Monitor with any analysis to support this assertion***."

359.   Moreover, Defendants' representation in the 2013 Form 10-K regarding Defendant Erbey's practice of recusing himself from decisions involving related-party transactions was directly belied by the NY DFS's confirmation in the August 4, 2014 Letter that Defendant Erbey negotiated and was solely responsible for approving an undisclosed "***troubling transaction***" in mid-January 2014 involving the provision of force-placed insurance, pursuant to which Ocwen used an unaffiliated insurance agent, SWBC, as a pass-through to funnel as much as $65 million in annual fees to Altisource for performing minimal work.  The NY DFS further "uncovered a growing body of evidence that Mr. Erbey has approved ***a number of transactions*** with [Ocwen's] related companies."   According to the NY DFS, these findings were "***inconsistent with public statements Ocwen has made, as well as representations in company SEC filings***[,]" including, in particular, "Ocwen's and Altisource's public claims . . . that [Defendant Erbey] recuses himself from decisions involving related companies."

360.   Moreover, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

March 5, 2014 *Wall Street Journal* Article

361.   On March 5, 2014, *The Wall Street Journal* published an article titled "Ocwen Chairman Defends Company's Business Relationships; Erbey's Comments Follow Scrutiny From New York Regulator" (the "March 5, 2014 *Wall Street Journal* Article.")  The March 5,

2014 *Wall Street Journal* Article reported that in a recent interview, Defendant Erbey dismissed concerns raised by the NY DFS in the February 26, 2014 Letter to the Company, quoting him in pertinent part:  "We're comfortable with the relationships we've got. . . .  We believe that it creates shareholder value by creating greater transparency as to the business roles of each of those entities."

362.    The foregoing statement set forth in ¶ 361 was materially false and misleading when made because, as disclosed by the NY DFS in the April 21, 2014 Letter and the August 4, 2014 Letter, Defendants knew and/or recklessly disregarded that Ocwen's related-party transactions were not fully disclosed to investors.

363.    Indeed, contrary to Defendant Erbey's statement in the March 5, 2014 *Wall Street Journal* Article regarding the putative "transparency" of Ocwen's business relationships with its affiliated companies, the April 21, 2014 Letter identified "significant concerns regarding self-dealing[,]" including, "[i]n particular, . . . questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors" or, "[a]lternatively, . . . whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs."  In particular, the April 21, 2014 Letter reported that Altisource's subsidiary, Hubzu, had been charging Ocwen inflated fees that were "up to three times the fees charged to non-Ocwen customers."    In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."

364.    This representation was further belied by the NY DFS's confirmation in the August 4, 2014 Letter that Defendant Erbey negotiated and was solely responsible for approving

an undisclosed "troubling transaction" in mid-January 2014 involving the provision of force-placed insurance, pursuant to which Ocwen used an unaffiliated insurance agent, SWBC, as a pass-through to funnel as much as $65 million in annual fees to Altisource for performing minimal work.  The NY DFS further identified a "growing body of evidence that Mr. Erbey has approved *a number of transactions* with [Ocwen's] related companies," which was "*inconsistent with public statements Ocwen has made, as well as representations in company SEC filings*[,]" including, in particular, "Ocwen's and Altisource's public claims . . . that [Defendant Erbey] recuses himself from decisions involving related companies."

365.   Moreover, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

2014 Proxy

366.   On April 22, 2014, Ocwen filed with the SEC an annual proxy statement on Form DEF 14A (the "2014 Proxy"), which was signed by Defendant Erbey.  In the 2014 Proxy, Ocwen reaffirmed its practice of recusing Defendant Erbey from decisions pertaining to related-party transactions as follows:

> Mr. Erbey currently serves as Executive Chairman of Ocwen and as non-executive Chairman of Altisource Portfolio Solutions S.A. ("Altisource"), Altisource Residential Corporation ("Residential") and Altisource Asset Management Corporation ("AAMC").  As a result, he has obligations to the Company as well as to Altisource, Residential and AAMC. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of Ocwen's common stock, 26% of Altisource's common stock, 5% of Residential's common stock and 27% of AAMC's common stock.  As of December 31, 2013, Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock, 291,164 options to purchase Residential common stock and 87,350 options to

purchase AAMC common stock, all of which were exercisable. Mr. Erbey is also the non-executive Chairman of Home Loan Servicing Solutions, Ltd. ("HLSS") and owned approximately 1% of HLSS' ordinary shares as of December 31, 2013. We do not consider Mr. Erbey to have a direct or indirect material interest under applicable Securities and Exchange Commission rules in our transactions with HLSS. **Due to the nature of Mr. Erbey's obligations to each of the companies, he recuses himself from decisions pertaining to any transactions between them.**

367.    The foregoing statement in the 2014 Proxy set forth in ¶ 366 was materially false and misleading when made because, as disclosed by the NY DFS in the August 4, 2014 Letter, Defendant Erbey played a central role in approving a "troubling transaction" in mid-January 2014 involving the provision of force-placed insurance, pursuant to which Ocwen used an unaffiliated insurance agent, SWBC, as a pass-through to funnel as much as $65 million in annual fees to Altisource for performing minimal work. The NY DFS further identified a "growing body of evidence that Mr. Erbey has approved *a number of transactions* with [Ocwen's] related companies," which was "*inconsistent with public statements Ocwen has made, as well as representations in company SEC filings*[,]" including, in particular, "Ocwen's and Altisource's public claims . . . that [Defendant Erbey] recuses himself from decisions involving related companies."

368.    Moreover, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

May 1, 2014 Press Release

369.    In the May 1, 2014 Press Release, Defendant Erbey stated in pertinent part:

Going forward, *we believe compliance and counterparty strength will be among the most important factors determining long-term success in the servicing business.* We consider our solid balance sheet, National Mortgage Settlement

compliance and long history of success in large servicing transfers, where we are able to substantially reduce delinquencies and keep more people in their homes, to be substantial competitive advantages.

370.     The May 1, 2014 Press Release also quoted Defendant Faris in pertinent part as

follows:

> ***Ocwen continues to work cooperatively with the New York Department of Financial Services*** to address their concerns that led to an indefinite hold on our Wells Fargo transaction.  We believe that increased regulatory scrutiny will, over time, benefit the industry and Ocwen by building greater confidence in the system and rewarding those with efficient and effective servicing processes. ***Nevertheless, new requirements and the associated investments have raised costs for the industry, including Ocwen.  This places an increased premium on operational scale and proficiency in operations, two areas of competitive strength for Ocwen.***

May 1, 2014 Conference Call

371.     In his opening remarks on the May 1, 2014 Conference Call, Defendant Erbey

commented in pertinent part:

> Let me begin with an overview of the three trends that we believe reinforce Ocwen's competitive position in the marketplace.  First, regulators[,] legislators[,] sellers[,] and other stakeholders insist upon near perfection in servicing transfers, and as we will discuss, Ocwen has both unique capabilities, and a long history of success in this regard.   Second, it's important to be in sync with the fullest regulatory mandates, and Ocwen is the only non-bank fully subject to the National Servicing Settlement requirements.   More over Ocwen's records of helping homeowners provides an exemplary record of complying with the spirit of emerging consumer protection.   And third, capital and counterparty strength are increasingly important to regulators, legislators and sellers.   Ocwen has the strongest balance sheet of any large non-bank servicer.
>
> \*         \*         \*
>
> [W]e are the only non-bank servicer subject to the most comprehensive servicing standards and monitoring required of the largest banks across our entire servicing platform.   ***Ocwen is deeply committed to adhering to the highest standards of compliance and regulatory oversight***, which is why we were the first non-bank servicer to come under National Servicing Standards and monitoring.   As such we're subject to virtually identical servicing standards and oversight as the large banks.
>
> Perhaps as importantly, Ocwen can point to facts that demonstrate that's [sic] ***we are very much in sync with the spirit of the regulations that aim as we do, to ensure that servicers are helping homeowners. . . .***

372.    In addition, Defendant Faris emphasized the Company's continued investment in its compliance management system during the May 1, 2014 Conference Call, stating in pertinent part:

Ocwen has been focused on process quality as an operating principal for a long time.  The emerging compliance structures are driving towards zero tolerance for errors, which is something we embrace wholeheartedly.

*       *       *

As we have said in the past we believe that increased regulatory requirements will be especially difficult for servicers that are subscale, and who have already high cost structures. We do not believe that these marginal servicers will be able to compete effectively without substantial investments.  In many cases, **their platforms are not capable of automating the new requirements efficiently or effectively.  Ocwen's platform on the other hand is designed in such a way that we can more easily automate requirements than others.**  Even if initially almost everyone's processes, including ours, are more manual than we might like.  **As a result, we expect that over time our margins and competitive advantage should improve**.

