UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| | ) | |
| In re Ocwen Financial Corporation | ) | Case 14-81057 CIV-WPD |
| Securities Litigation | ) | |
| | ) | |

**DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF DR. ZACHARY NYE, INCORPORATED MEMORANDUM OF LAW, AND REQUEST FOR ORAL ARGUMENT**

**GREENBERG TRAURIG, P.A.**

Jeffrey Allan Hirsch, Esq.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone: (954) 765-0500
Facsimile:  (954) 765-1477
Florida Bar No. 199850
Email: hirschj@GTLAW.com

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
John P. Coffey, Esq.
Jonathan M. Wagner, Esq.
Jason M. Moff, Esq.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: scoffey@kramerlevin.com

*Counsel for Defendants*

**Table of Contents**

**Page**

I.     PRELIMINARY STATEMENT ......................................................................................1

II.    BACKGROUND ...........................................................................................................2

     A.     Factual Background ...........................................................................................2

          1.     NMS Compliance.................................................................................2

          2.     Related Party Transactions ..................................................................3

     B.     Procedural Background......................................................................................4

     C.     Dr. Nye's Opinion ............................................................................................5

III.    ARGUMENT ................................................................................................................5

     A.     Governing Law .................................................................................................5

          1.     The *Daubert* Standard .........................................................................5

          2.     Loss Causation and Corrective Disclosures.........................................6

     B.     Dr. Nye's Opinion Concerning Loss Causation is Unreliable and Does Not Fit the Case .....................................................................................................7

          1.     Dr. Nye Does Not Establish that the Disclosures are Corrective ...............7

               a.     February 6, 2014 ...................................................................7

               b.     February 26, 2014 .................................................................8

               c.     October 21, 2014...................................................................9

               d.     November 13, 2014...............................................................10

               e.     December 16, 2014................................................................10

               f.     December 22, 2014: Failure to Disaggregate ................................12

          2.     The DFS Letter Issued on August 4, 2014 Does Not Qualify as a Corrective Disclosure: Ocwen's Stock Price Did Not Experience a Statistically Significant Decline on that Date ...........................................13

               a.     Loss Causation Requires a Statistically Significant Decline in Stock Price ...................................................................14

               b.     Dr. Nye's Opinion That Ocwen's Stock Price Experienced A Statistically Significant Decline Is Not Reliable.....................15

IV.    CONCLUSION.............................................................................................................17

Defendants Ocwen Financial Corporation, William C. Erbey and Ronald M. Faris respectfully move pursuant to Fed. R. Evid. 702 to exclude the proposed expert testimony of Dr. Zachary Nye, and submit this memorandum of law in support of their motion.

**MEMORANDUM OF LAW**

## I.    PRELIMINARY STATEMENT

Plaintiffs have offered Dr. Nye as an expert for the purpose of establishing loss causation and damages, required elements of their 10b-5 claim.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  The Court must consider Dr. Nye's proposed testimony under the standards set by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.  Dr. Nye attempts to establish loss causation through an event study, an exercise by which an expert "determines the extent to which the changes in the price of a security result from events such as disclosure of negative information about a company, and the extent to which those changes result from other factors." *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 86 (1st Cir. 2014).  Under this approach, Plaintiffs bear the burden of proving that the alleged corrective disclosures concern the same subject matter as and actually correct Defendants' actionable misstatements.  *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011).  Dr. Nye's report identifies seven dates in 2014 on which the market supposedly learned of corrective information, and he calculates damages based on the decline in Ocwen stock price following those disclosures.

As demonstrated below, Dr. Nye's proposed testimony is unreliable and does not fit the case, and thus should be excluded under *Daubert*:

*First*: Five of the seven supposed corrective disclosures in 2014 cited by Dr. Nye – on February 6, February 26, October 22, November 13 and December 16 – are not connected to the alleged misstatements remaining at issue in this action; they did not bear on the subject matter of those alleged misstatements and thus could not "correct" those statements.

*Second*: With respect to one additional alleged corrective disclosure, on December 22, Dr. Nye has conceded that he did not isolate the impact of the corrective disclosure from the impact of other negative information disclosed to the market on that date, as required under *Dura*.

1

*Third*: On the date of the remaining corrective disclosure – August 4 – Ocwen's stock did not experience a statistically significant decline, as required to establish loss causation under the governing case law.

The Eleventh Circuit Court of Appeals has declared that "the loss causation requirement ensures that the federal securities laws do not 'becom[e] a system of investor insurance that reimburses investors for any decline in the value of their investments.'" *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) (citation omitted). Dr. Nye's approach runs afoul of this important directive, and his testimony should thus be excluded.

## II.   BACKGROUND[1]

### A.   Factual Background

Pursuant to two rulings of this Court on Ocwen's motions to dismiss, two types of alleged false statements remain at issue: Ocwen's statements concerning (i) the company's compliance with servicing standards under the National Mortgage Settlement ("NMS Compliance"), and (ii) Ocwen's policies, procedures and practices with respect to former Chairman Mr. Erbey's recusal from negotiations and approvals of transactions with certain Related Companies ("Related Party Transactions").

#### 1.   NMS Compliance

In 2012, the Attorneys General of forty-nine states and the District of Columbia as well as the Consumer Financial Protection Bureau entered into the National Mortgage Settlement ("NMS") with five banks and mortgage servicers. (Ex. 5). The NMS created thirty-three metrics for determining compliance with servicing standards, and tasked an independent Monitor with assessing NMS compliance. (*Id.*). The settlement also set forth certain enforcement terms, including that each servicer develop an Internal Review Group or "IRG" to assist the Monitor. (Ex. 6 at Appx. E). While not a signatory to the original NMS, Ocwen became partially subject to the NMS after purchasing in February 2013 a portfolio of servicing rights from Residential Capital, LLC ("ResCap") that were already subject to the settlement. (Ex. 7).

