UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

```
_____     )
                                     )
In re Ocwen Financial Corporation    )    Case 14-81057 CIV-WPD
Securities Litigation                )
_____     )
                                     )
```

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE DEFENDANTS' EXPERT MARCEL BRYAR**

**GREENBERG TRAURIG, P.A.**

Jeffrey Allan Hirsch, Esq.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida  33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477
Florida Bar No. 199850
Email: hirschj@GTLAW.com

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**
John P. Coffey, Esq.
Jonathan M. Wagner, Esq.
Jason M. Moff, Esq.
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000
Email: scoffey@kramerlevin.com

*Counsel for All Defendants*

## **Table of Contents**

**Page**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     BACKGROUND ........................................................................................................3

    A.      Mr. Bryar's Qualifications ...........................................................................3

    B.      Mr. Bryar's Opinion.....................................................................................4

    C.      Plaintiffs' Motion ........................................................................................5

III.    ARGUMENT ..............................................................................................................5

    A.      Plaintiffs' Arguments Concerning the Admissibility of the NMS Reports
          are Not a Basis to Exclude Mr. Bryar's Testimony, and in Any Event are
          Meritless.......................................................................................................5

    B.      Mr. Bryar's Exercise was Proper ...............................................................11

        1.      Mr. Bryar Analyzed the Appropriate Materials ...............................11

        2.      Mr. Bryar's Opinion Would Be Helpful to the Trier of Fact....................13

        3.      Mr. Bryar Correctly Focused on the NMS Metric Standards ...................14

    C.      Plaintiffs' Remaining Criticisms are Meritless............................................16

        1.      Mr. Bryar Does Not Offer Inadmissible Legal Opinions .........................16

        2.      Plaintiffs' Remaining Criticisms go to Weight and not
                Admissibility.................................................................................17

IV.     CONCLUSION.........................................................................................................18

Defendants Ocwen Financial Corporation, William C. Erbey and Ronald M. Faris respectfully submit this memorandum of law in opposition to Plaintiffs' motion to exclude a portion of the proposed testimony of Defendants' regulatory expert Marcel Bryar.

## I.     PRELIMINARY STATEMENT[1]

Plaintiffs assert that Ocwen's statement on December 3, 2013 that the company "services in compliance with [NMS] servicing standards as applicable" was false.  Ocwen's summary judgment motion seeks dismissal of Plaintiffs' 10b-5 claim predicated on that statement because, based on the law and undisputed facts, (i) the statement was true when made, and (ii) Plaintiffs could not establish loss causation.  As to the former point, Ocwen noted that the NMS Monitor issued a report finding that Ocwen was in compliance with the NMS on December 4, 2013—the very day after Ocwen made the statement—and the NMS Monitor in subsequent reports never found Ocwen to be out of compliance with NMS servicing standards.  [D.E. 251].

Although on that basis alone summary judgment should be granted, Ocwen has also retained Mr. Bryar, a well-regarded, highly-credentialed expert on regulatory compliance.  As a testament to his qualifications, Plaintiffs themselves had tried to retain Mr. Bryar but were rebuffed.  Plaintiffs now move to exclude Mr. Bryar's testimony with respect to two of several opinions set forth in his expert report.  First, Mr. Bryar has opined that NMS compliance does not require absolute perfection.  Based on settled regulatory principles and his long experience with mortgage servicing regulations, Mr. Bryar reached the conclusion, in light of the language of the NMS and NMS Monitor's Reports, that Ocwen was never out of compliance with NMS servicing standards.  (Report ¶ 20).  Second, Mr. Bryar has opined that Ocwen had a reasonable basis to believe that the company was in compliance with the servicing standards set by the New

---

[1] Unless otherwise noted, "Ex. __" references exhibits attached to the Declaration of John P. Coffey, submitted with this Motion. "Report" references Mr. Bryar's Report, attached to the Coffey Declaration as Exhibit 1.  "Tr. __" references the transcript of Mr. Bryar's deposition, excerpts of which are attached to the Coffey Declaration as Exhibit 2.  "Oliver Report" references the Opening Report of Plaintiffs' expert Geoffrey Oliver, attached to the Coffey Declaration as Exhibit 3.  "Oliver Rebuttal" references Mr. Oliver's Rebuttal Report, attached to the Coffey Declaration as Exhibit 4.  "Oliver Tr. __" references the transcript of Mr. Oliver's deposition, excerpts of which are attached to the Coffey Declaration as Exhibit 5.  "Mot." references Plaintiffs' Motion to exclude Mr. Bryar [D.E. 259].  The relevant factual background for this Motion and accompanying defined terms can be found in Defendants' Motion to Exclude the Proposed Testimony of Dr. Zachary Nye [D.E. 255].

York Department of Financial Services (*id.*)—even assuming those standards are relevant to this case, a point that Ocwen contests.

Although Mr. Bryar's opinion complies with Fed. R. Evid. 702, Plaintiffs move to exclude his testimony on several grounds—all meritless.

*First*, despite relying heavily on the NMS Monitor Reports in their pleading and throughout this case, Plaintiffs contend that those reports are inadmissible and, because Mr. Bryar has relied upon them, his testimony should be excluded. However, under Fed. R. Evid. 703 an expert may rely on inadmissible evidence. And in any event, the Reports are admissible. Plaintiffs' complaint as well as their regulatory expert Geoffrey Oliver—whose proposed testimony Mr. Bryar is addressing—repeatedly reference those reports. It would thus defy the Federal Rules of Evidence—and basic fairness—to bar Mr. Bryar's testimony on account of his reliance on reports that are central to Plaintiffs' case.

*Second*, Plaintiffs erroneously maintain that to reach his opinions Mr. Bryar failed to rely sufficiently on what Plaintiffs call the factual record. By this argument, Plaintiffs misunderstand the role of an expert under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). An expert is not permitted to review selected documents, make one-sided factual findings and advocate positions to the jury in a partisan manner—as Plaintiffs' expert Mr. Oliver proposes to do. Rather, expert testimony is admissible to provide to the jury learned interpretations of complex subjects on the basis of an expert's independent knowledge and experience. Courts have found that this more limited exercise—which Mr. Bryar performed—is permitted to explain regulatory regimes and processes. Conversely, courts have rejected the kind of fact-finding advocacy offered by Mr. Oliver.