Before I move on to operations, let me address the questions we are often asked regarding the New York Department of Financial Services.  Our Wells Fargo transaction remains on indefinite hold.  Beyond that is it not appropriate for us to comment further at this time.  **I can say however that we continue to invest in our compliance and operational risk management systems.**

1Q 2014 Form 10-Q

373.    On May 2, 2014, Ocwen filed with the SEC its quarterly report on Form 10-Q for 1Q 2014 (the "1Q 2014 Form 10-Q"), which was signed by Britti and attached certifications signed by Britti and Defendant Faris pursuant to SOX Sections 302 and 906.

374.    The 1Q 2014 Form 10-Q discussed the cost savings that would result from Ocwen's decision to integrate the ResCap portfolio onto Ocwen's REALServicing platform, stating in pertinent part:

We also incurred $8.5 million and $2.3 million of outsourcing expenses during the first quarter of 2014 and 2013, respectively, primarily in connection with the ResCap servicing platform. The ResCap servicing platform leverages third-party

outsourcing for a variety of functions. ***We anticipate these costs will be absorbed and/or diminish as the ResCap assets transition to the REALServicing™ platform.***

375.    In addition, the 1Q 2014 Form 10-Q incorporated by reference the Risk Factors set forth under Item 1A of the 2013 Form 10-K, including, *inter alia*, the disclosure concerning Ocwen's management of potential conflicts of interest arising from related-party transactions that is set forth above in ¶ 270.

376.    The 1Q 2014 Form 10-Q also described the Company's agreements with Altisource in pertinent part as follows:

> Our business is currently dependent on services and products provided by Altisource under various long-term contracts, including the Support Services, Services, Technology Products Services, Intellectual Property, Data Center and Disaster Recovery Services and Data Access and Services agreements, each of which include renewal provisions. ***We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.***

377.    The foregoing statements set forth in ¶¶ 369-76 were materially false and misleading when made.  In sharp contrast to Defendants' statements regarding the Company's continued investment in its compliance management systems and compliance with applicable state and federal regulatory requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.  Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform– the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing,

which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations. Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

378.   In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS. Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

379.   Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records." Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems." In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

380.   The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "***Ocwen [was] not meeting those obligations***."  Moreover, the October 21, 2014 Letter revealed that after an Ocwen employee had alerted the Company's Vice President of Compliance to the letter backdating issue in November 2013, "Ocwen ignored the problem for five months until the same employee raised it again" in April 2014, but "[e]ven then, Ocwen failed to launch an appropriate investigation" and "still did not notify regulators, borrowers, or investors of this significant issue."   In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."  Similarly, Ocwen and Defendant Faris admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

381.   For the same reasons, Defendants' statements regarding the cost benefits of transferring the ResCap portfolio onto the REALServicing platform were materially false and misleading because Defendants knew and/or recklessly disregarded the fact that the REALServicing platform was patently inferior to the FiServ platform from a compliance

perspective, and that such savings would come at the expense of compliance.  In fact, contrary to Defendants' representations, Ocwen was dismantling the only servicing platform that was capable of complying with its regulatory obligations, and the additional costs associated with using the FiServ platform were necessary to ensure such compliance.

382.    In addition, Defendants' statements concerning the Company's related-party controls were materially false and misleading when made because, as disclosed by the NY DFS in the April 21, 2014 Letter and the August 4, 2014 Letter, Defendants knew and/or recklessly disregarded that Ocwen did ***not*** have sufficient controls in place to prevent the Company's related-party transactions from causing harm to homeowners.  In fact, Ocwen and Defendant Faris admitted in the December 22, 2014 Consent Order that "Ocwen does ***not*** have a written policy in place that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies."  These undisclosed facts concerning Ocwen's lack of related-party controls exacerbated the risk that the Company was not in compliance with its regulatory obligations to homeowners and, thus, the risk of additional regulatory action.  Indeed, contrary to Defendants' representation in the 1Q 2014 Form 10-Q regarding the Company's adoption of policies, procedures, and practices designed to avoid potential conflicts of interest arising from related-party transactions, including, in particular, Defendant Erbey's recusal from decisions involving related-party transactions, the August 4, 2014 Letter not only revealed Defendant Erbey's central role in approving a "troubling transaction" in mid-January 2014 involving the provision of force-placed insurance, pursuant to which Ocwen used an unaffiliated insurance agent, SWBC, as a pass-through to funnel as much as $65 million in annual fees to Altisource for performing minimal work, but also "***uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with***

*[Ocwen's] related companies*."  According to the NY DFS, these facts were **"inconsistent with public statements Ocwen has made, as well as representations in company SEC filings**[,]" including, in particular, "Ocwen's and Altisource's public claims . . . that [Defendant Erbey] recuses himself from decisions involving related companies."

383.    In addition, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Mr. Erbey has not in fact recused himself from approvals of several transactions with the related parties," and instead "has participated in the approval of a number of transactions between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014."

384.    Moreover, in contrast to Defendants' representation in the 1Q 2014 Form 10-Q that the rates charged under Ocwen's agreements with Altisource were "market rates," the NY DFS reported in the April 21, 2014 Letter that Altisource's subsidiary, Hubzu, had been charging Ocwen inflated fees that were "***up to three times the fees charged to non-Ocwen customers***."  In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "[i]n certain circumstances, Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors."  In light of Ocwen's relationship with Altisource, this finding, according to the NY DFS, "***raise[d] significant concerns regarding self-dealing***[,]" including, "[i]n particular, . . . questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors" or, "[a]lternatively, . . . whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs." The NY DFS further noted in the August 4, 2014 Letter that "Ocwen and Altisource state in their

public filings that rates charged under agreements with related companies are market rate, but

**Ocwen has not been able to provide the Monitor with any analysis to support this assertion**."

July 31, 2014 Conference Call

385.    On July 31, 2014, Ocwen hosted a conference call with analysts and investors to

discuss the Company's 2Q 2014 financial results (the "July 31, 2014 Conference Call").   In

connection with the July 31, 2014 Conference Call, Ocwen prepared an investor presentation

(the "July 31, 2014 Investor Presentation").  The July 31, 2014 Investor Presentation contained

the following slide highlighting Ocwen's "Compliance culture:"



386.    In his remarks on the July 31, 2014 Conference Call relating to the foregoing slide

from the July 31, 2014 Investor Presentation, Defendant Faris noted that "**in 2014 alone, we**

**have made major investments in our compliance infrastructure, adding over 325 employees in**

**Legal, Risk, Audit and compliance.**"

387.    Defendant Erbey also stated during the July 31, 2014 Conference Call:  "***Ocwen is deeply committed to adhering to the highest standards of compliance and regulatory oversight. We have made significant investments in this area over many years and will continue to do so.***"

388.    Also during the July 31, 2014 Conference Call, Defendant Faris stated with respect to the NY DFS's hold on the Wells Fargo deal:  "I am sure that many of you are interested in the status of the Wells Fargo transaction we announced in January.  Similar to last quarter, the deal remains on indefinite hold and ***we continue to cooperate with the New York Department of Financial Services***."

2013 Form 10-K/A

389.    On August 18, 2014, Ocwen filed with the SEC an amended annual report on Form 10-K/A for the year ended December 31, 2013 (the "2013 Form 10-K/A"), which was signed by Defendants Erbey and Faris and attached certifications signed by Defendant Faris pursuant to SOX Sections 302 and 906.  The 2013 Form 10-K/A repeated the statement contained in the 2013 Form 10-K regarding Ocwen's "diligent" approach to regulatory compliance that is set forth above in ¶ 345.

390.    In addition, the 2013 Form 10-K/A stated with regard to the NY DFS's hold on the Wells Fargo deal:  "[I]n early February 2014, the NY DFS requested that OLS put an indefinite hold on an acquisition of MSRs and related servicing advances from Wells Fargo, and we agreed to place the transaction on indefinite hold.  ***We are cooperating with the NY DFS on this matter.***"

1Q 2014 Form 10-Q/A

391.    On August 18, 2014, Ocwen filed with the SEC an amended quarterly report on Form 10-Q for the period ended March 31, 2014 (the "1Q 2014 Form 10-Q/A"), which attached

141

certifications signed by Defendant Faris pursuant to SOX Sections 302 and 906.   Regarding

Ocwen's regulatory compliance, the 1Q 2014 Form 10-Q/A stated in pertinent part:

> On December 5, 2012, we entered into a Consent Order with the NY DFS in which we agreed to the appointment of a Monitor to oversee our compliance with an Agreement on Servicing Practices.  ***The Monitor began its work in 2013, and we continue to cooperate with the Monitor.  We devote substantial resources to regulatory compliance***, and we incur, and expect to continue to incur, significant ongoing costs with respect to compliance in connection with the Agreement on Servicing Practices and the work of the Monitor.  In early February 2014, the NY DFS requested that Ocwen put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. (Wells Fargo) of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion.  The NY DFS expressed an interest in evaluating further our ability to handle more servicing.  We have agreed to place the transaction on indefinite hold.  ***We are cooperating with the NY DFS on this matter.***

2Q 2014 Form 10-Q

392.    On August 18, 2014, Ocwen filed with the SEC the 2Q 2014 Form 10-Q, which

attached certifications signed by Defendant Faris pursuant to SOX Sections 302 and 906.