---

[1] Unless otherwise noted, "Ex. __" references exhibits attached to the Declaration of John P. Coffey, submitted with this Motion. "Report" references Dr. Nye's Opening Report, attached to the Coffey Declaration as Exhibit 1. "Rebuttal" references Dr. Nye's Rebuttal Report, attached to the Coffey Declaration as Exhibit 2. "Tr. __" references the transcript of Dr. Nye's deposition, excerpts of which are attached to the Coffey Declaration as Exhibit 3. Exhibit 4 to the Coffey Declaration lists Dr. Nye's changes to his deposition transcript.

On December 3, 2013, an Ocwen employee stated during an investor presentation that "Ocwen is not a party to [NMS], but Ocwen services or subservices loans for parties which are subject to these settlements and therefore services in compliance with those standards as applicable." (the "NMS Compliance Statement") (Ex. 8 at Slide 8).  On December 19, 2013, Ocwen formally agreed to adopt NMS servicing standards for its entire portfolio, effective as of February 2014.  (*See* Ex. 9).[2]

On December 16, 2014, the NMS Monitor filed a quarterly report concerning Ocwen's compliance with the NMS during the first and second quarters of 2014.  (Ex. 10).  In the report, the Monitor stated that Ocwen's IRG may not have been sufficiently independent from the Ocwen mortgage servicing operations whose performance the IRG had measured.  (*Id.*).  The Monitor also noted an October 21, 2014 letter from the New York Department of Financial Services ("DFS") concerning the mis-dating of certain loan modification denial letters.  (*Id.*).  The Monitor found that these letter-dating and IRG issues may have affected Ocwen's test results with respect to certain NMS metrics for the first two quarters of 2014, and accordingly instructed an independent third party to re-test those metrics.  (*Id.*).  The report did not find that Ocwen had in fact violated any NMS metric or that Ocwen was out of compliance with NMS servicing standards for the first two quarters of 2014 – or otherwise.  (*Id.*).

On May 7, 2015 following the third party's re-testing, the Monitor issued another report, finding that one of the re-tested metrics did not pass the NMS standards during the time period at issue – again, the first two quarters of 2014.  (Ex. 11).  The Monitor deemed this metric – only one of thirty-three NMS metrics – a "potential" violation.  (*Id.* at page 10).  Critically, under the terms of the NMS, a potential violation is not a violation of the settlement.  Rather, a servicer can avoid a violation by curing a potential violation through a Corrective Action Plan.  (Ex. 6 at E-11).  As the Monitor later found, Ocwen subsequently cured its lone potential violation.  (Exs. 11-12).  Ocwen's lone potential violation thus never became an actual violation of the NMS.

### 2.    Related Party Transactions

During the Class Period, Ocwen had in place several policies, procedures and practices to ensure that Ocwen was not disadvantaged in any related party transaction on account of Mr.

---

[2] A more complete description of the enforcement regime under the NMS settlement is set forth in Ocwen's summary judgment motion.  [*See* D.E. 210].

Erbey's concurrent roles at certain related companies.  These measures included (i) oversight by the independent members of Ocwen's Board of Directors; (ii) contractual dispute resolution provisions in agreements with related parties; (iii) a Code of Business Ethics; and (iv) a policy and practice of Mr. Erbey recusing himself from negotiations and approvals of related party transactions.   On several occasions Ocwen made the following or substantially similar representations in its securities filings: "We have adopted policies, procedures and practices to avoid potential conflicts of interest involving significant transactions with related parties . . . including Mr. Erbey's recusal from negotiations regarding credit committee and board approvals of such transactions." ("the Related Party Transactions Statement") (Ex. 13).

After sending a series of letters to Ocwen throughout 2014, the New York DFS on December 22, 2014 entered into a Consent Order with Ocwen.  (Ex. 14).  The Consent Order found that Ocwen had (i) "Inadequate and Ineffective Information Technology Systems and Personnel"; and (ii) "Widespread Conflicts of Interest with Related Parties."  As examples of purported conflicts of interest, the DFS cited (i) Ocwen's use of an Altisource subsidiary, Hubzu, for certain on-line auctions; (ii) S.P. Ravi's service as Chief Risk Officer of both Ocwen and Altisource; and (iii) Mr. Erbey's supposed failure to recuse himself from related party transactions.  (*Id.*).

The Consent Order mandated several forms of relief, including (i) a $150 million fine; (ii) imposition of an Operations Monitor "to review and assess the adequacy and effectiveness of Ocwen's operations"; (iii) the expansion of Ocwen's Board by two independent Directors; (iv) a prohibition against Ocwen's purchase of mortgage servicing rights; and (v) Mr. Erbey's resignation as Chairman.  (*Id.*).

### B.   Procedural Background

Based on these core facts, Plaintiffs have brought 10b-5 claims against Ocwen and Messrs. Erbey and Faris, alleging that Ocwen's statements concerning regulatory compliance and related party transactions were knowingly or intentionally false, and that the "truth" was supposedly gradually revealed during 2014, culminating in the NMS December 16, 2014 Monitor Report and December 22, 2014 DFS Consent Order.

On September 4, 2015, the Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Amended Complaint, finding that none of the misstatements alleged in that pleading satisfied either the falsity or scienter requirements of 10b-5.  [D.E. 70].   On

December 22, 2015, the Court granted in part and denied in part Defendants' motion to dismiss Plaintiffs' Third Amended Complaint, sustaining at the pleading stage Plaintiffs' claims predicated on Ocwen's supposed false statement concerning NMS Compliance and the Related Party Transactions.  [D.E. 81].