*Third*, Plaintiffs mistakenly fault Mr. Bryar for undue reliance on the findings of the NMS Monitor, who, according to Plaintiffs, (i) is not the sole arbiter of NMS compliance, and (ii) did not evaluate non-metric NMS compliance. Plaintiffs are wrong on both counts. The NMS Monitor does indeed determine NMS compliance, and Ocwen's December 2013 statement at issue, when fairly read, references only NMS metrics. Beyond that, Mr. Bryar correctly explained that it is appropriate to rely on the Monitor's findings, as the Monitor was appointed by the supervising court to make such findings, considering both metric and non-metric standards.

2

*Fourth*, Mr. Bryar's opinions are not inadmissible legal conclusions, as Plaintiffs mistakenly maintain, for he does not propose to testify to ultimate issues of law.  But were the Court to find otherwise, then Mr. Oliver's proposed testimony would be subject to the same criticism and should likewise be excluded.

## II.   BACKGROUND

### A.   Mr. Bryar's Qualifications

Plaintiffs do not assert that Mr. Bryar is unqualified.  Nor could they under *Daubert*.  Mr. Bryar is a well-regarded, highly-credentialed expert in the field of mortgage regulatory compliance.  A graduate of Yale Law School, he worked at Fannie Mae from 2000 to 2012, first as a Director and then as an Officer.  Between 2012 and 2014, Mr. Bryar worked at JP Morgan Chase as a Senior Vice President for Operations.  Mr. Bryar now serves as a compliance consultant in the mortgage industry.  (Report ¶¶ 5-6, 15).

In 2005 and 2006, Mr. Bryar worked closely with a team responsible for overseeing the development and implementation of a control environment for Fannie Mae under the Sarbanes-Oxley Act of 2002.  In 2006, he was assigned responsibility for managing Fannie Mae's compliance with the company's Consent Order with its safety and soundness regulator, the Office of Federal Housing Enterprise Oversight ("OFHEO"), now called the Federal Housing Finance Agency.  Mr. Bryar oversaw Fannie Mae's implementation of the requirements of the Consent Order and reported on Fannie Mae's compliance status to OFHEO.  (*Id.* at ¶¶ 7-8).

In 2007, Mr. Bryar became the head of Fannie Mae's regulatory team, with responsibility for managing the company's relationship with both OFHEO and the United States Department of Housing and Urban Development, Fannie Mae's housing goals regulator.  Under Mr. Bryar's supervision, the team worked on regulatory examinations, commented on proposed regulations and performed regulatory reporting.  In June 2009, Mr. Bryar assumed responsibility for managing the Fannie Mae team charged with administering the Making Home Affordable ("MHA") program.  He directed all of Fannie Mae's work on behalf of the United States Department of the Treasury, including the development and drafting of program guidelines and the oversight of servicers.  Mr. Bryar also had responsibility for managing the relationship of Fannie Mae, in its capacity as the Department of the Treasury's agent for MHA, with (i) the Department of the Treasury, (ii) the Federal Housing Finance Agency, (iii) the Freddie Mac team responsible for implementing Freddie Mac's version of MHA, (iv) the National Servicing

Organization, the division of Fannie Mae responsible for implementing Fannie Mae's version of MHA, and (v) Making Home Affordable-Compliance, a division of Freddie Mac established to serve as the Department of the Treasury's compliance agent for MHA.  (*Id.* at ¶¶ 9-11).

At JP Morgan Chase, Mr. Bryar worked in the bank's Mortgage Servicing Operations Division.  His responsibilities included (i) implementing the provisions of the 2012 NMS with JP Morgan Chase governing the servicing of performing and non-performing loans, (ii) remediating MHA issues, and (iii) managing credit reporting, onboarding and loan transfer operations.  This work was subject to regulatory examination by the Consumer Financial Protection Bureau ("CFPB").  (*Id.* at ¶ 14.).

In recognition of Mr. Bryar's qualifications, Plaintiffs tried to retain Mr. Bryar as their own expert in this case, but were rebuffed.  (Tr. 19).[2]

### B.    Mr. Bryar's Opinion

Based on his review of the materials and personal experience, Mr. Bryar concluded among other things that "Ocwen was compliant with the NMS Servicing Standards during the Class Period" and "Ocwen had a reasonable basis during the Class Period for believing it was compliant with the NYDFS Servicing Standards."  (Report ¶ 20).

With respect to NMS, Mr. Bryar noted that based on settled regulatory principles, "[i]t is well established in the mortgage industry that a failure to meet a regulatory requirement in an individual instance does not translate into non-compliance" unless "[t]he failure is material" and "[t]he regulated party does not cure the failure within a reasonable amount of time."  (*Id.* at ¶¶ 23, 26).  Consistent with these regulatory principles, Mr. Bryar found that there are "very clear criteria for determining whether an NMS Servicing Standard failure is material" as established by the NMS metric standards, which contemplate some degree of imperfection and indeed provide explicit error thresholds before a failure is deemed material.  (*Id.* at ¶¶ 27-29).  Likewise consistent with the underlying regulatory principles, Mr. Bryar explained that the NMS "gives

---

[2] While Plaintiffs do not contend that Mr. Bryar is unqualified, they make several unwarranted attacks on his qualifications.  *See, e.g.* Mot. 4 ("Unlike Oliver, an experienced auditor who is qualified to opine on an entity's control framework, Bryar has no experience as an auditor or regulator . . . his only professional licensure is as an attorney"); *id.* at 15-16 (the prohibition on legal testimony by experts "is particularly true of Bryar, whose only professional licensure is as an attorney").  As set forth above, Mr. Bryar has substantial experience evaluating regulatory control frameworks as well as the NMS, the relevant subjects at issue.  That is likely why Plaintiffs themselves tried to retain him.

Ocwen a reasonable opportunity to cure a failure before the NMS Monitor will deem the company non-compliant with the standard and impose penalties." (*Id.* at ¶ 27). Ultimately, Mr. Bryar noted, the NMS Monitor "determined that Ocwen exceeded Threshold Error Rates with respect to certain metrics. But the Monitor has never found Ocwen out of compliance with the settlement. Instead, the NMS Monitor deemed each of Ocwen's failures Potential Violations and required Ocwen to cure them." (*Id.* at ¶ 35). As Mr. Bryar noted, Ocwen did so in a timely manner. (*Id.*).