Regarding Ocwen's regulatory compliance, the 2Q 2014 Form 10-Q stated in pertinent part:

> In December 2012, we entered into a Consent Order with the New York Department of Financial Services (NY DFS) in which we agreed to the appointment of a Monitor to oversee our compliance with an Agreement on Servicing Practices.  The Monitor began its work in 2013, and ***we continue to cooperate with the Monitor.  We devote substantial resources to regulatory compliance***, and we incur, and expect to continue to incur, significant ongoing costs with respect to compliance in connection with the Agreement on Servicing Practices and the work of the Monitor.  In early February 2014, the NY DFS requested that Ocwen put an indefinite hold on an acquisition from Wells Fargo Bank, N.A. of MSRs and related servicing advances relating to a portfolio of approximately 184,000 loans with a UPB of approximately $39.0 billion.  The NY DFS expressed an interest in evaluating further our ability to handle more servicing. We have agreed to place the transaction on indefinite hold.  The NY DFS has also inquired about certain other aspects of our business, including certain aspects of our business dealings with Altisource, HLSS, AAMC and Residential, the interests of our directors and executive officers in these companies, an online auction business owned by Altisource, the role of Altisource in certain lender-placed insurance arrangements and the provisions contained in releases we use in connection with litigation settlements.  ***We are cooperating with the NY DFS on these matters.***

393.     Each of the foregoing statements set forth in ¶¶ 385-92 was materially false and misleading when made.  In sharp contrast to Defendants' statements regarding the Company's "[c]ompliance culture," its continued investment in its compliance management systems, its compliance with applicable state and federal regulatory requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.  Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.  In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations.  Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

394.     In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS.  Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

395.     Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records."   Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems."  In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

396.     The October 21, 2014 Letter further confirmed the falsity of the foregoing statements by revealing that the Company was not, in fact, complying with its regulatory obligations during the Class Period.  Specifically, the NY DFS revealed that, notwithstanding Ocwen's "obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings," at least as far back as July 25, 2012, the Company had been "backdating . . . potentially hundreds of thousands of letters to borrowers[,]" and therefore "*Ocwen [was] not meeting those obligations*."   In the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that "Ocwen's systems have been backdating letters for years," and that "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records."   Similarly, Ocwen and Defendant Faris

admitted that "Ocwen's inadequate infrastructure and ineffective personnel have resulted in Ocwen's failure to fulfill its legal obligations."

397.    Moreover, contrary to Defendants' representations regarding the Company's continued cooperation with the NY DFS and the Monitor, the October 21, 2014 Letter revealed that after the Monitor confronted Ocwen regarding the letter backdating issue on June 19, 2014, over the course of the next three months, the Company represented to the NY DFS and the Monitor that the issue was isolated to a specific type and number of letters, had been discovered in April or May of 2014, and had been resolved in May 2014, but that "*[e]ach of these representations turned out to be false*[,]" as "*Ocwen finally admitted in a memorandum on September 10, 2014[] that the backdating issue may not [have] been isolated and that the changes to Ocwen's systems in May 2014 did not fully resolve the problem*" and, indeed that Ocwen "*still [had] not resolved the issue [as of October 21, 2014], nearly a year after its initial discovery*."   Further, Ocwen ultimately admitted that it learned of the backdating issue in November 2013, not April or May of 2014, as it had previously represented to the NY DFS.

October 21, 2014 Press Release

398.    Before the markets closed on October 21, 2014, Ocwen issued a press release (the "October 21, 2014 Press Release") responding to the NY DFS's disclosure of the backdating scandal by representing that the backdating of letters was "inadvertent," affected only "283 borrowers in New York", and had been fully resolved.

399.    Each of the foregoing representations set forth in ¶ 398 was materially false and misleading when made, and directly contradicted Ocwen's admission to the NY DFS that at least 6,100 borrowers had been affected.  In fact, just a few hours later and after the close of trading, Ocwen issued a subsequent press release correcting these misstatements concerning the scope of the backdating issue.   In particular, Ocwen revealed that, contrary to its representation that

backdating affected only 283 borrowers, it was "aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were."

<u>3Q 2014 Form 10-Q</u>

400.    On October 31, 2014, Ocwen filed with the SEC the 3Q 2014 Form 10-Q, which attached certifications signed by Defendant Faris pursuant to SOX Sections 302 and 906.

401.    The 3Q 2014 Form 10-Q discussed the cost savings that would result from Ocwen's decision to integrate the ResCap portfolio onto Ocwen's REALServicing platform, stating in pertinent part:

> Servicing-related outsourcing expenses declined by $7.3 million. The ResCap servicing platform leverages third-party outsourcing for a variety of functions. These costs are being absorbed and/or diminished as the loans transition to the REALServicing platform.

<u>October 30, 2014 Conference Call</u>

402.    On October 30, 2014, Ocwen hosted a conference call with analysts and investors to discuss the Company's 3Q 2014 financial results (the "October 30, 2014 Conference Call"). During the October 30, 2014 Conference Call, Defendant Erbey commented on the Company's migration of the ResCap portfolio from FiServ's platform to REALServicing, stating in pertinent part that "[t]his migration to one common servicing platform positions the Company well to drive further quality and process automation improvements in the coming year."

403.    Regarding the Company's efforts to ensure compliance with its regulatory obligations, Defendant Faris stated the following during the October 30, 2014 Conference Call:

> We have significantly expanded the scope of quality and compliance testing.  We have expanded our compliance training programs.  We set dedicated resources to support regulators and monitors.  We have engaged consultants to assist where necessary.  Considering the growth that our firm has experienced in the last few years, we believe these investments in risk and compliance will support sustainable growth in the future.  Apart from helping us to better fulfill our mission of helping homeowners and the mortgage loan investors, these

investments should also translate into better customer experiences and outcomes, higher efficiency and lower servicing expenses.

404.     In connection with the October 30, 2014 Conference Call, Ocwen prepared an investor presentation which stated that Ocwen's investment in its compliance management systems over the prior two years had resulted in a "[s]calable infrastructure," "[b]etter customer experience," and "increase[d] efficiency," and was a "competitive advantage" for the Company.

405.     Each of the foregoing representations set forth in ¶¶ 401-04 was materially false and misleading when made.   In sharp contrast to Defendants' statements regarding the Company's continued investment in its compliance management systems, and its compliance with applicable state and federal regulatory requirements, Defendants knew and/or recklessly disregarded that the servicing platform Ocwen used throughout the Class Period, REALServicing, was incapable of complying with Ocwen's regulatory obligations.   Indeed, on a weekly basis throughout 2013, Ocwen management, including S.P. Ravi and Defendant Faris, was informed of REALServicing's significant compliance-related deficiencies.   In light of these deficiencies, CW 1 and CW 2, among others, urged the Company to use the FiServ platform – the servicing platform that ResCap had used to comply with, among other things, the National Mortgage Settlement and applicable CFPB regulations – to service its loans instead of REALServicing, which had not been modified to comply with these regulations and was, in fact, incapable of complying with these regulations.   Rather than doing so, and despite acknowledging in March or April of 2013 that REALServicing was "more basic" than the FiServ platform, Ocwen dismantled the FiServ platform and continued using Altisource's inadequate REALServicing platform, thereby subverting compliance in order to reduce costs.

406.     In fact, the NMS Compliance Report disclosed that, with respect to the three-month period ended March 31, 2014 (i.e., Test Period 7), the transfer of servicing from FiServ to

RealServicing had resulted in Ocwen's inability to actually test loans for one of the metrics used to evaluate its compliance with the NMS. Moreover, the NMS Compliance Report identified deficiencies in RealServicing as the cause of the letter-backdating issue – a problem that did not affect loans serviced through FiServ.

407.    Further, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted that Ocwen's use of the REALServicing platform has resulted in Ocwen "regularly giv[ing] borrowers incorrect or outdated information, send[ing] borrowers backdated letters, unreliably track[ing] data for investors, and maintain[ing] inaccurate records." Ocwen and Defendant Faris further admitted that "Ocwen's core servicing functions rely on its inadequate systems." In particular, Ocwen and Defendant Faris admitted that REALServicing uses "more than 8,400" comment codes to service its portfolio, and that "[o]ften, due to insufficient integration following acquisitions of other servicers, there are duplicate codes that perform the same function," resulting "in an unnecessarily complex system of comment codes, including, for example, 50 different codes for the single function of assigning a struggling borrower a designated customer care representative."