### C.     Dr. Nye's Opinion

Dr. Nye in his Report has opined as follows:

> Information disclosed [on seven separate occasions] during the period February 6, 2014 through December 22, 2014 corrected Defendants' alleged misrepresentations in this matter, and caused the price of Ocwen stock to decline on at least nine distinct trading dates.  The statistically significant Company-specific declines in the price of Ocwen stock on these dates reflect the actual losses suffered by investors as a result of the alleged fraud and provide a measure of the artificial inflation present in the price of the stock throughout the Class Period.

(*Id.* at ¶ 8).  To calculate per share damages, Dr. Nye measured the decline in Ocwen's stock price on nine dates following the seven corrective disclosures he identified.  (*Id.* at ¶¶ 16-17).

## III.    ARGUMENT

Dr. Nye's proposed testimony should be barred because his opinions do not "fit" the case and are unreliable.   The corrective disclosures whose impact he measures either are disconnected from the alleged false statements at issue, or did not have a statistically significant impact on Ocwen's stock price – as required to establish loss causation.

### A.     Governing Law

#### 1.     The *Daubert* Standard

Under the Supreme Court's directive in *Daubert*, the District Court plays the role of "gatekeeper" with respect to the admission of expert testimony.  509 U.S. at 597; *see also* Fed. R. Evid. 702.  The gatekeeping role is "especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.'"  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595).

Three factors govern the admissibility of expert testimony:  (i) the expert's qualifications; (ii) the reliability of the expert's methodology; and (iii) whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue through the application of specialized expertise.  *Id.*  In addition, "[t]he proponent of the expert testimony carries a

substantial burden" to demonstrate that the expert satisfies all three requirements. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005).

The second factor — the reliability inquiry — addresses the process by which the expert reaches his or her conclusions, thereby ensuring that the court is not merely "taking the expert's word for it" and that the testimony is supported by "good grounds." *Frazier*, 387 F.3d at 1261. The third factor — the helpfulness inquiry — limits expert testimony to matters "beyond the understanding of the average lay person" so that the trier of fact does not give the expert testimony "undue weight on account of its special status." *Id.* at 1262; *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009). To be helpful to the trier of fact, expert testimony must be relevant to an issue in the case, a consideration known as "fit." *Daubert*, 509 U.S. at 591.

### 2.    Loss Causation and Corrective Disclosures

A necessary element of a 10b-5 claim is "loss causation," or proof that "defendant's misrepresentation . . . proximately caused the plaintiff's economic loss." *Dura,* 544 U.S. at 341-42, 346. Plaintiffs generally establish loss causation by (i) identifying corrective disclosures that revealed previously-concealed truths, (ii) demonstrating through an event study that the stock price dropped following the disclosure, and (iii) eliminating other explanations for the price drop. *See FindWhat*, 658 F.3d at 1311-12. Under *Dura,* "plaintiff must show that the defendant's fraud—as opposed to some other factor—proximately caused his claimed losses." *Kinnett v. Strayer Educ., Inc.*, 501 Fed.Appx. 890, 892 (11th Cir. 2012); *see also Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729 (11th Cir. 2012) (affirming dismissal of 10b-5 action for failure to plead loss causation; Plaintiff failed "to present evidence that would give a jury some indication, however rough, of how much of the decline in [defendant's] stock price resulted not from the fraud but from the general downturn in the Florida real estate market—the risk of which [defendant] is not alleged to have concealed.").

Most critically for the disposition of this motion, "to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a '*corrective* effect', rather than merely a '*negative* effect.'" *FindWhat*, 658 F.3d at 1311 n.28 (citation omitted). As demonstrated below, that standard has not been met here.

**B.** **Dr. Nye's Opinion Concerning Loss Causation is Unreliable and Does Not Fit the Case**

    **1.** **Dr. Nye Does Not Establish that the Disclosures are Corrective**

        a. <u>February 6, 2014</u>

On February 6, 2014, Ocwen issued a two-sentence press release announcing that "at the request of [DFS], [Ocwen] has agreed to put an indefinite hold on its previously announced purchase from Wells Fargo Bank, N.A. of mortgage servicing rights," and "Ocwen will continue to work closely with [DFS] to resolve its concerns about Ocwen's servicing portfolio growth." (Ex. 15). Dr. Nye contends that the release "partially revealed to the market that, notwithstanding Ocwen's representations regarding its compliance with applicable servicing and regulatory requirements, [DFS] had identified potential regulatory concerns." (Report at page 11). Dr. Nye assumes that the transaction was put on hold on account of Ocwen's regulatory violations. (*Id.*).

Ocwen's release, however, says nothing about regulatory compliance or related party transactions. Thus, while the release may have had a negative impact on Ocwen's stock price, the release does not meet the standard for a corrective disclosure because, by its plain language, the release is not connected to and thus not corrective of any of the alleged false statements at issue. *See Meyer*, 710 F.3d at 1197 (corrective disclosure must "'relate back to the misrepresentation and not to some other negative information about the company'") (citation omitted); *Strayer Educ.*, 501 Fed.Appx. at 894 (affirming dismissal of 10b-5 action; "since nothing in the [alleged corrective] statements corrects any prior disclosures . . . or reveals any omissions . . . that negatively affected the [stock] price . . . [plaintiff] has failed to adequately allege loss causation.").