With respect to the DFS, Mr. Bryar noted that Mr. Oliver "produces no evidence that, during the class period, NYDFS applied the NYDFS 2012 Consent Order compliance standard and concluded that Ocwen's issues were material or that Ocwen failed to cure them in a timely manner." (*Id.* at ¶ 41). Chiefly for that reason, Mr. Bryar opined that Ocwen would have had a reasonable basis to conclude that the Company was in compliance with DFS servicing standards (*id.* at ¶ 20)—even assuming DFS servicing standards and compliance were relevant, a point Ocwen contests, since Ocwen did not make any reference to DFS servicing standards in the December 2013 regulatory statement at issue.

### C.    Plaintiffs' Motion

Plaintiffs seek to exclude the two principal opinions of Mr. Bryar's set forth above. (Mot. 1). Plaintiffs do not challenge other opinions offered by Mr. Bryar, including that (i) "Mr. Oliver does not offer any evidence or credible opinions that contradict the foregoing opinions regarding Ocwen and compliance with the servicing standards," (ii) "Mr. Oliver's opinions regarding Ocwen's control environment are largely irrelevant to this case," and (iii) "Mr. Oliver makes numerous groundless and incorrect statements in connection with his discussion of Ocwen's business." (*Id.* at 1 n.2; Report ¶ 20). Nor do Plaintiffs challenge the methodology underlying Mr. Bryar's opinions.

As we show below, Plaintiffs' motion is meritless. At most—and unlike Defendants' motion addressed to Mr. Oliver—Plaintiffs' criticisms go to weight, not admissibility.

## III.    ARGUMENT

### A.    Plaintiffs' Arguments Concerning the Admissibility of the NMS Reports are Not a Basis to Exclude Mr. Bryar's Testimony, and in Any Event are Meritless

First and foremost, Plaintiffs contend that Mr. Bryar's "opinion that Ocwen was in compliance with the NMS" is "based solely on inadmissible evidence"—the NMS Monitor

Reports—and on that basis alone "should be excluded." (Mot. 9). This is the same red-herring argument that Plaintiffs raised in opposition to Ocwen's motion for summary judgment. The argument was meritless then, for the NMS Monitor Reports are clearly admissible—on several grounds. The argument is doubly meritless on this motion, for Plaintiffs' evidentiary objection to underlying material relied upon by Mr. Bryar is not a legal basis to exclude his testimony. Fed. R. Evid. 703 provides that "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Mr. Bryar has made clear that it is appropriate to rely on reports like those of the NMS Monitor (*see* Report ¶¶ 23-28; Tr. 283, 293-96), and the admissibility of his opinion relying on the NMS Monitor Reports thus does not turn on the admissibility of the Reports themselves.

Even putting aside that the supposed inadmissibility of the reports does not disqualify Mr. Bryar, Plaintiffs' evidentiary argument is misguided. Plaintiffs cite a provision of the NMS stating that the Reports "shall not be admissible into evidence by a Party to this Consent Judgement except in an action in the Court to enforce this Consent Judgement." (Mot. 10 (emphasis omitted)). As Defendants previously demonstrated in their reply in support of summary judgment, this provision of the NMS is found under the heading "Enforcing Authorities," and "is clearly intended to ensure that suits concerning the enforcement of the NMS are brought in specific fora mandated by the settlement—not to preclude defensive reference to the reports when a private litigant is trying to use those reports offensively against a signatory to the settlement." ([D.E. 251, at 2]; Ex. 6 at D13-14). Plaintiffs do not offer any response to this point, nor do they cite any reliable authority to support their far-fetched interpretation of this provision.[3]

Moreover, Plaintiffs once again overlook that they, not Defendants, injected the NMS Monitor Reports into this case as a key component of their pleading and as a supposedly critical corrective disclosure. (Third Amended Complaint [D.E. 41] ¶¶ 81-82, 130-38, 224, 245).

---

[3] Plaintiffs cite *United States v. Bank of America*, 78 F. Supp. 3d 520, 526 (D.D.C. 2015) (Mot. 10). That decision does not provide any specific guidance concerning the admissibility of the Monitor Reports. The case instead supports Mr. Bryar's opinion, for the court held that the NMS "does not require absolute perfection in loan servicing." *Id*. at 533.

Highlighting the centrality of the Monitor Reports under Plaintiffs' theory of the case, Plaintiffs' expert Mr. Oliver repeatedly references those Reports in his proposed testimony.  (Oliver Report ¶¶ 41-47, 52, 66, 84, 92-94; *see, e.g.*, ¶ 86 ("[t]he NMS Monitor also documented that Ocwen had difficulty identifying and extracting valid loan testing populations on REALServicing" (citing NMS Monitor Report)); Oliver Rebuttal ¶¶ 52, 55-56 ("The NMS Monitor would cite the letter dating issues as potentially impacting nine different NMS metrics. . . .").  In similar fashion, Plaintiffs' damages expert Dr. Zachary Nye relies heavily on the December 16, 2014 Monitor Report.  He cited that report as a key corrective disclosure, declaring that "[t]he December 16, 2014 Monitor Report partially revealed Ocwen's non-compliance with its regulatory requirements."  (Nye Opening Report (Ex. 7) page 26; *see also* Nye Rebuttal Report (Ex. 8) at ¶ 68).

Equity and common sense require that if one side's experts may rely on certain materials, then the other side's expert must be given the same opportunity.  *Cf. Sec. & Exch. Comm'n v. Bankatlantic Bancorp, Inc.*, 2013 WL 12009694, at *19 (S.D. Fla. Nov. 14, 2013) ("given that [one side's experts] will be permitted to testify regarding Defendants' conduct vis-a-vis SEC laws and regulations, it would be unfair to exclude [the other side's experts]") (citing *United States v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1992) ("It is an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.").  The rule of completeness, codified in Fed. R. Evid. 106, mandates the same result.  *See JTR Enterprises, LLC v. An Unknown Quantity of Colombian Emeralds, Amethysts and Quartz Crystals*, 297 F.R.D. 522, 531 (S.D. Fla. 2013) ("the doctrine of completeness requires full disclosure should the sworn statement be introduced at the upcoming hearing") (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 172 (1988) (the rule is "a reaffirmation of the obvious: that when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402")).