## VIII.   SUMMARY OF SCIENTER ALLEGATIONS

408.    As alleged in detail above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded that the statements identified above were materially false and misleading when made.

### A.    Direct Evidence Of Defendants' Scienter

409.    In the December 22, 2014 Consent Order with the NY DFS, Ocwen and Defendant Faris admitted to the following facts, among others:

> a)    The Monitor's review of 478 loans serviced by Ocwen that had been foreclosed upon "revealed *1,358 violations of Ocwen's legal obligations*, or about three violations per foreclosed loan," including "failing to

confirm that it had the right to foreclose before initiating foreclosure proceedings," "failing to ensure that its statements to the court in foreclosure proceedings were correct," and "pursuing foreclosure even while modification applications were pending";

b)    "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies," and, "[a]s a result, ***Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records***";

c)    "Ocwen's systems ***have been backdating letters for years,***" and its "processes failed to identify and remedy these errors";

d)    "Ocwen failed to fully investigate and appropriately address the backdating issue when an employee questioned the accuracy of Ocwen's letter dating processes and alerted the company's Vice President of Compliance," and "ignored the issue for five months until the same employee raised it again";

e)    "Ocwen has not fully resolved the [backdating] issue to date, more than a year after its initial discovery";

f)    "Ocwen's core servicing functions rely on its inadequate systems";

g)    REALServicing relies on "an unnecessarily complex system of comment codes," including "more than 8,400" comment codes, "duplicate codes that perform the same function," and "50 different codes for the single function of assigning a struggling borrower a designated customer care representative";

h)    "Ocwen's reliance on technology has led it to employ fewer trained personnel than its competitors," and according to Ocwen's Chief Financial Officer, "Ocwen [was] simply 'training people to read the scripts and the dialogue engines with feeling.'" throughout the Class Period;

i)    "Ocwen penalizes and has terminated customer support staff who fail to follow the scripts that appear on their computer screens" – a policy which "frustrated struggling borrowers who have complex issues that exceed the bounds of the script" and led to customer support staff "provid[ing] conflicting responses to a borrower's question";

j)    Ocwen "failed in many cases to record in Ocwen's servicing system the nature of the concerns that a borrower has expressed, leading to inaccurate records of the issues raised by the borrower";

k)    "Ocwen's inadequate infrastructure and ineffective personnel *have resulted in Ocwen's failure to fulfill its legal obligations*," and "[p]rior to the [DFS] review, Ocwen *did not take adequate steps* to implement the reforms that it was legally obligated to implement pursuant to the 2011 Agreement";

l)    Defendant Erbey and "[o]ther Ocwen executives and directors own significant investments in both Ocwen and the related parties," but "Ocwen *does not* have a written policy that explicitly requires potentially conflicted employees, officers, or directors to recuse themselves from involvement in transactions with the related companies";

m)   "Mr. Erbey has not in fact recused himself from approvals of several transactions with related parties," and instead "*has participated in the approval of a number of transactions* between [Ocwen and Altisource] or from which Altisource received some benefit, including the renewal of Ocwen's force[] placed insurance program in early 2014";

n)    "Hubzu has charged more for its services to Ocwen than to other customers – charges which are then passed on to borrowers and investors"; and

o)    "Ocwen's Chief Risk Officer concurrently served as the Chief Risk Officer of Altisource" and "reported directly to Mr. Erbey in both capacities."

410.   Additionally, as part of the December 22, 2014 Consent Order, Defendant Erbey agreed to resign from his position as the Executive Chairman of Ocwen, and as the Chairman of Altisource, AAMC, RESI and HLSS.  Pursuant to the December 22, 2014 Consent Order, Defendant Erbey is prohibited from having any "directorial, management, oversight, consulting or any other role at Ocwen or any related party, or at any of Ocwen's or the related parties' affiliates or subsidiaries as of the date of his resignation."  In addition, the NY DFS required that Ocwen executives and directors "not disclose to Mr. Erbey any non-public information about Ocwen that is not available to other shareholders."

411.   Moreover, Defendant Erbey's conduct throughout the Class Period was directly at odds with his and Ocwen's public statements concerning purported controls Ocwen had

instituted to screen Erbey from decisions concerning business placed with other Erbey Companies. First, Defendant Erbey personally approved of Ocwen's force-placed arrangement with Altisource and SWBC. Additionally, the NY DFS disclosed in the August 4, 2014 Letter that this was not an isolated breach of Mr. Erbey's public statements to investors but instead had "uncovered a growing body of evidence that Mr. Erbey has approved a number of transactions with the related companies." Defendant Erbey's conduct in this regard directly contravenes Defendants' public statements during the Class Period that he recuses himself from related-party transactions, and thus raises a strong inference of scienter.

412.    Defendant Erbey's direct participation in steering business to his related companies was detrimental to homeowners and concealed the risk from investors of regulatory enforcement of which Defendant Erbey was acutely aware. Indeed, he acknowledged that Ocwen's regulators were troubled with the Company's relationships with entities that he controlled and which had adverse goals to keeping homeowners in their homes. For example, during the February 27, 2014 Conference Call, Defendant Erbey noted that "[w]e received a letter yesterday from the [NY] DFS asking about our relationships with four related companies, independent companies. . . . We look forward to addressing the matters raised by DFS and will fully cooperate."

413.    A key example of Defendant Erbey's direct involvement with related-party transactions that were adverse to the interests of homeowners and were precisely the transactions from which he was supposedly recusing himself is the force-placed insurance arrangement he approved involving Ocwen, SWBC and Altisource. That deal, which Defendant Erbey approved in January 2014, called for the payment of a "technology support fee" to SWBC – 75% of which flowed through to Altisource – that was double what Ocwen had paid to another insurer for

similar services the prior year.  In fact, based on its review of documents related to the transaction, the NY DFS concluded that it was negotiated and approved by Defendant Erbey "with the expectation and intent that Altisource would use this opportunity to steer profits to itself."  In particular, according to the NY DFS, "this complex arrangement appears *designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work*."  As such, it raised serious concerns that Ocwen was attempting to circumvent prohibitions on kickbacks to mortgage servicers that the NY DFS had imposed the previous year in light of its investigation into similar arrangements involving higher commissions being kicked back by insurers to mortgage servicers' affiliated insurance agencies as a quid pro quo for purchasing force-placed insurance with higher premiums, "*[t]he extra expense of [which], in turn, can push already struggling families over the foreclosure cliff*."  Moreover, the NY DFS determined that Defendant Erbey's central role in its approval was "inconsistent with public statements Ocwen has made, as well as representations in company SEC filings" regarding Defendant Erbey's purported practice of recusing himself from decisions involving related companies.  These facts constitute further evidence of Defendant Erbey's scienter.

414.   Third, it was widely known within Ocwen that its platform – sourced by Altisource – was vastly inferior to the compliance platform that GMAC had used to ensure compliance with the NMS, which was created by FiServ, one of Altisource's principal competitors.  Nevertheless, after acquiring ResCap's loans from GMAC along with its monitoring employees, Ocwen's senior management determined to scrap GMAC's monitoring platform in favor of Altisource's to save money.  This was despite the fact that numerous of GMAC's compliance professionals who Ocwen had inherited when it acquired the ResCap

portfolio complained vociferously about the compliance issues created by Altisource's platform, REALServicing.  According to CW 1, Defendant Faris received daily and weekly updates from Ocwen's Chief Risk Officer, S.P. Ravi, identifying the severe compliance-related deficiencies within the REALServicing platform.  These reports were prepared by Ocwen's IRG, the group responsible for ensuring compliance of ResCap loans with NMS standards.  According to CW 1, Joseph Pensabene, an Executive Vice President at Ocwen who had served as the Chief Servicing Officer at ResCap, informed CW 1 and other compliance professionals that Ocwen would be transitioning to Altisource's platform because it was cheaper.

415.    Ocwen's unwillingness to devote the necessary resources to its compliance infrastructure contravenes Defendants Erbey's numerous statements about Ocwen's commitment to compliance.  Indeed, during the February 27, 2014 Conference Call, he volunteered in comments addressing the NY DFS's hold on the Wells Fargo transaction and queries concerning Ocwen's related-party transactions, "We've also invested in and will continue to invest in more robust auditing, quality control and validation of our servicing, quality and compliance." Defendant Faris repeated this representation on the call:

> As we look forward to this year, we expect to maintain strong operating performance by investing in our compliance management infrastructure that will enhance our ability to demonstrate our compliance, raising the bar on customer service through continued investments in training, new processes and new technologies, improving our cost structure by consolidating onto a single operating platform and taking advantage of our scale to further reduce overhead expenses and building our lending business and utilizing our core competencies to invest in adjacent businesses.