Courts uniformly exclude expert testimony concerning loss causation when, as here, the expert does not reliably establish the required connection between the alleged false representation and the corrective disclosure. For example, in *In re Williams Sec. Litig.-WCG Subclass*, the Tenth Circuit Court of Appeals upheld the exclusion of the proposed testimony of plaintiffs' damages expert in a 10b-5 class action because the expert, like Dr. Nye here, could not show "company-specific and fraud-related information" with respect to the corrective disclosures that would tie the disclosures to any of the alleged misrepresentations or demonstrate "why these disclosures should be considered 'corrective' such that corresponding losses could be reliably attributed to the fraud rather than other factors." 558 F.3d 1130, 1139-40 (10th Cir. 2009). In *In*

*re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2010 WL 6397500, at *14 (S.D. Fla. Aug. 18, 2010), Judge Ungaro excluded in part the testimony of plaintiffs' expert in a 10b-5 class action when the disclosure in question was supposedly a "materialization of . . . previously undisclosed risk," but the expert did "not explain how or why this is so."

That is our case. The terse February 6, 2014 press release on its face cannot be stretched to connect to Ocwen's NMS Compliance Statement or the Related Party Transaction Statements. The release does not even mention those subjects. The Court should thus bar Dr. Nye's testimony concerning Ocwen's February 6, 2014 press release.

b.   <u>February 26, 2014</u>

On February 26, 2014, DFS issued a letter stating that the agency had supposedly "uncovered a number of potential conflicts of interest between Ocwen and other public companies with which Ocwen is closely affiliated," and requested that Ocwen produce to DFS information bearing on this issue. (Ex. 16). According to Dr. Nye, the letter revealed that Ocwen "may not have been in compliance with its purported 'robust' related-party policies, practices and procedures that were supposed to prevent conflicts of interests"; he goes on to assert that the letter was "prompted" by these conflicts. (Report at page 15; Rebuttal ¶ 56). However, Dr. Nye has not established that the letter "corrects" Ocwen's statement in its SEC filings that the company has "policies, procedures and practices to avoid potential conflicts . . . including Mr. Erbey's recusal."

First and foremost, the letter does not reference the subject of Mr. Erbey and recusal. Indeed, the letter focuses on two *other* subjects. The letter references S.P. Ravi's role as Chief Risk Officer of both Ocwen and a related company (Altisource). The DFS letter states that Mr. Ravi "seemed not to appreciate the potential conflicts of interest posed by this dual risk which were particularly alarming given his role as Chief Risk Officer." (Ex. 16). However, the Court has dismissed all claims predicated on any supposed false statements concerning overlapping employees at Ocwen and Altisource – including claims concerning Mr. Ravi. *See* Order on Dismissal [D.E. 70] at pages 14-15 (concluding that allegations concerning overlapping employees fail to demonstrate that any Ocwen statements were false); Order on Dismissal [D.E. 81] at pages 2, 6 (all rulings in the first Order not contravened by the second Order are incorporated into the second Order and expressly reaffirming findings concerning DFS letters); *see also* D.E. 63-10 & 63-11 (demonstrating that market was already informed on companies'

websites that Mr. Ravi served as both companies' risk officer).  Thus, the February 26, 2014 DFS letter could not have corrected any actionable misstatements concerning Mr. Ravi.  Dr. Nye overlooked this critical point.  Notwithstanding the Court's prior rulings paring Plaintiffs' claims, Dr. Nye acknowledged that his report is "predicated on the proposition that *all* of the false statements alleged in the Complaint are at issue" (Tr. 30 (emphasis added)) – even though they clearly are not.  Dr. Nye had no idea that the Court had already dismissed claims relating to Mr. Ravi.  (*Id.* at 245-46).

Second, the DFS letter noted that "Ocwen's management owns stock or stock options in the affiliated companies" – a fact which, according to the DFS letter, raised the prospect that "management has the opportunity and incentive to make decisions concerning Ocwen that are intended to benefit the share price of affiliated companies[.]"  (Ex. 16).  However, there has never been any allegation in this case that Ocwen has concealed or misstated its executives' ownership of stock in any related company.  Thus, DFS' statement concerning dual ownership likewise does not correct any actionable misstatement.

Dr. Nye testified that the letter was "negative company-specific information that on its face relates to regulatory issues."  (Tr. 234).  The case law is clear that to establish loss causation corrective disclosures must be "'*corrective*'" as opposed to merely "'*negative*[.]'"  *FindWhat*, 658 F.3d at 1311 n.28 (citation omitted).  Because the February 26, 2014 DFS letter does not correct any actionable misstatement, the letter is not a corrective disclosure under *Dura* and Dr. Nye's opinion to the contrary should be excluded.

c.   <u>October 21, 2014</u>

On October 21, 2014, DFS issued a letter addressing allegations concerning Ocwen's supposed "backdating" of letters sent to borrowers denying their applications for mortgage loan modifications.  (Ex. 17).  Dr. Nye opines that the letter was a corrective disclosure that "partially revealed to the market that, contrary to its public representations, Ocwen was not servicing its mortgages in compliance with applicable regulatory servicing requirements."  (Report at page 22).  This DFS letter likewise does not qualify as a corrective disclosure. The Court has dismissed allegations against Ocwen predicated on misstatements concerning alleged "backdating."  *See* Order on Dismissal [D.E. 70] at pages 10-12, 20 (concluding that allegations in DFS letters, including those concerning backdating, fail to demonstrate that any Ocwen statements were false or made with scienter); Order on Dismissal [D.E. 81] at pages 2, 6 (all

9

rulings in the first Order not contravened by the second Order are incorporated into the second Order and expressly reaffirming findings concerning DFS letters).  Again, in disregard of these Court rulings, Dr. Nye merely assumed for the purpose of his report that all the false statements alleged in the complaint remain at issue.  (Tr. 30).