Plaintiffs nevertheless contend that the rule of completeness "would only apply if Plaintiffs introduced the NMS Monitor Reports at trial," and Plaintiffs "have no need" to introduce the Reports "to prove the falsity of Defendants' Regulatory Compliance Misrepresentations."  (Mot. 10-11).  If Plaintiffs no longer wish to resort to the Monitor Reports

despite their heavy reliance on this material in their pleading and expert reports, they should make that representation now.  Of course, they have not done so.  Nor could they; the NMS Monitor Reports are a core part of Plaintiffs' case and one of their supposed corrective disclosures.  And in all fairness, the jury cannot properly assess the history of Ocwen's regulatory compliance without considering the authoritative findings of the NMS Monitor, who, as established by Mr. Bryar, was tasked with examining Ocwen's NMS compliance and reached his conclusions after a thorough investigation.  Excluding the NMS Monitor Reports—as well as Mr. Bryar's opinions concerning the significance of those reports—would present a partial and skewed picture to the jury and thus interfere with the Court's truth-seeking function.  Fed. R. Evid. 106, 401-03.

Constrained by their heavy reliance on the NMS Monitor Reports in their pleading and experts' reports, Plaintiffs switch gears and assert that they will offer the December 16, 2014 NMS Monitor Report "exclusively in support of loss causation and not for the truth of its contents."  (Mot. 11 n.12).  This position could not be more disingenuous.  Plaintiffs in their Third Amended Complaint have called the December 2014 Monitor Report "a critical report which confirmed the inadequacies of Ocwen's servicing platform[.]"  ([D.E. 41] ¶ 76).  Further undermining their position, Plaintiffs declare in their pleading that the December 2014 Monitor Report "partially revealed the *truth* regarding Ocwen's false representations" concerning regulatory compliance.  (*Id.* at ¶¶ 224, 245 (emphasis added); *see also id.* at ¶¶ 130-38).  And as a legal matter, a disclosure is not "corrective" unless the disclosure reveals to the market the pertinent truth.  *See FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1311 (11th Cir. 2011) (a corrective disclosure is "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud").  In light of these allegations in Plaintiffs' pleading, it is far too late for Plaintiffs to walk away from their admission that in their view the NMS Monitor Reports contain the truth.  *See Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir. 1986) (noting "the general rule that a party is bound by the admissions in his pleadings"); *Students for Life USA v. Waldorp*, 90 F. Supp. 3d 1265, 1272 n.4 (S.D. Ala. 2015) ("statements in the pleadings may constitute judicial admissions").[4]

---

[4] Plaintiffs do not offer legal support for their position that they can rely on the December 2014 Monitor Report as a supposed corrective disclosure without admitting the Report for its truth, beyond one case that they describe as "admitting hearsay evidence of corrective disclosure."

On top of Plaintiffs' (i) failure to recognize the import of Fed. R. Evid. 703, (ii) mistaken interpretation of the provisions of the NMS, and (iii) substantial reliance on the NMS Monitor Reports they apparently now seek to exclude, Plaintiffs compound their errors by asserting that the Reports are inadmissible hearsay. (Mot. 11-12). Not so. Under Rule 803(8), "[a] record or statement of a public office" is admissible if it sets out "factual findings from a legally authorized investigation; and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." In light of the nature of the NMS Monitor and his reports, Rule 803(8) squarely applies. The NMS Monitor was appointed pursuant to a court-approved settlement among the CFPB, forty-nine state attorneys general, and several mortgage servicers. (Ex. 9). The NMS Enforcement Terms mandated that a Monitoring Committee comprised of "representatives of the state Attorneys General, State Mortgage Regulators, and the [CFPB] shall monitor Servicer's compliance" with the NMS. (Ex. 6 at D-1). Further, the NMS provided that "[p]rior to issuing any Monitor Report, the Monitor shall confer with Servicer and the Monitoring Committee regarding its preliminary findings and the reasons for those findings," and "[f]inal versions of each Monitor Report shall be provided simultaneously to the Monitoring Committee and Servicers within a reasonable time after conferring regarding the Monitor's findings." (*Id.* at D-9). Notably, the NMS also provided that subject to certain provisions (which Defendants believe impose no constraint), Monitor Reports "may be used in any court hearing, trial, or other proceeding brought pursuant to the Consent Judgment . . . and shall be admissible in evidence in a proceeding brought under the Consent Judgment[.]" (*Id.* at D-10).

Case law supports the admissibility of reports issued by monitors like the NMS Monitor to whom a "public office" has delegated authority. For example, in *Steward v. Janek*, 315 F.R.D. 472, 477-79 (W.D. Tex. 2016), the court held that reports authored by a state-appointed expert reviewer pursuant to the state's settlement with plaintiffs were admissible under Fed. R. Evid. 803(8). "The reports were prepared based on [the expert reviewer's] firsthand

_____

(Mot. 11 n.12). The reference, *In re L&L Energy Sec. Litig.*, 908 F. Supp. 2d 1147, 1152 & n.4 (W.D. Wash. 2012), concerned an alleged corrective disclosure cited by plaintiffs for the first time at oral argument and which the court considered for the limited purpose of determining whether in fact the disclosure qualified as corrective. The case does not support the general proposition that corrective disclosures can be asserted for loss causation purposes without considering these disclosures for their truth.

observations, in the course of a duty to report created by the parties' [settlement agreement] and the state's appointment of [the expert reviewer], and the circumstances surrounding the report indicate [the expert reviewer's] qualifications and independence in general and the trustworthiness of these reports in particular." *Id.* at 478. And in *Upky v. Lindsey*, 2015 WL 1918229, at *21-22 (D.N.M. Apr. 7, 2015), the court held that reports authored by a state-appointed panel of doctors and lawyers were admissible under Fed. R. Evid. 803(8), because "New Mexico . . . creates the medical panels; they act under the State's direction; and they make decisions and reports as the State mandates. Accordingly, medical panels are quasi-public entities that can create public records for rule 803(8) purposes."