416.    Yet, what Defendants Faris and Erbey failed to reveal is that the decision to dismantle the ResCap servicing platform that was NMS-compliant in favor of Altisource's platform was being roundly criticized by Ocwen's compliance professionals who viewed ResCap's platform as vastly superior to Altisource's, which was deficient in tracking

compliance.   The sole reason for jettisoning ResCap's platform was because it was more expensive to operate.

417.   Defendants' willingness to subvert compliance for the sake of cost savings (and to steer business from FiServ to Altisource), and their willingness to ignore obvious warning signs of the deficiencies in Ocwen's compliance infrastructure is starkly illustrated by the "pervasive" backdating of notices issued to homeowners facing foreclosure.  Ocwen admitted "that one of its employees identified the [backdating] problem in November 2013 and informed senior management, including the Vice President of Compliance."   Yet Ocwen did nothing to investigate or remediate the backdating issue, nor did it disclose to its regulators, borrowers or investors that the Company had been backdating borrower communications.  Instead, Defendants falsely assured investors that Ocwen was complying with all applicable servicing regulations, and continued to provide such false assurances to investors even after the backdating issue was again identified internally in April 2014, and after the NY DFS brought the backdating issue to Ocwen's attention in June 2014.  This conduct, which Ocwen and Defendant Faris admitted to in the December 22, 2014 Consent Order, constitutes further evidence of Defendants' scienter.

418.   Fourth, Ocwen repeatedly provided false and misleading information to the NY DFS concerning the timing and scope of the backdating issue.  In particular, Ocwen initially informed the NY DFS that:   (1) the issue "was isolated to letters of a specific type"; (2) approximately 6,100 communications had been affected; and (3) Ocwen discovered the issue in April or May of 2014 and resolved the issue in May 2014.  However, the NY DFS later found that "[e]ach of these representations turned out to be false."   In particular, just "a few days" into its investigation, the NY DFS monitor "uncovered nearly a thousand additional backdated letters that Ocwen evidently failed to find."   Moreover, "under pressure from the Department and the

Monitor to identify and disclose the full extent of this [backdating] issue, Ocwen finally admitted in a memorandum on September 10, 2014, that the backdating issue may not be isolated and that the changes to Ocwen's systems in May 2014 did not fully resolve the problem." However, Ocwen still only identified "a fraction of the instances of backdating that had already been uncovered by the Monitor." Finally, Ocwen's September 10 memorandum "repeated the assertion that Ocwen initially discovered the backdating issue in April 2014," but "after persistent questioning from the Monitor," Ocwen finally revealed that "one of its employees identified the problem in November 2013 and informed senior management, including the Vice President of Compliance."

419.    Fifth, Ocwen issued the October 21, 2014 Press Release, in which it falsely represented that just 283 borrowers had received backdated letters and that the issue had been resolved by the Company. This statement directly contradicted Ocwen's admission to the NY DFS that at least 6,100 borrowers had been affected. In fact, the Company later acknowledged that more than 283 borrowers had been affected by the backdating scandal, and that Ocwen had not yet identified the true scope of the problem. Defendants' issuance of materially false and misleading information to the market regarding Ocwen's backdating scandal likewise evidences their scienter.

**B.      Additional Evidence of Defendants' Scienter**

**1.      Defendant Erbey's Financial Motivation To Conceal Facts From Investors**

420.    As discussed herein, while Defendant Erbey owned 13% of Ocwen's common stock as of December 31, 2013, he owned double that amount – 26% – of Altisource's common stock as of the same date. This meant that Defendant Erbey took home $0.26 for every dollar earned by Altisource, but only $0.13 for every dollar earned by Ocwen.

421.    As the NY DFS recognized in the August 4, 2014 Letter concerning Defendant Erbey's approval of a related-party transactions, Defendant Erbey's larger ownership stake in Altisource and Altisource's lower effective tax rate ensured that Defendant Erbey profited personally every time Ocwen diverted revenues to Altisource.

422.    Defendant Erbey's interests in Altisource provided him with a clear motive to participate in related-party negotiations in contravention of Defendants' public statements to investors.   For instance, by approving Ocwen's force-placed arrangement with SWBC and Altisource, Defendant Erbey ensured that Altisource would earn approximately $65 million in annual revenues without providing any meaningful services to Ocwen or SWBC.   Defendant Erbey's share of those revenues amounts to approximately $16.9 million annually.   Neither Altisource nor Erbey would have earned these funds if Ocwen had not entered into this arrangement with SWBC.

423.    Likewise, Defendant Erbey's stake in Altisource meant that he also profited from Ocwen's decision to force its borrowers to pay 4.5% in fees to list on Hubzu, as opposed to the 1.5% fee Hubzu charged non-Ocwen borrowers.   Each time an Ocwen borrower paid that additional 3% over and above Hubzu's market rates, Defendant Erbey stood to earn 26% of that amount.   Moreover, Ocwen's decision to rely exclusively on Altisource's servicing platform despite widespread criticisms concerning its inability to handle the compliance needs associated with the volume of loans that Ocwen had acquired, benefited Defendant Erbey personally.

424.    Finally, Defendant Erbey personally profited every time a backdated letter caused an Ocwen-serviced property to enter foreclosure.   As alleged herein, once foreclosure proceedings began on an Ocwen-serviced loan, Ocwen engaged Altisource to provide various foreclosure-related services including, *inter alia*, valuation services and property preservation

services, thereby increasing Altisource's revenues.  In addition, once Ocwen foreclosed on a property, it had the option either to transfer the property to Hubzu for sale (thereby causing Defendant Erbey's stake in Altisource to increase in value once again) or to RESI for rental (thereby causing Defendant Erbey's stake in AAMC/RESI to increase in value).

425.    In sum, Defendant Erbey's financial interest in each of the Ocwen-related entities, and the fact that each of the improper transactions alleged herein had the effect of transferring assets out of Ocwen and into an Ocwen-related entity in which Defendant Erbey had a large financial interest, constitutes strong circumstantial evidence of his scienter.

### 2.    Defendant Erbey's And Defendant Faris's Positions Within Ocwen And The Erbey Companies Raise A Strong Inference Of Their Scienter

426.    As alleged herein, Defendant Erbey was the Executive Chairman of Ocwen and Defendant Faris served as its CEO throughout the Class Period.  According to the 2014 Proxy: "As our President and Chief Executive Officer, Mr. Faris is responsible for our day-to-day operations and for formulating and executing our long-term strategies in collaboration with the Board of Directors."  The 2014 Proxy goes on to state:  "As Executive Chairman of the Board, Mr. Erbey leads the Board of Directors and oversees Board meetings and the delivery of information necessary for the Board's informed decision-making.  In addition to leading the Board of Directors, Mr. Erbey is actively involved in our business and focuses on strategy, key personnel development and corporate finance."

427.    In addition, the 2014 Proxy notes:

The Board of Directors' role in risk oversight is consistent with the Company's leadership structure with the President and Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Executive Chairman, the Board of Directors and its Committees providing oversight in connection with these efforts.

428.   The 2014 Proxy also states that Defendant Faris has "an intimate knowledge of [Ocwen's] business and plays an active role in the day-to-day management of [its] operations."

429.   Given Defendant Faris's and Defendant Erbey's intimate involvement in the management and oversight of the Company, and in particular its risk exposures, it is simply inconceivable that they were not aware of the fact that S.P. Ravi and other Ocwen managers were was simultaneously employed by Altisource, or the conflicts of interest inherent in these dual roles.  This is particularly true for Defendant Erbey, who served as the Chairman of both Ocwen and Altisource.

430.   Moreover, Defendant Erbey's role as Chairman of Altisource during the Class Period constitutes additional circumstantial evidence of his scienter with respect to Ocwen's force-placed insurance arrangement with Altisource and SWBC, which resulted in Altisource earning approximately $65 million in fees annually.   Those fees were plainly material to Altisource's financial condition, as it represents nearly 8.5% of Altisource's total revenue and 48.6% of Altisource's net income for the entire fiscal year of 2013.   The magnitude of this arrangement with Ocwen constitutes strong circumstantial evidence that, as the Chairman of Altisource's Board of Directors, Defendant Erbey was aware of this arrangement and/or recklessly disregarded the fact that Altisource was earning above-market fees in exchange for little-to-no work.

431.   Additionally, Defendant Erbey's dual role as Chairman of both Ocwen and Altisource during the Class Period raises a strong inference of his awareness that the 4.5% fee Ocwen was paying to Hubzu was materially larger than the 1.5% fee that Hubzu charged its non-Ocwen businesses.  In fact, as set forth in the April 21, 2014 Letter, the NY DFS discovered that "the underlying HTML code for the Hubzu website appears to include a built-in notation stating

'isOcwenSeller' – followed by a 'Y' or 'N' for each individual property" and that higher rates were charged "[f]or those properties where a 'Y' is noted."