In light of the Court's prior rulings, the letter cannot correct any actionable misstatement. When, as here, a disclosure is not corrective as a matter of law, expert testimony with respect to that disclosure "will not assist the jury in resolving any factual dispute" and therefore lacks "fit" or relevance to the case and should be excluded.  *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *7, *14, *23 (E.D. Pa. Sept. 3, 2010).[3]

### d.    November 13, 2014

On November 13, 2014, Ocwen announced that the company had "signed a mutual termination agreement with Wells Fargo Bank, N.A. related to an agreement to purchase residential mortgage servicing rights and related advances that was announced in January 2014 and then put on hold in February 2014."  (Ex. 18).  Dr. Nye has opined that the announcement "partially revealed to the market that Ocwen's regulatory problems were having a disruptive impact on its operations and growth," and that "the regulatory environment surrounding Ocwen and its potential violations are severe enough that this deal cannot be completed."  (Report at page 24; Tr. 255).  But Dr. Nye's opinion is mere conjecture: like the February 6, 2014 press release announcing the hold, this release does not make any mention of regulatory problems or allude to any specific reason why the parties mutually agreed to cancel the deal.  Because the November 13, 2014 release does not reference related party transactions or NMS compliance, this release cannot be deemed to correct any previous statement concerning these subjects.  *See FindWhat*, 658 F.3d at 1311 n.28 ("to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement").

### e.    December 16, 2014

As noted above, on December 16, 2014 the NMS Monitor released an interim report concerning the first two quarters of 2014.  The report identified issues for further investigation,

---

[3] Moreover, the October 21, 2014 letter, which exclusively addressed a New York regulator's concerns about supposed "backdating," could not have corrected the NMS Compliance Statement because the NMS Monitor never found that the supposed "backdating" constituted a violation of the NMS.

including the independence of the Ocwen IRG and the misdating of certain borrower correspondence. (Ex. 10). Dr. Nye has opined that the Report "partially revealed Ocwen's non-compliance with its regulatory requirements" and "revealed that Ocwen had widespread deficiencies in the servicing and compliance controls which constituted violations of its regulatory requirements." (Report at page 26). Once again, Dr. Nye's opinion should be excluded because there is yet again a disconnect between the alleged false statement and the supposed corrective disclosure.

In the NMS Compliance Statement at issue in this case, Ocwen had announced on December 3, *2013* that as of that date Ocwen "services in compliance with [NMS] standards as applicable." The December 2014 report on its face concerned the first two quarters of *2014* – a period subsequent to and thus not addressed by Ocwen's December 3, 2013 statement. To satisfy the falsity element in Rule 10b-5, a plaintiff must show that the statement was false – when made. *See FindWhat*, 658 F.3d at 1305 ("A statement is misleading if in the light of the facts existing at the time of the statement a reasonable investor, in the exercise of due care, would have been misled by it") (internal quotations and citations omitted); *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1304 (S.D. Fla.) (dismissing 10b-5 claim because FDA had not made determination that MRI manufacturer failed to disclose adulteration or misbranding of its products until after manufacturer filed Registration Statements in question, and noting that manufacturer "could not have made any such disclosure prior to that point"), *appeal dismissed*, (11th Cir. Oct. 28, 2015). Since the December 2014 Monitor Report concerns a period different from that addressed by Ocwen's December 3, 2013 statement, the December 2014 Monitor Report could not possibly qualify as a corrective disclosure.[4]

In addition, even if the December 2014 Monitor Report could somehow be construed to apply retroactively to Ocwen's compliance status in 2013, that Report did not conclude that Ocwen had committed a violation of NMS Servicing Standards and thus cannot be deemed corrective of the December 3, 2013 NMS Compliance Statement. (Ex. 10). The December 2014 report merely identified two issues for further investigation: (i) the independence of Ocwen's

---

[4] For much the same reason, Ocwen's statement on May 1, 2014 concerning NMS Compliance — although not a proper basis for Plaintiff's 10b-5 action as set forth in Ocwen's summary judgment motion — could not address Ocwen's NMS Compliance Statement as of December 2013.

IRG; and (ii) the dating of certain correspondence with borrowers.  (*Id.*).  With respect to the IRG, the provisions concerning its independence were set forth in the NMS *Enforcement* Terms, not the NMS Servicing Standards.  (*Compare* Ex. 6, at Appx. A (Servicing Standards) *with id.* at Appx. E (Enforcement Terms)).   Therefore, by referring the IRG's independence for further investigation, the Monitor did not determine that Ocwen had violated the servicing standards referenced in the NMS Compliance Statement.   And with respect to both the IRG and the letter-dating issues, the NMS Monitor found only that further investigation was warranted, not that Ocwen was out of NMS compliance or had violated the NMS Servicing Standards.  (Ex. 10).  As described in Ocwen's summary judgment motion [*see* D.E. 210 at 4-5, 11-12], the NMS Monitor never concluded that Ocwen had violated the NMS servicing standards.

f.   December 22, 2014: Failure to Disaggregate

According to Dr. Nye, the December 22, 2014 DFS Consent Order qualifies as a corrective disclosure because the Consent Order "revealed to the market the full extent of Ocwen's regulatory non-compliance, including the full extent of its conflicts of interest with the Erbey-related companies and its inability to manage these conflicts of interests[.]"  (Report at page 34).  Yet here too Dr. Nye has failed properly to connect any Ocwen false statement to the supposed corrective disclosure.