By contrast, the authority upon which Plaintiffs rely to challenge admissibility of the NMS Monitor Reports has no application here. The DFS Monitor reports addressed in *United States ex rel. Fisher v. Ocwen*, 2016 WL 2997120 (E.D. Tex. May 24, 2016) (Mot. 11-12) were non-public, and the monitor in question was appointed pursuant to an out-of-court consent order entered into by the NYDFS and one party, Ocwen. In contrast, the NMS Monitor Reports were publicly filed with the United States District Court for the District of Columbia, the judicial authority responsible for administering the NMS entered in that Court. The NMS Monitor issued the Reports pursuant to a public multi-party settlement with virtually every state in the country, and the reports were subject to review and oversight by a committee of many public officials from dozens of states and were intended to be admissible in court. And unlike the DFS Monitor, a monitor for Ocwen only, the NMS Monitor served as a monitor for all the servicers subject to the NMS.[5]

Even were the Court to find somehow that the NMS Monitor Reports do not fall within the ambit of Fed. R. Evid. 803(8), they would nonetheless be admissible under the residual exception of Fed. R. Evid. 807, which applies when "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these

---

[5] Plaintiffs also cite *Colorificio Italiano Max Meyer, S.P.A. v. S/S Hellenic Wave*, 419 F.2d 223 (5th Cir. 1969), for the proposition that official reports authored by individuals not present at trial should be excluded. This decision appears to address the business records exception to the hearsay rule, which is not the exception applicable to the NMS Monitor Reports.

rules and the interests of justice."  The Monitor Reports meet each of those requirements.  The NMS Monitor Reports bear strong indicia of trustworthiness if only because their author—the NMS Monitor—was, under the terms of the NMS, (i) "highly competent and highly respected, with a reputation that will garner public confidence in his or her ability to perform the tasks required under this Consent Judgment," (Ex. 6 at D-1), (ii) subject to oversight by a committee of public officials, and (iii) responsible for monitoring all the mortgage servicers that were parties to the NMS.   Defendants would offer the Reports to show the truth of Ocwen's statements concerning compliance, and the Reports are dispositive of this issue as the Monitor was tasked with assessing NMS compliance.  Admitting the NMS Monitor Reports best serves the purposes of the Federal Rules of Evidence and the interests of justice.

As a final argument, Plaintiffs contend that they would suffer prejudice if the reports were admitted.  (Mot. 12).  Only in a topsy-turvy world could Plaintiffs suffer prejudice from the admission of documents which, if their pleading and expert reports are to be believed, are central to their case.

In sum, when all the dust settles, Plaintiffs' attacks on the admissibility of the NMS Monitor Reports, however misguided, pose no obstacle to the admissibility of Mr. Bryar's opinion.

### B.   Mr. Bryar's Exercise was Proper

#### 1.   Mr. Bryar Analyzed the Appropriate Materials

Plaintiffs next assert that Mr. Bryar's opinion concerning Ocwen's NMS and DFS compliance "is not based on the factual record" and therefore "should be excluded as unreliable and unhelpful to the jury."  (*Id.* at 13, 18).   This argument is bottomed on a fundamental misunderstanding of the permissible scope of expert opinion under *Daubert*.

Messrs. Oliver and Bryar approached their assignments in profoundly different ways.  Mr. Oliver reviewed a portion of the record evidence—for the most part, documents that Plaintiffs' lawyers chose to mark at depositions they took—and after supposedly weighing that evidence, constructed a factual narrative characterized by a decidedly anti-Ocwen spin.   Mr. Oliver did not even make a pretense of fairness.   Rather, Mr. Oliver admitted that he "buil[t] a case for non-compliance by Ocwen" and understood that his engagement "was not to find where [Ocwen] did comply" but rather "to find where [Ocwen] didn't comply."   (*See* Motion to Exclude Mr. Oliver [D.E. 256] at 1, 7-10).

In sharp contrast, Mr. Bryar took a far more limited, balanced and legally correct approach, using his knowledge and regulatory experience to provide insight to assist the fact-finder in evaluating the subject of mortgage servicing compliance.  Mr. Bryar undertook a dispassionate analysis of the structure of the NMS against settled regulatory principles and the definition of compliance under those principles and the NMS.

Mr. Bryar principally focused on the conclusions of the NMS Monitor, who is empowered to monitor Ocwen's NMS compliance.  (Report ¶¶ 21, 30).  Mr. Bryar concluded that any document beyond the Monitor Reports would not be relevant, because those materials would ultimately all link "back to information that the monitor received one way or another and the monitor, based on that information and a very detailed review of that information, concluded that Ocwen was in compliance with the settlement."  (Tr. 296).  And notwithstanding the materials cited by Plaintiffs, "nowhere does the monitor say, and 'because of this issue, I'm going to find Ocwen out of compliance with the [NMS] and the servicing standards.'"  (*Id.* at 283).  Mr. Bryar reached the same conclusions with respect to the issue of DFS compliance.  (*Id.* at 137-38; Report ¶¶ 38-41).

Plaintiffs fault Mr. Bryar for not undertaking the same approach as Mr. Oliver's.  Plaintiffs contend that Mr. Bryar failed to analyze sufficiently "the extensive record evidence demonstrating the actual state of Ocwen's NMS compliance during the Class Period," including the material  cited in Mr. Oliver's Rebuttal Report.  (Mot. 14-15; *see id.* at 18-19 (making similar claims with respect to DFS compliance)).  Ironically, Plaintiffs criticize Mr. Bryar because his opinion supposedly "affords jurors no more insight than they would gain from their own experience and own review of the evidence."  (*Id.* at 13).  That aptly describes Mr. Oliver's approach, not Mr. Bryar's.

It is Mr. Oliver who erred by making extensive factual findings based on his concededly partisan review of a skewed record.   But the role of an expert in assisting a trier of fact is limited to providing "information and explanations; the expert's role is not to be an advocate."  *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003) (excluding expert testimony), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004).  *See In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1345-46 (S.D. Fla. 2010), (excluding proposed expert testimony consisting of "regurgitat[ing]" a "factual narrative of [a drug's] regulatory history and summaries of [Defendant's] internal documents"; "these facts should be presented to the jury directly").  Mr. Oliver runs afoul of this principle by

"regurgitat[ing]" Plaintiffs' selective evidence and usurping the role of trier of fact.   It is Mr. Bryar who, unlike Mr. Oliver, undertook the disinterested exercise of applying his knowledge and experience concerning regulatory principles in the mortgage servicing industry to assist the fact-finder in assessing Ocwen's regulatory compliance.

## 2. Mr. Bryar's Opinion Would Be Helpful to the Trier of Fact

Plaintiffs fare no better in asserting that Mr. Oliver's testimony would be "unhelpful to the jury." (Mot. 13). While Mr. Bryar's opinions may be unhelpful to Plaintiffs' case, they would significantly aid the jury's understanding of the regulatory matters at issue.