432.     Similarly, Defendant Erbey's dual role as the Chairman of both Ocwen and Altisource during the Class Period raises a strong inference of his awareness that Altisource was receiving $65 million in compensation in exchange for little to no work under Ocwen's force-placed insurance arrangement with SWBC, and that the "technology support fee" paid by Ocwen was double the rate that it had paid to another company for similar services during the prior year.

433.     Further, during the Class Period Defendant Faris served on the Ocwen Board's Compliance Committee, which "provides assistance to the Board of Directors with (1) establishment and oversight of our compliance function, including our compliance management system, and (2) oversight of our compliance with applicable laws, rules and regulations governing its consumer-oriented businesses including Federal consumer financial laws and applicable state laws."  Defendant Faris's role as a member of the Compliance Committee, which required him to oversee the Company's compliance with legal and regulatory requirements, constitutes strong circumstantial evidence of his awareness, or reckless disregard of, *inter alia*: (1) the severe compliance-related deficiencies associated with Ocwen's REALServicing platform, its resulting inability to satisfy Ocwen's regulatory obligations throughout the Class Period and the increased costs necessary to satisfy such allegations; and (2) Ocwen's consistent failure to comply with applicable regulations throughout the Class Period by, among other things, backdating borrower communications.  This is particularly true in connection with Ocwen's admission that its Vice President of Compliance was informed of, and ignored, the backdating scandal in November 2013 and again in April 2014.

### 3.   The Magnitude Of The Backdating Scandal

434.   As alleged above, the backdating scandal at Ocwen spanned nearly four years and affected "potentially hundreds of thousands" of borrowers.   The enormous breadth of this improper practice, which directly contravened the terms of the NMS, as well as Ocwen's agreements with the CFPB and the NY DFS, constitutes additional circumstantial evidence that Defendants were aware of or recklessly disregarded the backdating problem, and the fact that it rendered their Class Period statements to investors materially false and misleading.

### 4.   Ocwen's Decision To Dismantle ResCap's FiServ Platform In Favor Of REALServicing

435.   As noted above, Ocwen received numerous complaints from employees regarding Altisource's servicing platform.   In particular, according to CW 1 and other Ocwen employees indicated that, from a compliance perspective, REALServicing was inferior to ResCap's FiServ platform and created substantial compliance issues for the Company   These compliance-related issues were reported weekly in a document that was sent to S.P. Ravi and Defendant Faris. Defendant Faris was also given daily and weekly updates regarding the migration of data from the Fiserv platform to REALServicing.

436.   Despite its inferiority to the FiServ platform from a compliance standpoint, Ocwen made the decision to use Altisource's REALServicing platform and to dismantle ResCap's FiServ platform – a decision that resulted in Ocwen continuing to funnel money to Altisource (and, therefore, Defendant Erbey), and that had the effect of transferring revenues associated with the ResCap portfolio away from FiServ, one of Altisource's primary competitors. Ocwen's decision to use REALServicing despite being aware of its shortcomings raises an inference that Defendants knew, or were reckless in not knowing, that their statements regarding Ocwen's commitment to compliance, its ability to comply with regulations at a lower cost than

its peers, and its "robust" controls over related-party transactions were materially false and misleading.

### 5. Regulators' Increased Focus On The Timing And Substance Of Ocwen's Borrower Communications During The Class Period

437. The timing and substance of Ocwen's communications with its borrowers were the subject of intense scrutiny during the Class Period, and were, in fact, the focus of both the Agreement on Mortgage Servicing Practices and the Consent Judgment. In particular, Ocwen specifically agreed in the Consent Judgment to notify borrowers of loan modification denials within 10 days, and to provide borrowers with 30 days to appeal such a denial.

438. Given this increased regulatory scrutiny and Ocwen's public agreement to reform its mortgage servicing practices with respect to borrower communications, the fact that the backdating scandal constituted a direct violation of the terms of these regulatory settlements provides further evidence that Defendants were aware of, or were reckless in not knowing, that Ocwen was backdating borrower communications prior to and during the Class Period.

439. Moreover, beginning in at least November 2013, the backdating issue had been raised to Ocwen's senior management by compliance employees, and ignored. The issue was raised internally by the NY DFS to Ocwen in June 2014, at which point Ocwen first denied previous knowledge to the NY DFS, then admitted that they had known about the issue since at least November 2013. Ocwen also attempted to mislead the NY DFS regarding the scope of the backdating problem. And despite the concerns raised by the NY DFS concerning Ocwen's ability to service loans on its existing platform in a compliant manner, Defendant Faris spoke to investors at a conference on June 2014, in which he suggested that Ocwen would be able to successfully close on the Wells Fargo deal and satisfy the NY DFS. Given that Defendant Faris

knew about the NY DFS's inquiries and concern over the backdating issue, these statements were reckless, at best.

## IX.    LOSS CAUSATION

440.    Defendants' unlawful conduct alleged herein directly and proximately caused the foreseeable losses suffered by Lead Plaintiff and the Class. The material false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.  These materially false and misleading statements and omissions regarding, *inter alia*, Ocwen's controls over related-party transactions and its compliance with applicable mortgage servicing rules and regulations caused the Company's common stock to trade at artificially-inflated prices throughout the Class Period.

441.    As the true facts became known, the price of Ocwen common stock declined, causing damage to Lead Plaintiff and the Class.  Specifically, through a series of partial disclosures between February and December 2014, the market learned that, contrary to Ocwen's public representations, Defendant Erbey had not recused himself from all related-party transactions, the Company was not entering into related-party transactions at market rates, the Company's mortgage servicing practices were not in compliance with its obligations under the various consent agreements it had entered into with its regulators, the cost of compliance with these regulations reduced Ocwen's purported competitive advantage to service loans at 70% less than the cost of its competitors while ensuring higher quality servicing, and Ocwen would be unable to acquire more loans because of its inability to assure its regulators that it could comply with regulatory mandates.

442.    Each of the corrective disclosures discussed below partially revealed the truth regarding Ocwen's improper mortgage servicing practices, related-party transactions, and true costs of servicing its loans using its existing servicing platform.  However, the full truth

regarding Defendants' misstatements and omissions was not fully revealed to the market until December 22, 2014, when the market finally appreciated the true extent of Defendants' misconduct, and the full impact that Ocwen's undisclosed wrongful practices would have on the Company's financial condition and growth prospects.  Prior to December 22, 2014, the market remained unaware of the full scope of Defendants' improper servicing practices and related-party transactions, the true extent of Defendant Erbey's wrongful conduct, and the full impact of such wrongful conduct on the Company's financial condition.

443.    On February 6, 2014, Ocwen disclosed that the NY DFS had placed "an indefinite hold" on its agreement to purchase of $39 billion in MSRs from Wells Fargo due to "concerns about Ocwen's servicing portfolio growth."   Ocwen responded to the market that it "will continue to work closely with the NY DFS to resolve its concerns about Ocwen's servicing portfolio growth."   The NY DFS's halt to the Wells Fargo transaction revealed that despite Ocwen's representations to the market that it was in full compliance with NY DFS requirements and thus poised for continued growth, the NY DFS had identified ongoing compliance problems at Ocwen.

444.    Ocwen's share price declined $1.82 in response to this news, from a close of $43.20 on February 5, 2014 to $41.38 on February 6, 2014.  As *The New York Times* reported on February 7, 2014, "[a] move to delay the Wells Fargo transaction, which was announced two weeks ago, or future transactions could complicate Ocwen's strategy of increasing its revenue by acquiring more servicing rights from the big banks."

445.    On February 26, 2014, the potential ongoing compliance problems suggested by the NY DFS's February 6, 2014 hold on the Wells Fargo transaction were revealed in a public letter issued by NY DFS.  In the February 26, 2014 Letter, the NY DFS accused Ocwen of

"potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated," and exposed S.P. Ravi's dual role as CRO of both Ocwen and Altisource. Superintendent Lawsky wrote that these relationships, "raise[] the possibility that management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies, resulting in harm to borrowers, mortgage investors, or Ocwen shareholders as a result."   S.P. Ravi's conflicted role, in the Superintendent's view, "cast serious doubt[]" on Ocwen's public statements that it had a strict arm's-length relationship with affiliated companies.

446.   Ocwen's share price declined $2.76 per share in response to this news, or nearly 7%, from a close of $39.52 on February 25, 2014 to close at $36.76 per share on February 26, 2014.   As set forth above, Ocwen responded to the February 26, 2014 Letter by issuing additional misleading statements affirming that its related-party agreements "are fully disclosed in our public filings, and we believe them to be on an arms-length basis."

447.   Ocwen's reassurances that its relationships with related parties were fully disclosed and on an arm's-length basis were undermined – as was investor confidence – on April 21, 2014, when the NY DFS issued another letter to Ocwen.   In the April 21, 2014 Letter, the NY DFS publicly disclosed its Monitor's finding that Ocwen borrowers were being charged inflated rates for the sale of homes facing foreclosure by Altisource's Hubzu portal:

> The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing.   In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors.   Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs.