As noted above, the DFS Consent Order cited two types of failures by Ocwen: "Inadequate and Ineffective Information Technology Systems and Personnel," and "Widespread Conflicts of Interest with Related Parties."  (Ex. 14).  With respect to alleged conflicts of interest, the Consent Order cites issues concerning Hubzu and Mr. Ravi in addition to Mr. Erbey's supposed failure to recuse himself.  (*Id.*)  The Court, however, has dismissed claims predicated on supposed false statements concerning Hubzu and Mr. Ravi.  *See* Order on Dismissal [D.E. 70] at pages 13-15 (concluding that allegations concerning Hubzu and Mr. Ravi fail to demonstrate that any Ocwen statements were false or made with scienter); Order on Dismissal [D.E. 81] at page 2 (all rulings in the first Order not contravened by the second Order are incorporated into the second Order).  Beyond that, the Consent Order sets out at least five different forms of relief, including a $150 million fine, a prohibition against future Ocwen purchases of mortgage servicing rights, and Mr. Erbey's resignation.  (Ex. 14).  Dr. Nye did nothing to isolate the impact of the revelation of any "truth" concerning Mr. Erbey's recusal from the impact of the other noteworthy information contained in the Consent Order.  Nor did he isolate the impact of

12

any individual settlement terms imposed by DFS.  Dr. Nye also failed to trace any specific settlement terms contained in the Order to Ocwen's supposed misdeeds with respect to recusal. (Tr. 296-97:  "I haven't disaggregated.").

This failure to disaggregate legally bars Dr. Nye's opinion that the December 22, 2014 Consent Order is a corrective disclosure.  To establish loss causation, an event study must "[eliminate] other possible explanations for [the] price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of the price drop." *FindWhat,* 658 F.3d at 1311-12.  And "[a]n event study that fails to disaggregate the effects of confounding factors must be excluded because it misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged fraud on a stock's price when, in fact, the movement could very well have been caused by other information released to the market on the same date." *Bricklayers and Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston,* 853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd,* 752 F.3d 82, 95-96 (1st Cir. 2014).  Dr. Nye did not perform this required exercise.

Courts consistently bar the testimony of 10b-5 damage experts, who, like Dr. Nye, have not isolated the impact of the corrective disclosure.  For example, in *In re REMEC, Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010), the court excluded the opinion of plaintiffs' damage expert because he "fail[ed] to separate the loss caused by the disclosure of corrective information (new, negative, company-specific, revealing a prior misrepresentation or omission) from loss caused by the disclosure of other company-specific information." *See also United States v. Schiff*, 538 F. Supp. 2d 818, 837-38 (D.N.J. 2008) (expert testimony as to materiality with respect to change in stock price following events in question did not control for multiple "confounding factors" and therefore was not relevant; testimony "does not 'fit' the issues in this case"); *Bricklayers*, 853 F. Supp. 2d at 191 (excluding expert testimony when "many event days are hopelessly confounded and not readily attributable to the defendants' alleged misconduct").  The Court should likewise bar Dr. Nye's testimony on this ground.

### 2. The DFS Letter Issued on August 4, 2014 Does Not Qualify as a Corrective Disclosure: Ocwen's Stock Price Did Not Experience a Statistically Significant Decline on that Date

The one remaining purported corrective disclosure cited by Dr. Nye is an August 4, 2014 DFS letter stating that the agency had supposedly "uncovered a growing body of evidence that

13

Mr. Erbey has approved a number of transactions with the related companies, despite Ocwen's and Altisource's public claims – including in SEC filings – that he recuses himself from decisions involving related companies." (Ex. 19). DFS went on to assert that "Mr. Erbey's approval" of a transaction concerning forced placed insurance "appears to be a gross violation of this supposed recusal policy." (*Id.*) While this letter (unlike any of the other supposed corrective disclosures) is indeed connected to Ocwen's prior statements concerning recusal, as a matter of law Dr. Nye cannot establish loss causation here: upon disclosure of this letter Ocwen's stock did not experience a statistically significant decline, as required to establish loss causation.

Defendants retained Dr. Glenn Hubbard, Dean of Columbia Business School, to address loss causation issues. Dr. Hubbard analyzed the stock price decline on August 4, 2014 and opined as follows:

> To assess the inflationary impact on Ocwen's stock price from the alleged misstatement that Mr. Erbey had not recused himself from transaction negotiations between Ocwen and related parties, I evaluated Ocwen's stock price movement on August 4, 2014, when the first corrective disclosure of the alleged misstatement was made . . . . Ocwen's stock price did not experience a statistically significant decline on August 4, 2014.

(Hubbard Report (Ex. 20) ¶ 39).

Dr. Nye responded to Dr. Hubbard's analysis with two points: (i) a statistically significant decline in stock price is not required to establish loss causation (Rebuttal ¶ 34; Tr. 34-35, 126-27)), and (ii) even if statistical significance were required, that requirement has been met here. (Rebuttal ¶ 21; Tr. 155). Dr. Nye is wrong on both counts.

a.   Loss Causation Requires a Statistically Significant Decline in Stock Price

The notion that a 10b-5 plaintiff need not establish a statistically significant stock decline to sustain its burden of proving loss causation is specious, and conflicts with the dictates of *Dura*, which held that to state a 10b-5 claim a plaintiff must plead that "[the] share price fell significantly after the truth became known[.]" 544 U.S. at 346-47. The law is settled that to establish loss causation a stock price decline "must be statistically significant." *In re REMEC*, 702 F. Supp. 2d at 1266. *See also In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011) (to show loss causation, "the decline in stock price caused by the revelation of that truth must be statistically significant").