Mr. Bryar employed a standard methodology in assessing compliance, describing the multistep process which must occur before a determination can be made that a servicer is out of compliance with a regulatory requirement. (Tr. 137-38). Mr. Bryar observed that based on his regulatory experience and review of the relevant regulatory materials, including the NMS itself, "[i]t is well established in the mortgage industry that a failure to meet a regulatory requirement in an individual instance does not translate into non-compliance[.]" (Report ¶ 23). Instead, a failure to meet a regulatory requirement does not qualify as non-compliance unless (i) the failure is material and (ii) the regulated entity does not cure the failure within a reasonable amount of time. (*Id.*).[6]

Plaintiffs' criticisms of Mr. Bryar's approach are unfounded. According to Plaintiffs, Mr. Bryar's opinion "amounts to nothing more than a parroting of the findings of the NMS Monitor, devoid of any independent analysis." (Mot. 14). Plaintiffs contend that "such conclusions cannot assist the trier of fact, as they only serve to supplant the jury's independent

---

[6] Plaintiffs contend that "[i]n support of this contention, Mr. Bryar cites a single CFPB Bulletin that addresses factors considered by the CFPB in exercising its enforcement discretion." (Mot. 5; Report ¶ 23 n.5; CFPB Bulletin 2013-06 (Ex. 10)). This "single" CFPB bulletin is highly probative of how consumer finance regulators consider compliance. The CFPB is widely considered the most important voice in consumer finance regulation. *See* Alexander M. Wolf, Note, *Taking Back What's Theirs: The Recess Appointments Clause, Pro Forma Sessions, and a Political Tug-of-War*, 81 FORDHAM L. REV. 2055, 2060 (2013) ("most consumer financial protection at the federal level is the CFPB's responsibility."). Moreover, a fair reading of Mr. Bryar's report demonstrates that he has accurately represented the structure of NMS, the 2011 DFS agreement and the 2012 DFS consent order.

Separately, Plaintiffs' reference an unrelated 2017 CFPB action involving Ocwen which is not alleged to be a corrective disclosure in this case, and which has no relevance here. (Mot. 5 n.6).

analysis of the evidence," and purportedly resemble "the substance of a closing argument[.]" (*Id.* at 14-15; *see also id.* at 13 (Mr. Bryar's opinion "affords jurors no more insight than they would gain from their own experience and their own review of the evidence.").  Coming from Plaintiffs, this criticism rings hollow.  As demonstrated above and in Defendants' *Daubert* motion, it is Mr. Oliver, not Mr. Bryar, who would displace the role of the trier of fact by parroting the language of selective Ocwen documents and making numerous factual determinations—in a partisan manner and based on a one-sided record.  And if Mr. Bryar's testimony is excluded on this basis, then surely Mr. Oliver's should be excluded as well.

Courts permit expert testimony like Mr. Bryar's concerning the standards for compliance with a regulatory regime.  *See, e.g.*, *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 191 (S.D.N.Y. 2009) (permitting expert testimony concerning "general FDA regulatory requirements and procedures or offering an opinion as to [defendant's] compliance therewith. . . .").  Courts have also recognized that the mortgage industry can be complex.  *See Corelogic Info. Solutions, Inc. v. FiServ, Inc.*, 2012 WL 12904000, at *1 (E.D. Tex. Sept. 20, 2012) (expert retained "to provide an opinion on fraud in the mortgage industry" is "likely to help the jury understand the nature of the marketplace, and the role of automated valuation models in the mortgage banking system"); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, 2009 WL 2132635, at *1 (S.D. Ohio July 7, 2009) ("[a]lthough many of the jurors may be expected to be home owners who probably have personal experience with residential mortgages," expert testimony would be helpful, for "experience with a securitization of commercial mortgages is unlikely to be within the ordinary experience of the jury").

Because, unlike the partisan fact-finder Mr. Oliver, Mr. Bryar may assist the trier of fact in explaining the relevant regulatory regime and regulatory principles and their application here, Mr. Bryar's testimony should be admitted and Mr. Oliver's should be excluded.

### 3.     Mr. Bryar Correctly Focused on the NMS Metric Standards

Plaintiffs next contend that because Mr. Bryar's opinion focused on the NMS Monitor Reports and the results of Ocwen's metric testing, Mr. Bryar's testimony should be excluded; according to Plaintiffs, the NMS Monitor "is not the sole arbiter of NMS Compliance," and his reports supposedly "did not assess Ocwen's compliance with the non-metric Servicing Standards."  (*Id.* at 14 (emphasis omitted)).  Plaintiffs err in all respects.

The NMS Monitor is indeed arbiter of NMS compliance and, further, the NMS Monitor does assess compliance with non-metric standards. The NMS provides that "[i]t shall be the responsibility of the Monitor to determine whether Servicer is in compliance with the Servicing Standards." (Ex. 6 at D3). The NMS also authorizes the Monitor to determine servicer compliance with all "Servicing Standards," which as set forth in A1 *et seq.* of the NMS include the non-metric standards. *See id.*[7] Plaintiffs' citation to *Bank of America*, 78 F. Supp. 3d at 528-32 (Mot. 14) does not help them on this motion, for that decision addresses who may enforce violations of non-metric standards, not who determines compliance. *Bank of America* clarifies that the purpose of the metric standards is to serve as a tool to assess and evaluate all standards, and that these judgments are made by the Monitor. *Id.* ("[t]he Consent Judgment sets forth 304 Servicing Standards . . . and the Monitor is responsible for implementing and performing 'Metric' testing to determine compliance with such Standards"). And in any event, Mr. Bryar's opinion is not limited to the metric servicing standards. (Tr. 244-45: "I concluded that Ocwen was compliant with all of the standards.").

---

[7] Plaintiffs' position is likewise at odds with the NMS Monitor's description of his own role. *See* Ex. 9 ("The NMS created the role of a Monitor to oversee the servicers and ensure their compliance with the consent judgments. The participating banks must file regular reports with the Monitor to detail their compliance. Based on these reports as well as his independent oversight, the Monitor makes his own determinations on servicer performance and then issues his own reports to the courts and the participants on a semi-annual basis."). Nothing in this language distinguishes between metric and non-metric standards.

In addition, Plaintiffs' position on this motion directly contradicts their position that the December 16, 2014 NMS Monitor Report is a corrective disclosure that revealed Ocwen's non-compliance. That position is rooted in the premise that the NMS Monitor is in fact responsible for NMS oversight. (*See* [D.E. 41] ¶ 76 ("on December 16, 2014, the NMS Monitor *responsible for overseeing Ocwen's compliance with the NMS Servicing Standards* issued a critical report") (emphasis added); Ex. 7 (Nye Opening Report) at page 25 ("[o]n December 16, 2014, the NMS Monitor *responsible for overseeing Ocwen's compliance with NMS Servicing Standards* issued an Interim Report") (emphasis added)). Plaintiffs cannot retract these admissions now. *Students for Life*, 90 F. Supp. 3d at 1272 n.4.