448.    Ocwen's share price declined an additional $0.95 in response to this news, from a close of $39.01 on April 17, 2014, to $38.06 on April 21, 2014.   The April 21, 2014 Letter further called into question Ocwen's ability to satisfy NY DFS's concerns about its related-party transactions and whether such transactions were, as Ocwen had represented to its shareholders, at arm's-length and at "market rates."   The April 21, 2014 Letter disclosed for the first time evidence that Ocwen was not charging market rates to homeowners for services obtained through related companies, thereby exacerbating Ocwen's regulatory risk.

449.    On May 1, 2014, Ocwen announced its 1Q 2014 earnings in the May 1, 2014 Press Release.   In the May 1, 2014 Press Release, Ocwen disclosed, for the first time that regulatory demands had increased its costs for servicing non-conforming loans and these costs were eating into servicing margins.   Britti stated on the May 1, 2014 Conference Call, however, that Ocwen stood to benefit from an industry-wide phenomenon of increasing servicing costs. According to him, "[w]hile the regulatory environment has raised costs for Ocwen and the industry, we believe that we are better positioned than competitors to respond to these higher costs that improve margin over time because of our scale and demonstrated process management and automation capability."   Defendant Faris further stated,

> [W]e estimate that industry average variable costs for servicing nonperforming loans have risen by approximately $50 to $60 per year.   We would estimate our own variable costs have gone up by about $30 to $40 per year per nonperforming loan . . .  no doubt that the impact of all of this has been to erode margins in the short run.   Longer term we believe this strengthens Ocwen's competitive advantage because the changes increase the importance of scale and efficiency…

Defendant Erbey further noted during the May 1, 2014 Conference Call that "Ocwen is the only non-back servicer to be subject to its own National Mortgage Settlement that applies across the entire servicing portfolio," and identified Ocwen's "National Mortgage Settlement compliance" as another competitive advantage.   Thus, while disclosing increasing costs in the short term for

regulatory compliance, Ocwen claimed that it had a competitive advantage because it was better suited than its competitors to efficiently comply with regulatory requirements on its existing platform.   Ocwen's shares responded to the 1Q 2014 earnings release by falling 7.4%.

450.    That Ocwen was well poised to meet its compliance requirements and continue its growth was suggested by Defendant Faris in an investor conference on June 4, 2014, hosted by Keefe, Bruyette & Woods, a research firm.  At the conference, as reported publicly by numerous media outlets, Defendant Faris expressed optimism that the Wells Fargo deal would proceed. Compass Point analyst Kevin Barker relayed in a report, "In the first quarter they specifically did not talk about a pipeline at all and to include the Wells Fargo deal in that may signal that they believe the deal's going to go through, or it may happen eventually."  Ed Groshans, analyst with Height Analytics reported that the Wells Fargo deal was confirmed, and this showed that Ocwen "is willing and capable of addressing the concerns" raised by the NY DFS.  "This supports our view that the two parties can reach an accord, which will permit the Wells Fargo transaction to proceed," wrote Groshans.

451.    On July 31, 2014, however, the reassuring statements that followed the 1Q 2014 earnings release were met with a dramatic disclosure of how Ocwen's lack of regulatory compliance was severely impacting its financial condition.  Specifically, Ocwen disclosed that during the second quarter of 2014, it incurred "roughly $12 million of expenses for the New York states [sic] and national monitors," that it "expect[ed] to incur roughly 9 million dollars in the third quarter[] [in] ongoing monitoring costs," and that such costs "are a significant element of [Ocwen's] cost base."  This disclosure revealed for the first time that Ocwen's compliance costs were dramatically higher than Defendants had previously represented, and that, contrary to

Defendants' prior statements, Ocwen was unable to service loans in full compliance with its regulatory obligations at the 70% discount it disclosed to investors during the Class Period.

452.    The Company's share price declined $4.49 per share in response to this news, from $34.66 on July 30, 2014 to $30.17 on July 31, 2014.  This decline eliminated more than $600 million in market capitalization.

453.    On August 4, 2014, the NY DFS disclosed additional improper related-party transactions at Ocwen, this time revealing evidence indicating that "Ocwen hired Altisource to design Ocwen's new force-placed program with the expectation and intent that Altisource would use this opportunity to steer profits to itself."  According to the NY DFS, "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."

454.    In response to this latest revelation from the NY DFS, Ocwen's share price fell an additional $0.70 per share, from a close of $27.68 on August 1, 2014 to close at $26.98 on August 4, 2014.

455.    On October 21, 2014, the NY DFS shocked the market by disclosing that Ocwen had engaged in a practice of backdating communications to "potentially hundreds of thousands" of borrowers, in violation of the Company's legal and regulatory obligations:

> Ocwen has obligations under both New York and federal law, as well as various agreements with state and federal authorities, regarding how quickly it must communicate with borrowers on matters such as requests for mortgage modifications or the initiation of foreclosure proceedings.  Ocwen is not meeting those obligations.  And given the issues with Ocwen's systems, it may be impossible to determine the scope of Ocwen's non-compliance.

456. The NY DFS concluded:

The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.

457. Before the markets closed on October 21, 2014, Ocwen issued the October 21, 2014 Press Release, in which it indicated that the backdating was "inadvertent," affected only 283 borrowers in New York, and had been fully resolved. Nevertheless, in response to these shocking revelations, the Company's share price declined by $4.78 per share, or 18.2%, from a close of $26.26 on October 20, 2014 to close at $21.48 on October 21, 2014.

458. After the markets closed on October 21, 2014, Ocwen revealed that October 21, 2014 Press Release contained inaccurate information. In fact, contrary to its representation that backdating affected only 283 borrowers, Ocwen subsequently disclosed that it was "aware of additional borrowers in New York who received letters with incorrect dates but does not yet know how many such letters there were." In response to this news, the Company's share price declined an additional $2.44, or 11.36%, from its close of $21.48 on October 21, 2014 to close at $19.04 on October 22, 2014. As the NY DFS wrote, in the October 21, 2014 Letter,

The stakes for borrowers and investors are enormous. If the Department concludes that it cannot trust Ocwen's systems and processes, then it cannot trust Ocwen is complying with the law.

459. As the market realized, Ocwen's massive backdating problem was the death-knell for the Wells Fargo deal, and likely end to Ocwen's ability to purchase any further MSRs in the near future. In response to these revelations, Compass Point analyst Kevin Barker issued a Flash Note the same day noting that Ocwen's backdating issue "increases the chances the Wells Fargo servicing deal is cancelled" and could cause the Company's shares to trade closer to its tangible book value of $18 per share.

460.    Likewise, Arren Cyganovich of Evercore Partners downgraded Ocwen from Buy to Hold due to "heightened regulatory risk for the foreseeable future" which will, among other things, "lower the prospects of new MSR acquisitions" and "increase near- to intermediate-term examination/monitor-related costs." In particular, Cyganovich noted that "the regulator's criticism (in substance and tone) of OCN systems and processes failures and its apparent failure to address the situation over the past year suggests that OCN is not likely to gain approval for pending or future MSR acquisitions anytime soon."

461.    Piper Jaffray analyst Michael Grondahl also lowered his price target from $42 to $32 in response to this news. In addition, S&P's credit analyst, Stephen Lynch stated: "We believe the culmination of events and ongoing investigations will limit the company's ability to acquire servicing assets," and downgraded the Company's credit rating from B+ to B. Finally, Sterne Agee analyst Henry Coffey advised investors to "avoid the OCN complex until we can get some clarity around this issue." Coffey further noted that the inaccuracies in Ocwen's initial response to the DFS letter were particularly "disconcerting."

462.    In addition, Moody's cited the October 21, 2014 Letter as support for its decision to downgrade Ocwen, stating that the backdating allegations "raise the risk of actions that restrict Ocwen's activities, the levying of monetary fines against Ocwen, or additional actions that negatively affect Ocwen's credit strength."

463.    Thereafter, on December 16, 2014, the NMS Monitor issued a report regarding Ocwen's compliance with the NMS. The NMS Compliance Report publicly disclosed, for the first time, the inadequacies of Ocwen's REALServicing platform in ensuring the Company's regulatory compliance, and revealed that during Test Period 7, Ocwen's IRG had failed to satisfy

the terms of the NMS in several material respects based upon significant deficiencies in its internal control processes.

464.    In response to this news concerning the inability of Ocwen's REALServicing platform to comply with its regulatory obligations under the NMS, Ocwen's share price declined by $1.32, or 5.9%, from a closing price of $22.25 on December 15, 2014 to close at $20.93 on December 16, 2014.