By opining otherwise, Dr. Nye has severely departed from the governing legal standards under *Dura*. On this ground alone, his opinion concerning the August 4, 2014 disclosure should be excluded.

b.    Dr. Nye's Opinion That Ocwen's Stock Price Experienced A Statistically Significant Decline Is Not Reliable

As a fallback, Dr. Nye contends that Ocwen's stock price decline on August 4, 2014 was statistically significant. (Rebuttal ¶¶ 21, 61). His conclusion is incorrect because he used a legally flawed "industry index" that does not correspond with settled standards.

Courts have required that event studies measure a defendant's stock fluctuations against fluctuations in relevant market and industry indices. That ensures that any stock price decline in question resulted from the corrective disclosures as opposed to other developments in the market. *See In re REMEC*, 702 F. Supp. 2d at 1273 (excluding expert opinion for failure to utilize proper market and industry indices). To establish loss causation, Plaintiffs must show that the company's stock price declined after taking into account market and industry price movements. *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 310352, at *7 (S.D.N.Y. Mar. 24, 2000).

Here, Drs. Hubbard and Nye used the same market index, but fundamentally disagreed concerning the appropriate industry index. (Hubbard Report ¶ 84).[5] Dr. Hubbard used an industry index consisting of five companies in the non-bank mortgage origination and services sector – the same field as Ocwen's – and found that Ocwen's stock price movement on August 4, 2014 was not statistically significant. (*Id.* at ¶ 27 & n.13). Of note, Dr. Nye himself used a similar index when he served as an expert in another 10b-5 class action brought against another mortgage servicer. *See* Nye Report in *Thorpe v. Walter Inv. Mgmt.*, No. 1:14-cv-20880-UU, D.E. 114-2 (S.D. Fla. 2015), at ¶ 79 n.116 (Ex. 21). But in this case, to arrive at the conclusion that this mortgage servicer's stock price declined by a statistically significant margin on August 4, 2014, Dr. Nye used a very different index, comprised of eighteen companies across a variety of markets and sectors, most of which have nothing to do with Ocwen's business of mortgage servicing. (Report at Ex. 2C). The index included an electronic payments provider in the former

---

[5] The experts also used different control periods to establish a predicted return. Dr. Hubbard used the twelve months preceding August 4, 2014 and Dr. Nye used the twelve months preceding February 6, 2014, each corresponding to their respective views of the date of the first corrective disclosure. (Rebuttal ¶ 19).

15

Soviet Union; an aircraft leasing company; a fuel card company; and an auto-lender.  (*Id.*; *see* Hubbard Report ¶¶ 84-88).

An industry index is not reliable if it does not properly measure the appropriate industry. *See, e.g., Carpe v. Aquila, Inc.*, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding expert testimony as unreliable; expert failed to incorporate index consisting of the "market trends of other energy trading firms").  Dr. Nye's industry index cannot be squared with this bedrock requirement for event studies.  He has, instead, picked from an overbroad set of companies, most of which have nothing to do with Ocwen's business of mortgage servicing.  Because Dr. Nye's industry index was improperly constructed, his event study is unreliable and cannot demonstrate loss causation.  *See Bricklayers*, 752 F.3d at 95 (affirming exclusion of expert testimony based on lack of "methodological underpinning" in event study).  This conclusion is particularly appropriate since the index Dr. Nye constructed for this case differs materially from the one he relied upon in the *Walter* case.

As a second fallback, Dr. Nye contends that if one uses Dr. Hubbard's industry index but Dr. Nye's control period, Dr. Nye can show a decline in stock price that is "statistically significant" as he defines that term.  But under this approach, Dr. Nye engages in a sleight of hand.  He uses a much more lenient 90 percent as the required level of statistical significance rather than the 95 percent level he used in his original report.  (Rebuttal ¶¶ 21, 41).  In a turnabout from his original report, Dr. Nye claims that "there is no requirement in economics that material information must induce a price reaction that is considered to be statistically significant at a particular level."  (*Id.* at ¶ 43).  Dr. Nye's fallback does not cure the legal errors infecting his analysis because courts have strictly required that an event study demonstrate statistical significance using the 95 percent level.

For example, in *Erica P. John Fund, Inc. v. Halliburton Co.* the court rejected a finding of price impact below the 95% confidence level, a level "which the Court finds is necessary." 309 F.R.D. 251, 270 (N.D. Tex. 2015).  The court explained that "[t]o show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard[.]"  *Id.* at 262. Similarly, in *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *15 (N.D. Cal. Dec. 22, 2016) the court rejected a finding of price impact when the expert did not find significance at the 95% level.  "Although Plaintiffs argue that price impact at a 90% confidence level is []

statistically significant, the district court in [*Halliburton*] adopted 95% confidence level as the threshold requirement and this court finds no reason to deviate here." *Id.*

Dr. Nye's position also contradicts his own prior work, both in this case and elsewhere. Dr. Nye analyzed the results in his original report here using 95 percent as the level required for statistical significance. (Report at Ex. 2A; Rebuttal ¶ 21 n.41). And he has used the 95 percent level in his expert reports in other cases. *See* Nye Declaration in *In re Heckmann Corporation Securities Litigation*, 2012 WL 11789497, Case No. 1:10-cv-00378-LPS-MPT, D.E. 186-3 (D. Del. 2012), at ¶ 49 n.63 ("Statistical significance is measured using the 95% level of significance, which is a measure frequently employed by economists.") (Ex. 22).