Plaintiffs also misunderstand the scope of this case, and take the Ocwen representation at issue out of context. The December 3, 2013 Ocwen statement, contained in a PowerPoint slide, represented that the company "services in compliance with [NMS] servicing standards as applicable." (Ex. 11 at 8; *see* [D.E. 251], at 4). The slide also contains another truthful statement: "Ocwen has passed each metric in the publicly available [NMS Monitor] reports." That statement makes clear that in the slide Ocwen was specifically referencing compliance with NMS metric standards. (*Id.*).

### C.    Plaintiffs' Remaining Criticisms are Meritless

#### 1.    Mr. Bryar Does Not Offer Inadmissible Legal Opinions

Plaintiffs contend that Mr. Bryar proposes to offer inadmissible legal testimony with respect to NMS and DFS compliance.  As Plaintiffs put it, Mr. Bryar has made "erroneous . . . assertions regarding the proper standard for assessing Ocwen's compliance [that] will confuse the jury and undermine the Court's ability to properly instruct the jury regarding the applicable law." (Mot. 15-18).  Plaintiffs do not explain why this argument would not also apply to Mr. Oliver, who has opined—based on what he considers, albeit erroneously, the governing compliance standards—that Ocwen was not in regulatory compliance.  (Oliver Report ¶ 65 ("Ocwen was not in compliance with many aspects of the requirements of the NMS and [DFS]"); Oliver Rebuttal ¶ 82 ("Ocwen had [a] history of non-compliance with mortgage servicing standards"); Oliver Tr. 46 (offering testimony as to whether Ocwen was "compliant under the law" and asserting that he is competent to opine as to whether a "mortgage servicer, is complying with . . . legal rules and regulations"); *see also id.* at 94 ("[i]f legal conclusions include whether [Ocwen is] compliant under the law, I guess you can say that is a legal conclusion.")).

Mr. Bryar's proposed testimony does not constitute inadmissible legal conclusions. Plaintiffs do not make clear exactly what in their view qualifies as improper legal opinion. Instead, they note that "many 'courts have excluded expert testimony that employs terminology with legal import,' . . . (collecting cases)[.]"  (Mot. 17 (citing *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1325 (M.D. Fla. 2015)).  Plaintiffs omit the full quoted sentence: "courts have excluded expert testimony that employs terminology with legal import, *such as negligence*" (emphasis added), and the referenced string cite concerns cases determining that "negligence" comprises a legal conclusion.  *C.R. Bard*, 96 F. Supp. at 1325-26 (excluding expert opinions that defendants "acted negligently or recklessly . . . . [t]hese terms carry special meaning under the law and are contingent upon application of the appropriate standard of care)."  Conversely, Mr. Bryar's opinion explaining the relevant compliance framework does not constitute a legal finding concerning the appropriate standard of care.  Notably, courts have held that expert opinions interpreting regulatory requirements do not constitute impermissible legal testimony. *See Bankatlantic*, 2013 WL 12009694, at *14 ("The SEC seeks to exclude [the expert's] opinions . . . as improper legal conclusions on the grounds that they embrace an ultimate legal

16

issue and would tell the jury how to decide the case . . . . However, expert testimony as to the interpretation of the SEC's requirements relating to . . . public disclosures and the application of those requirements to the facts of a case, does not, without more, constitute improper legal conclusions"); *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *3 (S.D. Cal. Nov. 17, 2011) (same).  The same result is warranted here.

While the Court would err in excluding Mr. Bryar's testimony as legal opinion, were the Court to do so then Mr. Oliver's testimony would also have to be excluded, for there is no basis to distinguish between the two opinions in this respect.  *See Lankford*, 955 F.2d at 1552 (courts may not "exclude the otherwise admissible opinion of a party's expert . . . while allowing the opinion of his adversary's expert on the same issue.").

### 2. Plaintiffs' Remaining Criticisms go to Weight and not Admissibility

Plaintiffs raise a score of additional criticisms of Mr. Bryar.  However, Plaintiffs do not challenge his underlying methodology or contest that his proposed testimony has a reliable basis in the knowledge and experience of his discipline.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).  Rather, Plaintiffs' criticisms consist of disagreements with the specific conclusions that Mr. Bryar has reached.  These criticisms go to weight, not admissibility, and Plaintiffs' appropriate remedy is "[v]igorous cross-examination [and] presentation of contrary evidence[.]"  *Daubert*, 509 U.S. at 596.  For example:

- Plaintiffs contend that Mr. Bryar's "opinion regarding the proper construction of the 2012 NYDFS Consent Order does not withstand even a cursory analysis" because he "contends that two provisions of the 2012 NYDFS Consent Orders" appearing under the heading "Breach of the Consent Order . . . in actuality apply to NYDFS Servicing Standard failures." (Mot. 18 (emphasis omitted)).  Plaintiffs misunderstand Mr. Bryar's point, which is that under the 2012 DFS Consent Order, "fails" must be material and Ocwen must be afforded an opportunity to cure, as indicated by the text of the 2012 DFS Consent Order.  (Report ¶ 32: "[i]n the event that the Department believes Ocwen to be materially in breach of the Consent Order . . . Ocwen must . . . appear before the Department to demonstrate that no Breach has occurred or, to the extent pertinent, that the Breach is not material or has been cured" (quoting 2012 DFS Consent Order (Ex. 12)).

- Plaintiffs maintain that Mr. Bryar "provides only a superficial analysis of the NYDFS Monitor's findings," and assert that "each of the Class Period NYDFS Monitor Reports

put Defendants on notice that Ocwen was not compliant with the NYDFS Servicing Standards." (Mot. 19-20 (referencing the first four NYDFS Monitor Reports)).   However, as Mr. Bryar explained, Mr. Oliver's conclusions are unsound because Mr. Oliver made selective use of the DFS reports, omitting later reports commenting favorably on Ocwen's compliance efforts.  (*See, e.g.*, Report at ¶ 41 & n.26 ("the NYDFS Monitor noted on various occasions that Ocwen was making significant strides to remediate failures")).