465.    Finally, before the markets opened on December 22, 2014, Ocwen issued a press release disclosing the terms of the December 22, 2014 Consent Order, and announcing Defendant Erbey's resignation.  The December 22, 2014 Consent Order, which was attached as an exhibit to a Form 8-K filed by Ocwen on December 22, 2014, revealed, for the first time, the true extent of Ocwen's compliance-related deficiencies.    Indeed, Ocwen's compliance deficiencies were so severe that the Company was forced to agree to, among other things, (1) the installation of an NY DFS operations monitor to assess all aspects of Ocwen's operations; (2) the addition of two independent board members to be determined in consultation with the NY DFS; and (3) to cease acquiring additional MSRs except when authorized by the NY DFS.

466.    In addition, by revealing that, pursuant to the terms of the December 22, 2014 Consent Order, Defendant Erbey was required to resign as Chairman of Ocwen and the Erbey Companies, the Ocwen's December 22, 2014 disclosures revealed to the market the true extent of Defendant Erbey's wrongful actions throughout the Class Period.

467.    Moreover, in the December 22, 2014 Consent Order, Ocwen and Defendant Faris admitted, for the first time, to the glaring deficiencies within the Company's REALServicing platform, and to the facts contained in the February 26, 2014 Letter, the April 21, 2014 Letter,

the August 4, 2014 Letter, and the October 21, 2014 Letter, which contradicted Defendants'

public representations to shareholders throughout the Class Period.

468.   Ocwen's share price plummeted in response to this news, falling 26.89% from its

close of $21.90 on Friday, December 19, 2014, to close at $16.01 on Monday, December 22,

2014.  In total, Ocwen shares declined by nearly 63% between February 5, 2014, the day before

the first corrective disclosure, and December 22, 2014.

## X.   THE FRAUD-ON-THE-MARKET DOCTRINE APPLIES

469.   At all relevant times, the market for Ocwen's common stock was an efficient

market for the following reasons, among others:

        a)   Ocwen's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient electronic stock market;

        b)   As a registered and regulated issuer of securities, Ocwen filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

        c)   Ocwen regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

        d)   Ocwen was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

        e)   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Ocwen stock; and

        f)   Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and the other members of the Class purchased or otherwise acquired Ocwen stock between the time that Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of Ocwen stock was artificially inflated by Defendants' misrepresentations and omissions.

470.    As a result of the foregoing, the market for Ocwen common stock promptly digested current information regarding Ocwen from all publicly available sources, and the prices of Ocwen common stock reflected such information.  Based upon the materially false and misleading statements and omissions of material fact alleged herein, Ocwen common stock traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Ocwen common stock relying upon the integrity of the market price of Ocwen common stock and other market information relating to Ocwen.

471.    Under these circumstances, all purchasers of Ocwen common stock during the Class Period suffered similar injuries through their purchases of Ocwen common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.    THE STATUTORY SAFE HARBOR IS INAPPLICABLE

472.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any such forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those set forth in the purportedly forward-looking statement.

473.    Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Ocwen who knew that those statements were false when made.

## XII.   CLASS ACTION ALLEGATIONS

474.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and all those who purchased Ocwen common stock during the Class Period.  Excluded from the Class are Defendants, members of Defendants' immediate families, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

475.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  At the end of the Class Period, approximately 78.3 million shares of Ocwen common stock were outstanding and actively traded on the NYSE.  The precise number of Class members is unknown to Lead Plaintiff at this time, but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Ocwen or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

476.   Lead Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class.  Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

477.   Lead Plaintiff's claims are typical of the claims of all other members of the Class because Lead Plaintiff's and all of the other Class members' damages arise from, and were caused by, the same false and misleading representations and omissions made by, or chargeable

to, Defendants.  Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

478.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

479.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to members of the Class are:

a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether Defendants' statements issued during the Class Period were materially false and misleading; and

c)      the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XIII.  CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Ocwen, Erbey and Faris

480.    Lead Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is asserted against Defendants Ocwen, Erbey and Faris (collectively, the "Section 10(b) Defendants").

481.    During the Class Period, the Section 10(b) Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities

174

exchanges to make the materially false and misleading statements and omissions of material fact alleged herein to:  (1) deceive the investing public, including Lead Plaintiff and the other Class members, as alleged herein; (2) artificially inflate and maintain the market price of Ocwen common stock; and (3) cause Lead Plaintiff and the other members of the Class to purchase Ocwen common stock at artificially inflated prices that did not reflect their true value.   In furtherance of their unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants took the actions set forth herein.

482.   While in possession of material adverse, non-public information, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of national securities exchanges:  (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or failed to disclose material facts necessary to make the statements that they made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Ocwen common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   The Section 10(b) Defendants are sued as primary participants in the wrongful conduct alleged herein.

483.   By virtue of their high-level positions at the Company during the Class Period, Defendants Erbey and Faris were authorized to make public statements, and made public statements during the Class Period on Ocwen's behalf.   Defendants Erbey and Faris were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own

dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

484. In addition to the duties of full disclosure imposed on the Section 10(b) Defendants as a result of their making of affirmative statements and reports to the investing public, the Section 10(b) Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. Section 210.01 et seq.) and Regulation S-K (17 C.F.R. Section 229.10 et seq.), as well as other SEC regulations, including accurate and truthful information with respect to the Company's operations, so that the market price of the Company's common stock would be based on truthful, complete, and accurate information. Defendants Erbey and Faris also had duties under SOX to ensure that Ocwen's Forms 10-Q and 10-K filed with the SEC did not misrepresent or omit any material facts.

485. The Section 10(b) Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and to disclose such facts, even though such facts were known or readily available to them. The Section 10(b) Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Ocwen's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

486. The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Ocwen's common stock during the Class Period. In ignorance of the fact that the market prices of Ocwen's common stock were artificially inflated, and relying directly or indirectly upon the

materially false and misleading statements made by the Section 10(b) Defendants, and upon the integrity of the market in which the Company's common stock trades, or upon the absence of material adverse information that was recklessly disregarded by the Section 10(b) Defendants but not disclosed in public statements by the Section 10(b) Defendants during the Class Period, Lead Plaintiff and the other members of the Class purchased Ocwen's common stock during the Class Period at artificially inflated prices. As the truth eventually emerged, the price of Ocwen's common stock substantially declined.

487.    At the time of the material misrepresentations and omissions alleged herein, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth with respect to the business, operations, performance, and prospects of Ocwen, which was concealed by the Section 10(b) Defendants, Lead Plaintiff and the other members of the Class would not have purchased Ocwen's common stock, or if they had purchased such securities, would not have done so at the artificially inflated prices that they paid.

488.    By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

489.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

## For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

490.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against the Individual Defendants.

177

491.    During the Class Period, the Individual Defendants were senior executive officers and/or directors of Ocwen and were privy to confidential and proprietary information concerning Ocwen, and its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

492.    Defendant Erbey served as the Executive Chairman of the Company's Board of Directors at all relevant times.  Defendant Faris served as a director and the Company's CEO and President at all relevant times.

493.    Because of their high-level positions at Ocwen, the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

494.    The Individual Defendants acted as controlling persons of Ocwen within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff alleges were materially false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after those

statements were issued, and had the ability to prevent the issuance of the statements and/or to cause the statements to be corrected.

495.   In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and therefore had, or are presumed to have had, the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

496.   As set forth above, Defendants Erbey, Faris and Ocwen violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of the Individual Defendants' positions as controlling persons, and their participation in the underlying violation of Section 10(b) and Rule 10b-5, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment, including:

A.   Determining that Counts  I and II of this action constitute a proper class action under Federal Rules of Civil Procedure 23, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff's counsel as Lead and Liaison Counsel for the Class;

B.   Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

   C.  Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

   D.  Awarding Lead Plaintiff and the other members of the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

   E.  Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury on all triable claims.


Dated:  February 6, 2015                    Respectfully Submitted,


                                            **SALLAH ASTARITA & COX, LLC**
                                            2255 Glades Road
                                            Suite 300E
                                            Boca Raton, Florida 33431
                                            Telephone: (561) 989-9080
                                            Facsimile: (561) 989-9020


                                            By: /s/ Joshua A. Katz
                                                Joshua A. Katz
                                                Florida Bar No. 848301
                                                Email: jak@sallahlaw.com


                                            **KESSLER TOPAZ**
                                            **MELTZER & CHECK LLP**
                                            David Kessler (admitted *pro hac vice*)
                                            dkessler@ktmc.com
                                            Lee Rudy (admitted *pro hac vice*)
                                            lrudy@ktmc.com
                                            Sharan Nirmul (admitted *pro hac vice*)
                                            snirmul@ktmc.com
                                            Richard A. Russo, Jr. (admitted *pro hac vice*)
                                            rrusso@ktmc.com
                                            Meredith L. Lambert (admitted *pro hac vice*)
                                            mlambert@ktmc.com
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056

                                            *Lead Counsel for Lead Plaintiff AP7 and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 6, 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 6, 2015.


/s/ Joshua A. Katz
Joshua A. Katz

182