By arguing against the general principle of statistical significance and the generally accepted 95% standard, Dr. Nye places himself outside the legal standards governing event studies. Because Dr. Nye has utilized an unreliable methodology that is not generally accepted in the scientific community or under the controlling case law, his opinion concerning the August 4, 2014 disclosure should be barred. *See Frazier*, 387 F.3d at 1262 (expert's technique must be "generally accepted in the scientific community").

## IV.    CONCLUSION

For these reasons, the Court should exclude Dr. Nye's proposed testimony.

### REQUEST FOR HEARING

The disposition of this motion could have a substantial impact on the trial, scheduled to begin on July 24, 2017, for loss causation and damages are critical elements of Plaintiffs' 10b-5 claim. Defendants respectfully request a hearing to last no longer than one hour to address the issues raised by this Motion.

### CERTIFICATION OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 7.1(a)(3), Defendants hereby certify that they have conferred with counsel for Plaintiffs in this action and that counsel for Plaintiffs have stated that they object to the relief requested herein.

Dated:    May 22, 2017

GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone:    (954) 765-0500
Facsimile:    (954) 765-1477

*/s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH
Florida Bar No. 199850
Email: hirschj@GTLAW.com

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456

*/s/ John P. Coffey*
John P. Coffey
Jonathan M. Wagner
Jason M. Moff

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of May, 2017, I served the foregoing on all

counsel of record identified on the attached Service List **via CM/ECF.**

*s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH

**SERVICE LIST**

**IN RE OCWEN FINANCIAL CORPORATION SECURITIES LITIGATION**
**Case 14-81057 CIV-WPD**

_____

***Lead Counsel for Lead Plaintiff AP7 and the Class***
Joshua A. Katz, Esquire
James Sallah, Esquire
Jeffrey Cox, Esquire
SALLAH AST ARITA & COX, LLC
2255 Glades Road, Suite 300E
Boca Raton, Florida 33431
Telephone: 561-989-9080
Facsimile: 561-989-9020
Email: jak@sallahlaw.com
jlc@sallahlaw.com; jds@sallahlaw.com

and

David Kessler, Esquire
Lee Rudy, Esquire
Sharan Nirmul, Esquire, Esquire
Richard A. Russo, Jr. , Esquire
Michelle M. Newcomer, Esquire
Meredith L. Lambert, Esquire
Nathan Hasiuk, Esquire
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056
Email:  dkessler@ktmc.com;
lrudy@ktmc.com; snirmul@ktmc.com;
rrusso@ktmc.com; mnewcomer@ktmc.com;
mlambert@ktmc.com; nhasiuk@ktmc.com

Jennifer L. Joost (admitted *pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: 415-400-3000
Facsimile: 415-400-3001
Email: jjoost@ktmc.com

***Counsel for all Defendants***
Jeffrey Allan Hirsch, Esquire
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone: 954-765-0500
Facsimile: 954-765-1477
Email: hirschj@gtlaw.com

John P. Coffey, Esquire
Jonathan M. Wagner, Esquire
Jason M. Moff, Esquire
Jared I. Heller, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456
Email: scoffey@kramerlevin.com;
jwagner@kramerlevin.com;
jmoff@kramerlevin.com
jheller@kramerlevin.com

***Counsel for Plaintiffs United Union of Roofers Waterproofers & Allied Works Local Union No. 8***
Joseph E. White , III, Esquire
Lester Rene Hooker, Esquire
SAXENA WHITE, P.A.
Boca Center
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone:  561-394-3399
Facsimile: 561-394-3382
Email: jwhite@saxenawhite.com and
lhooker@saxenawhite.com

***Counsel for New Jersey Building Laborers***
***Pension Fund***
Emily Cornelia Komlossy, Esquire
KOMLOSSY LAW, P.A.
2131 Hollywood Boulevard
Suite 408
Hollywood, FL 33020
Telephone: 954-842-2021
Facsimile: 954-416-6223
Email:  eck@komlossylaw.com

***Attorney for Altisource***
***Portfolio Solutions SA***
Darren A. Shuler, Esquire
KING & SPALDING LLP
10712 Avenida Santa Ana
Boca Raton, FL 33498
Telephone: 404-572-2790
Facsimile: 404-572-5139
Email: dshuler@kslaw.com

Michael R. Smith, Esquire
Benjamin Lee, Esquire
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia
Telephone:  404-572-4600
Email: mrsmith@kslaw.com
and blee@kslaw.com

***Attorney for StoneTurn Group, LLP***
Tucker H. Byrd, Esquire
Scottie N. McPherson, Esqire
BYRD CAMPBELL, P.A.
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: 407-392-2285
Facsimile: 407-392-2286
Email: TByrd@ByrdCampbell.com;
SMcPherson@ByrdCampbell.com
and
John D. Buretta, Esquire (*pro hac vice pending*)
CRAVATH, SWAINE & MOORE LLP *Of Counsel*
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone: 212-474-1000
Email: jburetta@cravath.com

***Counsel for University of Puerto Rico***
***Retirement System***
Adam M. Schachter, Esquire
Jarred L. Reiling, Esquire
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131-3224
Telephone: 305-728-0950
Facsimile: 305-728-0951
Email:  aschachter@gsgpa.com
jreiling@gsgpa.com, and efilings@gsgpa.com

***Of Counsel for University of Puerto Rico***
***Retirement System***
Robert C. Finkel, Esquire
Joshua W. Ruthizer, Esquire
Fei-Lu Qian, Esquire
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: 212-759-4600
Facsimile: 212-486-2093
Email: rfinkel@wolfpopper.com;
jruthizer@wolfpopper.com; fqian@wolfpopper.com

*WDC 373508830v1*