- Plaintiffs maintain that Mr. Bryar's "opinion that Ocwen's NMS compliance was exclusively determined by the NMS Monitor is inconsistent with his experience implementing the NMS at JP Morgan Chase."  (Mot. 7).  There is no inconsistency.  As he explained in his deposition testimony, Mr. Bryar was responsible at JP Morgan Chase for ensuring that JP Morgan Chase performed the work necessary to allow the NMS to conclude that JP Morgan Chase was compliant with the NMS.  In both situations Mr. Bryar considered both metric and non-metric standards as part of the compliance process and identified the metric standards as evaluated by the NMS Monitor as the key compliance measurement.  (Tr. 77-80).

- Plaintiffs assert that Mr. Bryar's "interpretation of the NMS Monitor Reports should . . . be excluded as misleading given that it is inconsistent with the very NMS Monitor Reports upon which it is supposedly premised."  (Mot. 16).  However, as demonstrated above "inconsistent" describes Plaintiffs'—not Mr. Bryar's—approach to those reports.

Against this backdrop, there is no basis to exclude any portion of Mr. Bryar's testimony.

## IV.    CONCLUSION

For these reasons, Plaintiffs' motion should be denied.

### REQUEST FOR HEARING

The disposition of this Motion could have a substantial impact on the trial, as the regulatory matters addressed here are likely to figure significantly at any trial, scheduled to begin on July 24, 2017.  Defendants respectfully request the opportunity to address this motion at the hearing scheduled for June 19, 2017.

Dated: June 5, 2017.

GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477


*/s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH
Florida Bar No. 199850
Email: hirschj@GTLAW.com

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP |
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8456

*/s/ John P. Coffey*
John P. Coffey
Jonathan M. Wagner
Jason M. Moff

*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of June, 2017, I served the foregoing on all

counsel of record identified on the attached Service List **via CM/ECF.**

*s/ Jeffrey Allan Hirsch*
JEFFREY ALLAN HIRSCH

19

<u>**SERVICE LIST**</u>

**IN RE OCWEN FINANCIAL CORPORATION SECURITIES LITIGATION**
**Case 14-81057 CIV-WPD**

<u>*Lead Counsel for Lead Plaintiff AP7 and the Class*</u>
Joshua A. Katz, Esquire
James Sallah, Esquire
Jeffrey Cox, Esquire
SALLAH AST ARITA & COX, LLC
2255 Glades Road, Suite 300E
Boca Raton, Florida 33431
Telephone: 561-989-9080
Facsimile: 561-989-9020
Email: jak@sallahlaw.com
jlc@sallahlaw.com; jds@sallahlaw.com

and

David Kessler, Esquire
Lee Rudy, Esquire
Sharan Nirmul, Esquire, Esquire
Richard A. Russo, Jr. , Esquire
Michelle M. Newcomer, Esquire
Meredith L. Lambert, Esquire
Nathan Hasiuk, Esquire
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
Facsimile: 610-667-7056
Email:  dkessler@ktmc.com;
lrudy@ktmc.com; snirmul@ktmc.com;
rrusso@ktmc.com; mnewcomer@ktmc.com;
mlambert@ktmc.com; nhasiuk@ktmc.com

Jennifer L. Joost (admitted *pro hac vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: 415-400-3000
Facsimile: 415-400-3001
Email: jjoost@ktmc.com

<u>*Counsel for all Defendants*</u>
Jeffrey Allan Hirsch, Esquire
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: 954-765-0500
Facsimile: 954-765-1477
Email: hirschj@gtlaw.com

John P. Coffey, Esquire
Jonathan M. Wagner, Esquire
Jason M. Moff, Esquire
Jared I. Heller, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: 212-715-9100
Facsimile: 212-715-8456
Email: scoffey@kramerlevin.com;
jwagner@kramerlevin.com;
jmoff@kramerlevin.com
jheller@kramerlevin.com

<u>*Counsel for Plaintiffs United Union of Roofers Waterproofers & Allied Works Local Union No. 8*</u>
Joseph E. White , III, Esquire
Lester Rene Hooker, Esquire
SAXENA WHITE, P.A.
Boca Center
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone:  561-394-3399
Facsimile: 561-394-3382
Email: jwhite@saxenawhite.com and
lhooker@saxenawhite.com

***Counsel for New Jersey Building Laborers Pension Fund***
Emily Cornelia Komlossy, Esquire
KOMLOSSY LAW, P.A.
2131 Hollywood Boulevard
Suite 408
Hollywood, FL 33020
Telephone: 954-842-2021
Facsimile: 954-416-6223
Email:  eck@komlossylaw.com

***Attorney for Altisource***
***Portfolio Solutions SA***
Darren A. Shuler, Esquire
KING & SPALDING LLP
10712 Avenida Santa Ana
Boca Raton, FL 33498
Telephone: 404-572-2790
Facsimile: 404-572-5139
Email: dshuler@kslaw.com

Michael R. Smith, Esquire
Benjamin Lee, Esquire
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia
Telephone:  404-572-4600
Email: mrsmith@kslaw.com
and blee@kslaw.com

***Attorney for StoneTurn Group, LLP***
Tucker H. Byrd, Esquire
Scottie N. McPherson, Esqire
BYRD CAMPBELL, P.A.
180 Park Avenue North, Suite 2A
Winter Park, Florida 32789
Telephone: 407-392-2285
Facsimile: 407-392-2286
Email: TByrd@ByrdCampbell.com;
SMcPherson@ByrdCampbell.com
and
John D. Buretta, Esquire (*pro hac vice pending*)
CRAVATH, SWAINE & MOORE LLP *Of Counsel*
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone: 212-474-1000
Email: jburetta@cravath.com

***Counsel for University of Puerto Rico***
***Retirement System***
Adam M. Schachter, Esquire
Jarred L. Reiling, Esquire
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131-3224
Telephone: 305-728-0950
Facsimile: 305-728-0951
Email:  aschachter@gsgpa.com
jreiling@gsgpa.com, and efilings@gsgpa.com

***Of Counsel for University of Puerto Rico***
***Retirement System***
Robert C. Finkel, Esquire
Joshua W. Ruthizer, Esquire
Fei-Lu Qian, Esquire
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Telephone: 212-759-4600
Facsimile: 212-486-2093
Email: rfinkel@wolfpopper.com;
jruthizer@wolfpopper.com; fqian@wolfpopper.com